**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| _____ | ) | |
| THE CENTER FOR INVESTIGATIVE | ) | |
| REPORTING & AARON GLANTZ, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No.  CV 19-8181 JCS |
| | ) | |
| U.S. DEPARTMENT OF THE | ) | |
| TREASURY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**<u>DECLARATION OF MICHAEL G. MOSIER</u>**

I, Michael G. Mosier, declare the following to be a true and correct statement of facts:

1.  I am the Deputy Director of the Financial Crimes Enforcement Network (FinCEN), a bureau within the United States Department of the Treasury (Treasury).  I have held my current position since February 2020.

2.  I previously served as FinCEN's Chief of Strategic Advancement and, immediately prior to that position, I served as an Associate Director at Treasury's Office of Foreign Assets Control.  Prior to joining Treasury, I served as Deputy Chief in the Department of Justice's Money Laundering & Asset Recovery Section.  I also served at the White House National Security Council as Director for Transnational Organized Crime.

3.  I make this declaration upon my official knowledge acquired from FinCEN staff through the performance of my official duties and upon conclusions reached and determinations made in accordance therewith.

4.  In my capacity as Deputy Director of FinCEN, I supervise FinCEN operations, including oversight and review of all Freedom of Information Act (FOIA) requests.  I am familiar with the procedures followed by FinCEN in responding to Plaintiffs' request for information pursuant to the FOIA, 5 U.S.C. § 552.

5.  In accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), this declaration along with the accompanying *Vaughn* index (a true and correct copy is attached hereto as exhibit 1 (*Vaughn* index)), previously served on Plaintiffs on August 13, 2020,[1] and other exhibits are submitted in support of Defendant's motion for summary judgment.  The *Vaughn* index, specifically, is provided to assist the Court and Plaintiffs by explaining FinCEN's processing of Plaintiffs' request for records and FinCEN's justification for withholding records in full or in part under FOIA Exemptions 3, 5, 6, 7(A), 7(C), and 7(E).  *See* 5 U.S.C. §§ 552(b)(3), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), and (b)(7)(E).  Plaintiffs have not challenged either the form or the content of the *Vaughn* index pursuant to the parties' Joint Stipulation for Summary Judgment Briefing Plan and Order (JS), filed on July 24, 2020, which required that any such challenge be submitted by August

---

[1] Defendant hereby notes that the *Vaughn* index contains two calculation errors, specifically, the entries for Documents 7 and 8 should have reflected a total of 50 pages instead of 40 pages, and the entries for Documents 9, 10, and 11 should have reflected a total of 60 pages instead of 58 pages.

20, 2020.  *See* JS (Dkt. No. 28) at 2, footnote 2.  As such, I understand that the form and

content of Defendant's *Vaughn* index is uncontested at this time.  In response to

Plaintiffs' request, FinCEN processed a total of approximately 42,926 responsive pages

drawn from 61 records.[2]  Of these 42,926 pages, 11 pages were released in redacted form

(true and correct copies are attached hereto as exhibit 2 (11 released pages)), and the

remaining 42,915 pages were withheld in full.

## BACKGROUND

### Plaintiffs' Request and Related Correspondence

6.  On July 17, 2019, Plaintiffs submitted a FOIA request seeking the beneficial ownership

information of certain real estate transactions that were the subject of Geographic

Targeting Orders.  In particular, Plaintiffs sought the following:

"[A]ny and all records -- including, data, documents, and correspondence that include

information about the real human owners (in some cases known as beneficial owners)

of all-cash real residential real estate transactions nationally from 2016 to the present,

including but not limited to:

---

[2] FinCEN initially identified approximately 156,676 pages as being responsive to Plaintiffs'
request.  Of that total, approximately 113,750 pages represented Geographic Targeting Order
Reports (GTO Reports), which are in an electronic format.  On June 25, 2020, Plaintiffs
stipulated that GTO Reports are exempt from disclosure under 5 U.S.C. § 552 and 31 U.S.C. §
5319.  *See* Dkt. No. 23.  Plaintiffs agreed that neither the declaration nor the *Vaughn* index
needed to address the GTO Reports or the sufficiency of the search for such records.  *See* Dkt.
Nos. 23 and 28.  Page numbers are approximate because, as discussed in more detail *infra*, the
most voluminous document is a large spreadsheet (Document 1, which totals approximately
41,000 pages) that is electronic and in a format that makes it difficult to paginate.

- Addresses of all residential real estate purchased with the cash, which FINCEN is aware of;

- The amount of money transferred;

- The name of the true, human owners of each residential real estate purchased with cash, including but not limited to those purchased by LLC, LLP, and LP shell companies;

- The name of the individual responsible for representing the purchaser of the property;

- The address of the human owners, the address of the individual responsible for representing the purchaser; and

- Any and all additional information FINCEN possesses about these purchases, which is publicly disclosable." A true and correct copy is attached hereto as exhibit 3 (Plaintiffs' FOIA request).

7. The request also asks for "Any FINCEN reports, published or unpublished, which show the most frequent or largest purchasers of residential real estate through LLC, LPP, or LP shell companies." *See id.*

8. On July 29, 2019, FinCEN sent a letter to Plaintiffs in which FinCEN neither confirmed nor denied that FinCEN had responsive records pursuant to 5 U.S.C. § 552(b)(3). A true and correct copy is attached hereto as exhibit 4 (July 29, 2019 FinCEN letter to Plaintiff).

9. On August 7, 2019, FinCEN's FOIA office received an appeal from Plaintiffs' General Counsel dated August 1, 2019. The appeal stated that FinCEN's FOIA officer improperly refused to confirm or deny the existence of records and failed to detail the records being

4

withheld.  A true and correct copy is attached hereto as exhibit 5 (August 1, 2019 Plaintiff letter to FinCEN).  The letter further argued that the application of the exemption in 5 U.S.C. § 552(b)(3) was improper because Plaintiffs had not requested BSA records but rather information relating to certain owners of real property.  *See id.*

10. On August 7, 2019, FinCEN's FOIA office sent Plaintiffs a letter that acknowledged Plaintiffs' appeal received that day and stating that the appeal had been directed to FinCEN's Office of Chief Counsel.  A true and correct copy is attached hereto as exhibit 6 (August 7, 2019 FinCEN letter to Plaintiff).

11. On October 17, 2019, my predecessor, FinCEN Deputy Director Jamal El-Hindi, notified Plaintiffs by letter that he had remanded the matter to FinCEN's FOIA office for further processing.  A true and correct copy is attached hereto as exhibit 7 (October 17, 2019 FinCEN letter to Plaintiff).

12. On December 26, 2019, Plaintiffs filed its Complaint in this case.  Dkt. No. 1.

13. On January 31, 2020, FinCEN sent Plaintiffs a letter explaining that "[t]he processing of your request identified certain materials that are being withheld in full pursuant to the Freedom of Information Act, 5 U.S.C. § 552."  A true and correct copy is attached hereto as exhibit 8 at 2 (January 31, 2020 FinCEN letter to Plaintiff).  The letter noted that an estimate of 41,000 pages were withheld.  *See id.* at 3.  This same January 31, 2020, letter stated: "As a courtesy, FinCEN is also providing the URLs of three press releases available on the agency's public website:

- https://www.fincen.gov/news/news-releases/fincen-targets-shell-companies-purchasingluxury-properties-seven-major (August 22, 2017);

- https://www.fincen.gov/news/news-releases/fincen-renews-real-estate-geographictargeting-orders-identify-high-end-cash (February 23, 2017; HTML version); and

- https://www.fincen.gov/news/news-releases/fincen-expands-reach-real-estategeographic-targeting-orders-beyond-manhattan (July 27, 2016)." *See id.*

14. On February 7, 2020, FinCEN issued another response to the Plaintiffs that stated that an additional 11 pages had been identified that were being withheld in full pursuant to FOIA.  A true and correct copy is attached hereto as exhibit 9 (February 7, 2020 FinCEN letter to Plaintiff).

15. On February 27, 2020, FinCEN issued a final response that stated that "The processing of your request identified certain materials that are being withheld in full pursuant FOIA."  A true and correct copy is attached hereto as exhibit 10 (February 27, 2020 FinCEN letter to Plaintiff).  Those pages number approximately 113,871.  *See id.* at 3.

16. On June 26, 2020, FinCEN issued a supplemental response that identified 1,799 pages inadvertently not identified at the time of the prior letters.  A true and correct copy is attached hereto as exhibit 11 (June 26, 2020 FinCEN letter to Plaintiff).  FinCEN also determined that 11 pages of material from the total number of responsive documents to that date were suitable for release in part.  Accordingly, on June 26, 2020, FinCEN released those 11 pages, including six pages as a discretionary release.  *See* exhibit 2 (11 released pages).

### FinCEN and Its Mission

17. FinCEN was created in 1990 and became a bureau of Treasury by virtue of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the USA PATRIOT Act).  P.L. 107-56 (2001).  FinCEN has seven Divisions described in paragraphs 40 through 46, *infra*.  The Director of FinCEN is appointed by the Secretary of the Treasury and reports to the Treasury Under Secretary for Terrorism and Financial Intelligence.  31 U.S.C. §§ 310(b)(1), 312(a)(7)(A).

18. The mission of FinCEN is to safeguard the financial system from illicit use (including criminal use), combat money laundering, and promote national security through the collection, analysis, and dissemination of financial intelligence and strategic use of financial authorities.  31 U.S.C. § 310.  FinCEN carries out its mission by, among other things, receiving and maintaining financial transactions data; analyzing data using sophisticated non-public techniques to combat criminal financial activity; disseminating that information for law enforcement purposes, including for both criminal and national security purposes; and supervising and building global cooperation with counterpart organizations in other countries and with international bodies, including organizations with criminal and national security enforcement authorities.

19. FinCEN exercises regulatory functions primarily under the Currency and Financial Transactions Reporting Act of 1970, as amended by Title III of the USA PATRIOT Act of 2001 and other legislation, which legislative framework is commonly referred to as the "Bank Secrecy Act" (BSA).  The BSA is one of the federal government's primary tools

for combatting money laundering and terrorist finance.  The BSA authorizes the Secretary of the Treasury to issue regulations requiring banks and other financial institutions to take a number of precautions against financial crime, including the establishment of AML/CFT programs and the filing of reports that have been determined to have a high degree of usefulness in criminal, tax, and regulatory investigations and proceedings, and certain intelligence and counter-terrorism matters.  31 U.S.C. §§ 5311, 5318(h).  The Secretary of the Treasury has delegated to the Director of FinCEN the authority to implement, administer, and enforce compliance with the BSA and associated regulations.  *See* Treasury Order 180-01 (Jan. 14, 2020).

20. Specifically, the BSA recordkeeping and reporting provisions—by requiring the keeping of records about specified transactions and the filing of reports on specified transactions, including the reporting of suspicious activities that might signify money laundering, tax evasion, or other criminal activities—assist in the detection and prevention of money laundering and other financial crimes including terrorist financing.  FinCEN administers and enforces the reporting and recordkeeping requirements of the BSA, codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-1959, and 31 U.S.C. §§ 5311-5314, 5316-5332.

21. Congress has given FinCEN certain duties and responsibilities for the central collection, analysis, and dissemination of this data.  *See* 31 U.S.C. § 310.  In particular, FinCEN's responsibilities include the detection and deterrence of financial crime by using sophisticated techniques not publicly disclosed to analyze this data, which comes from BSA Reports individually and in combination with others of the same and different types, to identify possible criminal activities to appropriate federal, state, local, and foreign law

enforcement authorities and to support ongoing criminal financial investigations and

prosecutions and related proceedings, including civil and criminal tax and forfeiture

proceedings.  *See* 31 U.S.C. § 310(b)(2)(C).  In order to accomplish this mission, among

other things, FinCEN does the following:

- Collects substantial amounts of BSA data—much of it highly sensitive in nature— from a wide variety of reporting entities;

- Manages this collection by processing, securely storing, and protecting this data from unauthorized disclosure;

- Analyzes the data for trends and patterns using confidential techniques;

- Disseminates and allows direct access, as appropriate, both to BSA data and FinCEN-created analytical products for certain purposes, including law enforcement investigations, using BSA data;

- Conducts additional analysis to support policymakers, regulatory and intelligence agencies, foreign financial intelligence units (FIUs), and the financial industry;

- Issues and interprets regulations authorized by statute; and

- Supports and enforces compliance with those regulations.

22. Of particular relevance to this case is the authority of the Director of FinCEN to issue an

order that imposes certain additional recordkeeping and reporting requirements on one or

more domestic financial institutions or nonfinancial trades or businesses in a geographic

area.  *See* 31 U.S.C. § 5326(a).  The Director may utilize this authority when "reasonable

grounds exist" for concluding that the additional recordkeeping and reporting is

necessary "to carry out the purposes of this subtitle[3] or prevent evasions thereof …."
31 U.S.C. § 5326(a).  These orders, called Geographic Targeting Orders (GTOs), remain
in effect up to 180 days but can be renewed.  *See* 31 U.S.C. § 5326(a), (d).  As further
explained *infra*, beginning at paragraph 32, certain GTOs require title insurance
companies and others to report information to FinCEN about certain real estate
transactions.  These GTO Reports are unique to FinCEN and are different in material
ways from information that other governmental entities keep and publicly record for tax
and other administrative purposes.  Further, the techniques that FinCEN uses to analyze
that data are themselves confidential and not known to the public.

23. FinCEN plays an important role in analyzing and disseminating the information it both
receives and generates through the proper channels and to the proper authorities, both
domestically and internationally.  It is a role that places upon FinCEN a heightened duty
of care for the use, storage, and dissemination of this information.

24. FinCEN's Intelligence Division, for example, produces a number of different types of
reports based at least in part on information collected in GTO Reports.  Most of the
intended recipients are other government agencies.  FinCEN also regularly issues
advisories and other information on its website for public viewing, when possible and
appropriate.

25. With regard to the relevant real estate GTOs, FinCEN has posted publicly numerous
press releases, sample GTOs, and other documents (true and correct copies are attached

---

[3] Subtitle IV (entitled "Money") of title 31 of the United States Code, which includes BSA
provisions 31 U.S.C. §§ 5311 through 5332.

hereto as exhibit 12 (Real estate GTO advisory) and exhibit 13 (Real estate GTO #1) through exhibit 22 (Real estate GTO #7 press release) to assist the public in understanding the substance of the GTOs, how they further law enforcement investigations, and how real estate transactions involving luxury property purchased through shell companies—particularly when conducted with cash and no financing—can be an attractive avenue for criminals to launder illegal proceeds while masking their identities.

26. At the same time that FinCEN disseminates data both to targeted audiences and the public, FinCEN has strict rules regarding what information it may not share.  The requirement to appropriately safeguard its information is a key component of FinCEN's mission.  For this reason the BSA is clear: while reports filed pursuant to the BSA "shall be available for a purpose that is consistent with this subchapter … a report and the records of reports are exempt from disclosure under section 552 of title 5 …."  31 U.S.C. § 5319.  The words "this subchapter" in 31 U.S.C. § 5319 refer to Subchapter II Records and Reports on Monetary Instrument Transactions of Chapter 53 of title 31 of the United States Code, which is part of the BSA.  Subchapter II includes GTO Reports and suspicious activity reports (SAR Reports), discussed at length, *infra,* as well as other BSA Reports.  In this case, the exclusive source of information responsive to Plaintiffs' Request is GTO Reports.  As such, all responsive documents are therefore either BSA Reports or records of reports as described in 31 U.S.C. § 5319.

27. Not only is BSA information exempt from required disclosure but it must not be improperly disclosed.  To do so is a criminal violation carrying substantial penalties.  "A

person willfully violating this subchapter [including disclosure of suspicious activity report information] or a regulation prescribed or order issued under this subchapter … shall be fined not more than $250,000, or imprisoned for not more than five years, or both." 31 U.S.C. § 5322.  A clear public policy rationale undergirds this; the confidentiality of BSA information, including GTO Reports and SAR Reports, is required for law enforcement to meaningfully investigate crime.

28.   While voluminous and vitally important to law enforcement and a host of Federal agencies, the value of any BSA data—including that coming directly from GTO Reports—quickly degrades the minute it is no longer secure.  The rationale for requiring that GTO information derived from BSA Reports be kept confidential is obvious: if it were released, investigations would be immediately jeopardized, reporting financial institutions and their employees would be at risk, and both criminals and those who facilitate their activities within the global financial system would gain an invaluable advantage in knowing what is known about them and their behavior—and how it became known.  This is the public policy beneath the statutory and regulatory regime within which FinCEN uses, shares, and protects BSA data.  As discussed further in paragraphs 87 and 88, *infra*, the need to secure BSA data is by no means theoretical; the more FinCEN shares certain information, the easier it is for criminals to avoid reporting.

29.   FinCEN's collection of GTO information is so important for the prevention and prosecution of financial crime that an attempt to circumvent the laws that authorize FinCEN to collect financial information itself is a federal crime in some cases.  *See, e.g.*, 31 U.S.C. § 5324 (making structuring transactions to evade reporting requirements a

crime and also making it a crime to fail to file a report or maintain a record required by 31 U.S.C. § 5326—the provision regarding GTOs—or to file such a report or maintain such a record that contains a material omission or misstatement of fact).

### The Real Estate GTOs

30. One important type of GTO has been and continues to be those involving real estate transactions.  FinCEN's analysis of BSA and law enforcement information, among other sources, made clear that issuing GTOs targeting all cash transactions involving real property at specific dollar thresholds for selected jurisdictions would be useful in the fight against money laundering.  *See* exhibit 12 at 2.

31. As this 2017 FinCEN advisory explained in more detail, "Real estate transactions and the real estate market have certain characteristics that make them vulnerable to abuse by illicit actors seeking to launder criminal proceeds.  For example, many real estate transactions involve high-value assets, opaque entities, and processes that can limit transparency because of their complexity and diversity.  In addition, the real estate market can be an attractive vehicle for laundering illicit gains because of the manner in which it appreciates in value, 'cleans' large sums of money in a single transaction, and shields ill-gotten gains from market instability and exchange-rate fluctuations.  For these reasons and others, drug traffickers, corrupt officials, and other criminals can and have used real estate to conceal the existence and origins of their illicit funds."  *See id.*

32. Seven real estate GTOs have been publicly issued within the time frame requested by

Plaintiffs:[4]

- Real estate GTO #1 was issued in January 2016.[5]  A true and correct copy is
  attached hereto as exhibit 13 (Real estate GTO #1).  It required U.S. title
  insurance companies to identify the natural persons behind all-cash purchases of
  residential real estate.  In particular, the GTO mandated that title insurance
  companies, their subsidiaries, and agents fill out FinCEN Form 8300,[6] *see id.* at 1,
  and then submit it to FinCEN through the BSA e-filing system within 30 days of
  the closing of the triggering transaction, in this case purchases of residential real
  estate in the Borough of Manhattan in New York City and Miami-Dade County in
  excess of $1 million without "a bank loan or other similar form of external
  financing" and "[s]uch purchase is made, at least in part, using currency or a
  cashier's check, a certified check, a traveler's check, or a money order in any

---

[4] FinCEN also has issued a confidential real estate GTO.  The terms of that GTO are squarely covered by Exemption 7(E), and it will not be further discussed here.

[5] Real estate GTO #1 was two separate issuances on the same day, as described *infra* and in the attached exhibit 13.  Originally issued on January 5, 2016, real estate GTO #1 was re-issued on January 13, 2016; these later issuances (exhibit 13) superseded the issuances of the previous week, slightly altering the period during which the GTO was effective and making other, minor textual changes.

[6] For the initial real estate GTOs, FinCEN opted to use an existing BSA form—the Form 8300—as the vehicle to collect information required under the GTOs.  This form was already familiar to some of the covered title insurers, and creating a new form would have resulted in a delay in issuing the GTOs.  FinCEN now uses the currency transaction report (CTR) form as the GTO reporting mechanism because of the benefits associated with the fields used in the CTR form. *See also* "Anti-Money Laundering," GAO-20-546 (July 2020), at 12 (https://www.gao.gov/assets/710/708115.pdf) (stating, "FinCEN concluded that the potential burden on title insurers of reporting a large number of transactions would be mitigated by requiring title insurers to report the information using an existing form they already were required to file if they engaged in cash transaction over $10,000.").

form." *See id.*  As the FinCEN press release issued that same day stated,

"FinCEN is concerned that all-cash purchases – i.e., those without bank financing

– may be conducted by individuals attempting to hide their assets and identity by

purchasing residential properties through limited liability companies or other

opaque structures."  A true and correct copy is attached hereto as exhibit 14 (Real

estate GTO #1 press release) at 1.  FinCEN's Director at the time explained, "We

are seeking to understand the risk that corrupt foreign officials, or transnational

criminals, may be using premium U.S. real estate to secretly invest millions in

dirty money.  Over the years, our rules have evolved to make the standard

mortgage market more transparent and less hospitable to fraud and money

laundering. But cash purchases present a more complex gap that we seek to

address. These GTOs will produce valuable data that will assist law enforcement

and inform our broader efforts to combat money laundering in the real estate

sector."  *See id.*

- Real estate GTO #2 was issued later that year, on July 22, 2016.  A true and

  correct copy is attached hereto as exhibit 15 (Real estate GTO #2).  It extended

  the reporting requirements beyond the two localities subject to the first GTO to

  include the following: "(1) all boroughs of New York City; (2) Miami-Dade

  County and the two counties immediately north (Broward and Palm Beach); (3)

  Los Angeles County, California; (4) three counties comprising part of the San

  Francisco area (San Francisco, San Mateo, and Santa Clara counties); (5) San

  Diego County, California; and (6) the county that includes San Antonio, Texas

(Bexar County)." *See id.* at 1.  Triggering purchase prices differed by locality, with Manhattan increased to $3 million (the highest), the remaining New York City boroughs at $1.5 million, subject counties in Florida at $1 million, subject counties in California at $2 million, and Bexar County, Texas, at $500,000.  *See id.*

- Real estate GTO #3 was issued on February 21, 2017, renewing the coverage of these six major metropolitan areas.  A true and correct copy is attached hereto as exhibit 16 (Real estate GTO #3).  As the then FinCEN Acting Director explained, "[t]hese [real estate] GTOs are producing valuable data that is assisting law enforcement and is serving to inform our future efforts to address money laundering in the real estate sector…The subject of money laundering and illicit financial flows involving the real estate sector is something that we have been taking on in steps to ensure that we continue to build an efficient and effective regulatory approach."  *See* exhibit 17 (Real estate GTO #3 press release) at 1. Further, "FinCEN has found that about 30 percent of the transactions covered by the GTOs involve a beneficial owner or purchaser representative that is also the subject of a previous suspicious activity report. This corroborates FinCEN's concerns about the use of shell companies to buy luxury real estate in 'all-cash' transactions."  *See id.*

- Real estate GTO #4 was issued on August 22, 2017.  A true and correct copy is attached hereto as exhibit 18 (Real estate GTO #4).  It required U.S. title insurance companies to identify the natural persons behind shell companies used

16

to pay for high-end residential real estate in seven cities.  Subsequent to

legislative amendments to the GTO authority,[7] FinCEN revised the GTOs to

capture a broader range of transactions and include transactions involving wire

transfers.  FinCEN also modified the GTOs to include transactions conducted in

the City and County of Honolulu, Hawaii.  *See id.*

- Real estate GTO #5 was issued on March 19, 2018 and renewed the previous

   GTO with no changes.  A true and correct copy is attached hereto as exhibit 19

   (Real estate GTO #5).

- Real estate GTO #6 was issued on November 15, 2018.  A true and correct copy

   is attached hereto as exhibit 20 (Real estate GTO #6).  This GTO applied a

   uniform purchase amount threshold of $300,000 across the named regions (certain

   counties within the following major U.S. metropolitan areas: Boston, Chicago,

   Dallas-Fort Worth, Honolulu, Las Vegas, Los Angeles, Miami, New York City,

   San Antonio, San Diego, San Francisco, and Seattle).  FinCEN also required

   reporting of covered purchases using virtual currencies.  *See id.*

- Real estate GTO #7 was issued on May 15, 2019.  A true and correct copy is

   attached hereto as exhibit 21 (Real estate GTO #7).  It covered the same types of

   transactions in the same counties as the GTO issued in November of 2018.  Doing

---

[7] One of the provisions of the Countering America's Adversaries Through Sanctions Act, Pub. L. 115-44, title II, section 275(a) (Aug. 2, 2017), amended 31 U.S.C. § 5326 by substituting the term "funds" for coins, currency or other money instruments, and clarifying that Treasury may issue a GTO when necessary to carry out the purposes of the BSA or to prevent evasions thereof.

so, according to the press release, "will further assist in tracking illicit funds and other criminal or illicit activity, as well as inform FinCEN's future regulatory efforts in this sector."  A true and correct copy is attached hereto as exhibit 22 (Real estate GTO #7 press release) at 1.

33. As evidenced by the number of real estate GTOs issued as well as the changes in their terms over time, the work of collecting accurate, timely, and useful information from these real estate transactions for criminal and other investigation purposes is ongoing, evolving, and requires a high degree of sophistication.

34. Real estate GTOs are materially different from any potentially overlapping federal laws or the varying "states' 'public recording systems,' central to all states' property laws." Complaint, para. 23, at 5.  The plain language of 31 U.S.C. § 5311 states as much in declaring that the purpose of the provisions of the BSA authorizing recordkeeping and reporting of certain financial transactions is to require such records and reports where they have "a high degree of usefulness in *criminal*, tax, or regulatory *investigations or proceedings*, or in the conduct of *intelligence or counterintelligence activities*, including analysis, to protect against *international terrorism*."  (Emphases added.)  Further, FinCEN's real estate GTOs cover only select transactions in targeted geographic areas based on confidential analysis of jurisdictions likely to be locations of suspicious real estate purchases rather than all purchases and sales in entire states.  This focus reflects the fact that FinCEN's purposes for collecting this information are wholly separate from any reporting or recording requirements imposed by localities on separate, state-specific forms, the latter of which are almost always publicly available because they are used by

18

potential real estate buyers and sellers and for tax administration and other municipal recordkeeping purposes, not to uncover or prevent criminal activity.[8]  Finally, it should be noted that GTO Reports are only one type of BSA information that FinCEN collects: "Most BSA requirements apply by their terms only to 'financial institutions,' as defined in the BSA and its implementing regulations. The definition of financial institution encompasses a wide variety of institutions, including banks, broker-dealers in securities, money services businesses, and casinos and card clubs, among others. … The BSA, in more limited circumstances, prescribes rules of conduct for nonfinancial trades and businesses and individuals."  A true and correct copy is attached hereto as exhibit 23 (FinCEN enforcement statement) at 1.  FinCEN uses information from all these sources—alone and in many combinations—to help law enforcement fight financial crime and the financing of terrorism.

35. In short, states' goals may well be furthered by making public the information they collect; FinCEN's goals, however, would be substantially undermined by releasing the information that FinCEN collects.  Criminal investigations, much less intelligence or counterintelligence activities, especially involving international terrorism, would be substantially frustrated, to say the least, unless done discreetly.  In enacting the confidentiality provisions of the BSA, *see, e.g.,* 31 U.S.C. §§ 5319 and 5322, Congress

---

[8] The same is just as true of SAR Reports, which, for loan and finance companies, requires the filing with FinCEN of, among other things, "a report of any suspicious transaction relevant to a possible violation of law or regulation," 31 C.F.R. § 1029.302(a).  *See generally* 31 C.F.R. § 1029.302 for other specifics.

clearly understood this.

## THE SEARCH FOR RESPONSIVE RECORDS

36. "As of the filing of [the] Joint Stipulation, Plaintiffs have not challenged the sufficiency

of Defendant's overall search, and the parties have stipulated that Plaintiffs shall not

challenge Defendant's withholding in full of GTO Reports, such that Plaintiffs shall not

raise challenges to these issues for the first time in their Cross Motion and Opposition

and Defendant need not address these issues in its Opening Motion for Summary

Judgment.  *See* Dkt. No. 23."  *See* JS (Dkt. No. 28) at 2, footnote 3.  Additionally, as of

the date of this Declaration, I understand that Plaintiffs still have not challenged the

sufficiency of Defendant's overall search.  As such, I understand that the sufficiency of

Defendant's overall search is uncontested at this time.

37. When FinCEN receives a FOIA request, FinCEN's FOIA office evaluates the request to

determine which offices or record systems within FinCEN reasonably may be expected to

contain the records requested.  This determination is based on the description of the

records requested and requires a familiarity with FinCEN records systems, applicable

records disposition schedules, and the substantive and functional mandates of numerous

FinCEN offices and missions.  Factors such as the nature, scope, and complexity of the

request are relevant as well.

38. It also should be noted that the FOIA office, in conjunction with the other offices

mentioned *infra*, conducted thorough searches of all records responsive to Plaintiffs'

request, whether or not such records were GTO reports.  In other words, searches were

limited only by Plaintiffs' request and not by other terms or categories of documents by anyone within FinCEN.

39. The Request makes clear that, as a practical matter, the information that Plaintiffs seeks is GTO Reports or information derived therefrom: "information about the real human owners (in some cases known as beneficial owners) of all-cash real residential real estate transactions nationally from 2016 to the present." A true and correct copy is attached hereto as exhibit 3 (Plaintiffs' FOIA request) at 1. Furthermore, the only source of information responsive to Plaintiffs' FOIA Request are the GTO Reports, which Plaintiffs have stipulated are exempt from disclosure and therefore properly withheld in full pursuant to 31 U.S.C. § 5319 in view of Exemption 3. *See* Dkt. No. 23.[9] As such, aside from GTO Reports—and documents which derive information from GTO Reports, such that those documents that derive information from GTO Reports are themselves records of reports also subject to 31 U.S.C. § 5319 and therefore properly withheld at least in part under Exemption 3—FinCEN has no information responsive to the FOIA Request.

40. FinCEN is comprised of the Office of the Director, seven Divisions, and operationally includes the Office of Chief Counsel. The seven Divisions are the Intelligence Division, the Enforcement Division, the Global Investigations Division, the Strategic Operations Division, the Policy Division, the Technology Division, and the Management Division.

---

[9] Additionally, Plaintiffs have stipulated that "Plaintiffs shall not raise challenges to [the sufficiency of Defendant's overall search or Defendant's withholding in full of GTO Reports] for the first time in their Cross Motion and Opposition. See Dkt. No. 23." *See* JS (Dkt. No. 28) at 2, footnote 3.

41. After reviewing Plaintiffs' request, FinCEN determined that the only offices or records systems reasonably likely to have documents responsive to Plaintiffs' request were the Office of the Director, Office of Chief Counsel, Intelligence Division, Enforcement Division (including the later-formed Global Investigations Division), and Strategic Operations Division.[10]  Pursuant to its standard practice, the FOIA Officer then provided each relevant office with the FOIA request and a standard reporting form so that persons within each office could document their search.  No date range was initially given to these offices.  However, in order to provide a reasonable cutoff for documents potentially responsive to the FOIA request, FinCEN determined that March 1, 2016 through July 29, 2019 was the appropriate range; these were the effective date of the first real estate GTO and almost two weeks after Plaintiffs' FOIA Request, respectively.  The FOIA Officer relied on the knowledge and expertise of the employees of each office to determine, based on the documents requested, the files and other locations reasonably likely to house responsive records and the most effective means of retrieving such records, as these employees were in the best position to know how their files were organized.  Likewise, those employees were also in the best position to determine, guided by the FOIA request, which search terms would yield potentially responsive records because they were the most knowledgeable about the organization of the records systems in use.  In this case,

---

[10] The Technology and Management Divisions focus much of their efforts on the internal workings of the bureau, and the Policy Division issues regulations and other guidance in furtherance of FinCEN's legal authorities.  None of these three divisions, therefore, meaningfully deals in specific GTO-related information or information identifying the real human owners of real estate.

wherever possible FinCEN relied on the expertise of individuals with knowledge about the real estate GTOs to assist with the search, given the breadth of the request.

42. The Office of the Director includes the Director, Deputy Director, Chief of Staff, and a handful of other front office personnel.  An employee who was knowledgeable of both the request and Office of the Director records conducted a computer search for electronic files and relevant email files in Microsoft Outlook.  This search located no responsive records.  The Office of the Director does not maintain paper files that would contain responsive information not also contained in the electronic records searched.

43. The Office of Chief Counsel contains the Chief Counsel and the attorneys who report to him.  Employees knowledgeable of both the request and Office of the Chief Counsel records conducted searches of the office's records in email files in Microsoft Outlook and in electronic files.  Electronic files are stored on office designated folders on the agency shared drive.  This search located no responsive records.  The Office of Chief Counsel does not maintain paper files that would contain responsive information not also contained in the electronic records searched.

44. The Intelligence Division assists in carrying out FinCEN's statutory responsibility to collect, analyze, and disseminate financial intelligence in accordance with 31 U.S.C. § 310, by among other things "support[ing] ongoing criminal financial investigations and prosecutions and related proceedings, including civil and criminal tax and forfeiture proceedings."  31 U.S.C. § 310(b)(2)(C)(ii).  This division primarily serves FinCEN's internal and external customers, including law enforcement, regulators, and foreign authorities by producing financial intelligence and providing expertise on illicit finance.

23

A senior advisor who was knowledgeable of the request and integral to FinCEN's GTO work (who is also a subject matter expert on the Intelligence Division record systems) conducted a search of the Intelligence Division's electronic record systems reasonably likely to contain responsive records. These searches initially located approximately 41,115 responsive pages, which are identified as Documents 1, 4 through 11 in the *Vaughn* index.[11] FinCEN initially withheld all these pages in full. In preparation for litigation, FinCEN released four of these pages in redacted form—one page each from Documents 8 through 11 in the *Vaughn* index, as well as a one-page document identified as Document 13 in the *Vaughn* index which was also released in redacted form. As part of FinCEN's ongoing diligence in connection with preparing material for this pending FOIA litigation, the Intelligence Division subsequently located approximately 1,754 additional pages. Of this total, approximately 490 pages identified in the *Vaughn* index as Document 12 were withheld in full. The remaining 1,264 pages are identified in the *Vaughn* index as drafts of Documents 7, 8, 9, and 10. Of these 1,264 pages, FinCEN made a discretionary release of 6 pages in redacted form. The Intelligence Division does not maintain paper files that would contain responsive information not also contained in the electronic records searched.

45. FinCEN's Enforcement Division serves as the primary action arm of FinCEN. The office

---

[11] The vast majority of the pages covered by this paragraph, as discussed in more detail later in this declaration, are made up of two compilations of information: an approximately 41,000-page Excel spreadsheet of data elements from real estate GTO reports and data elements from other BSA Reports that were summarized for various FinCEN purposes, and an approximately 490-page earlier version of the Excel spreadsheet.

employs an analytics-driven approach to target examination efforts in high-risk areas; investigates referrals from examining authorities such as the Federal banking agencies and uses effective, proportionate, and dissuasive measures to enforce compliance with the BSA; and proactively investigates and exercises a broad range of FinCEN authorities to disrupt the criminal and other illicit uses of the financial system by priority targets.  In August of 2019, FinCEN created a new division from an office that previously was housed within the Enforcement Division.  The new division—the Global Investigations Division—is responsible for implementing targeted investigation strategies and initiating actions rooted in FinCEN's unique authorities, including GTOs under 31 U.S.C. § 5326. A senior officer who was knowledgeable of the request and a subject matter expert of Enforcement Division records (including those in the Global Investigations Division) conducted a computer search for electronic files and relevant email files in Microsoft Outlook.  The review was based on the senior officer's personal knowledge of where appropriate documents might be located as well as keyword searches.  These searches initially located 11 responsive pages which are identified as Documents 2 and 3 of the *Vaughn* index.  FinCEN withheld all of these pages in full.  As part of FinCEN's ongoing diligence in connection with preparing material for this pending FOIA litigation, the Global Investigations Division subsequently located an additional 45 pages.  These 45 pages, which are drafts of Documents 2 and 3, were withheld in full.  The Enforcement Division and Global Investigation Division do not maintain paper files that would contain responsive information not also contained in the electronic records searched.

46. Toward the end of 2019, FinCEN realigned its former Liaison Division and renamed it the Strategic Operations Division.  The Strategic Operations Division is responsible for designing and implementing FinCEN's strategic partnerships across industry, with Federal, State, and local government colleagues, as well as with counterparts in foreign jurisdictions.  After carefully reviewing Plaintiffs' request, a program director in Strategic Operations who was knowledgeable of both the request and Strategic Operations' record system advised that the scope of the request was outside Strategic Operations' mission.  Therefore, Strategic Operations located no responsive records.

## WITHHOLDINGS

47. The FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  FinCEN released 11 pages of documents in part (a true and correct copy is attached hereto as exhibit 2 (11 released pages)) and withheld the remaining responsive documents in full.  FinCEN scrolled through the information in each column in the large spreadsheets, which are Documents 1 and 12, sufficiently to reasonably ascertain they contain only the types of information specified in the header row cells for each respective column; FinCEN also conducted a line-by-line review of all other documents.  In both cases, with respect to both spreadsheets and non-spreadsheets, FinCEN conducted its review to identify information exempt from disclosure and to assess whether any such exempt information nonetheless could be released as a matter of discretion.  With respect to the records that were released, all information not exempt from disclosure pursuant to the FOIA exemptions specified herein was correctly

segregated, and non-exempt portions were released.  With respect to the records withheld

in their entirety, FinCEN determined that no additional meaningful, non-exempt

information can reasonably be segregated and released.  In other words, FinCEN released

all non-exempt information that was reasonably segregable.  Under Exemption 3,

FinCEN withheld in full some responsive documents and withheld in part other

responsive documents.  Most of the documents also were withheld in part under

Exemptions 5, 6, and 7.

**Exemption 3**

48. Exemption 3 protects records specifically exempted from disclosure by statute, where a

statute "establishes particular criteria for withholding or refers to particular types of

matters to be withheld."  5 U.S.C. § 552(b)(3).  The BSA explicitly exempts reports made

under its authority from disclosure under the FOIA, as provided at 31 U.S.C. § 5319.

The statute states that, for reports filed under the BSA, "a report and records of reports

are exempt from disclosure under section 552 of title 5 …."  31 U.S.C. § 5319.  GTO

reports are filed under the authority of 31 U.S.C. § 5326 and, thus, are BSA Reports.

49. FinCEN withheld under Exemption 3, together with additional exemptions discussed

*infra*, all of Document 1, the spreadsheet which totals approximately 41,000 pages and

compiles data exclusively from GTO Reports and other reports filed under the BSA.  As

such, the spreadsheet is a record of BSA Reports and therefore is statutorily exempt from

disclosure under the FOIA pursuant to 31 U.S.C. § 5319.  This document alone accounts

for approximately 95% of the approximately 42,926 pages of responsive records found.

Specifically with respect to the portions of this spreadsheet that contain information

responsive to Plaintiffs' FOIA Request, all such information is derived from GTO Reports.

50. FinCEN is withholding two memoranda (Documents 2 and 3), which are law enforcement referrals prepared by FinCEN officials, under Exemption 3, together with additional exemptions discussed *infra*.  The memoranda identify and refer potential persons of interest for further investigation by designated law enforcement agencies based on a review of financial activity contained in GTO reports and other BSA Reports.  FinCEN is also withholding three emails (Documents 4, 5, and 6) under Exemption 3, together with additional exemptions discussed later in this declaration.  The first two emails (Documents 4 and 5) are correspondence between a law enforcement official and a FinCEN official about GTO reports related to a person of interest identified by law enforcement, and the last email (Document 6) is from a FinCEN official to two law enforcement officials referring possible persons of interest for further investigation based on BSA Reports, including GTO reports described in the email.  Therefore, Documents 2 through 6 are summaries of and references to specific BSA Reports, including GTO reports, on persons of potential investigative interest and therefore are statutorily exempt from the FOIA under 31 U.S.C. § 5319.  FinCEN is withholding Documents 14 and 15, which are draft versions of Document 2, and withholding Documents 16 through 20, which are draft versions of Document 3.  These versions precede and pre-date the final memorandum.  Specifically with respect to the portions of these documents that contain information responsive to Plaintiffs' FOIA Request, all such information is derived from GTO Reports.

51. With the exception of one page from Document 8 that was released in part, FinCEN is

withholding intelligence assessments (Documents 7 and 8) under Exemption 3, together

with additional exemptions discussed *infra*.  These assessments were prepared by

FinCEN and shared with U.S. government law enforcement agencies to assist in the

identification of real estate money laundering.  FinCEN is withholding these documents

under Exemption 3 because they describe information obtained from BSA Reports,

including real estate GTO reports.  In addition, Document 8 describes persons of

potential investigative interest based upon specific BSA Reports, including GTO Reports.

As such, those portions are records of BSA Reports and therefore are statutorily exempt

from the FOIA under 31 U.S.C. § 5319.  FinCEN is withholding in full Documents 21

through 28, which are draft versions of Document 7, and Documents 29 through 47,

which are draft versions of Document 8.  FinCEN also is withholding in part Documents

48 through 51, which are draft versions of Document 8.  These versions precede and pre-

date the final intelligence assessments.  Specifically with respect to the portions of these

documents that contain information responsive to Plaintiffs' FOIA Request, all such

information is derived from GTO Reports.

52. With the exception of one page each from Documents 9, 10, and 11 that was released in

part, FinCEN also is withholding investigative memoranda (Documents 9, 10, and 11)

under Exemption 3, together with additional exemptions discussed *infra*.  The

investigative memoranda also were prepared by FinCEN and identify specific persons of

interest for further investigation by U.S. law enforcement agencies based on GTO reports

and other BSA Reports.  FinCEN is withholding these documents under Exemption 3

because they contain information obtained from BSA Reports, including real estate GTO reports. These documents contain references to, and information about, specific transactions and persons identified in BSA Reports, including GTO reports. As such, those portions are records of BSA Reports and therefore are statutorily exempt from the FOIA under 31 U.S.C. § 5319. FinCEN is withholding in full Documents 52 through 60, which are draft versions of Document 9, and Document 61, which is a draft version of Document 10. These versions precede and pre-date the final investigative memoranda. Specifically with respect to the portions of these documents that contain information responsive to Plaintiffs' FOIA Request, all such information is derived from GTO Reports.

53. FinCEN is also withholding all of Document 12, an older version of the spreadsheet identified as Document 1, under Exemption 3, together with additional exemptions discussed *infra*. Document 12 totals approximately 490 pages and compiles data exclusively from FinCEN's BSA Reports, including GTO Reports. As such, the spreadsheet is a record of BSA Reports and therefore is statutorily exempt from the FOIA under 31 U.S.C. § 5319 and 5 U.S.C. § 552(b)(3). Specifically with respect to the portions of these documents that contain information responsive to Plaintiffs' FOIA Request, all such information is derived from GTO Reports.

54. FinCEN withheld in part Document 13, a one-page summary of the real estate GTOs, which was appended to Document 1. The information withheld under Exemption 3 is drawn from GTO reports and as such is a record of BSA Reports and therefore is statutorily exempt from the FOIA under 31 U.S.C. § 5319 and 5 U.S.C. § 552(b)(3).

FinCEN also withheld other information under another exemption discussed later in this declaration.  Specifically with respect to the portions of these documents that contain information responsive to Plaintiffs' FOIA Request, all such information is derived from GTO Reports.

55. In sum, and as discussed *supra*, all information FinCEN has that is responsive to Plaintiffs' FOIA Request is contained in or derived or extracted from GTO Reports—the only source of information responsive to Plaintiffs' FOIA Request are GTO Reports. This is why Exemption 3 applies to every single document identified in FinCEN's *Vaughn* index.  And "[a]s of the filing of [the] Joint Stipulation, Plaintiffs have not challenged the sufficiency of Defendant's overall search, and the parties have stipulated that Plaintiffs shall not challenge Defendant's withholding in full of GTO Reports, such that Plaintiffs shall not raise challenges to these issues for the first time in their Cross Motion and Opposition and Defendant need not address these issues in its Opening Motion for Summary Judgment.  *See* Dkt. No. 23."  *See* JS (Dkt. No. 28) at 2, footnote 3. This of course leaves only one possible challenge: information derived or extracted from GTO Reports.  However, like the GTO Reports themselves, all documents containing information derived or extracted from GTO Reports also are statutorily exempt from the FOIA as reports or records of reports pursuant to 31 U.S.C. § 5319 under 5 U.S.C. § 552(b)(3).

**Exemption 5**

56. Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Under Exemption 5, information that is normally privileged in the civil discovery context, including information that is protected under the deliberative process privilege, is exempt from disclosure.

57. Document 6, as discussed *supra*, is an email from a FinCEN official to two law enforcement officials referring possible persons of interest for further investigation based on BSA Reports, including GTO reports described in the email.  Document 6 includes a statement that is being withheld under Exemption 5 because it is both pre-decisional as well as deliberative in nature in that it references potential interagency coordination about future actions and therefore is protected under the deliberative process privilege of Exemption 5.

58. Documents 7 and 8 are intelligence assessments prepared by FinCEN analysts for U.S. Government law enforcement agencies.  These inter-agency memoranda contain FinCEN's analytical research and assessments of the information obtained through real estate GTO reports as well as other BSA Reports.  The reports are intended to assist law enforcement by identifying possible persons of interest involved in real estate money laundering or other potential illicit activity and therefore are both pre-decisional—that is, the receiving agencies, not FinCEN, are the ones that make the final decision as to whether to act on FinCEN's identification of persons of interest—and deliberative—that is, these documents make recommendations or express opinions on such matters.

32

59. In particular, Documents 7 and 8 contain factual summaries of aggregate and individual BSA Reports that are intertwined with FinCEN's expert opinion on the significance of the data such as trends and patterns that may assist law enforcement in identifying criminal activity; segregating and releasing these factual summaries is not reasonable because the segregated factual material is so intertwined by non-exempt material that releasable material would be so fragmented as to be meaningless. FinCEN is withholding this material under Exemption 5 as deliberative insofar as it reflects FinCEN's opinions on the data and proposed recommendations for agencies to focus their resources toward investigating financial crime. Release of this information would (1) inhibit open and frank inter-agency discussions on matters of policy, such as the prioritization and allocation of law enforcement resources to certain high-risk financial activities that may be indicative of money laundering; (2) prematurely disclose FinCEN's assessments as to money laundering risks and vulnerabilities before law enforcement agencies have an opportunity to further investigate these risks or act on these recommendations; and (3) confuse the public as to the nature and weight of FinCEN's assessment of risk regarding BSA reporting that may not result in actions by other agencies.

60. Documents 14 through 61 represent drafts of Documents 2, 3, 7, 8, 9, and 10. *See Vaughn* index at 2 through 34. FinCEN is withholding these draft documents in full under Exemption 5 as both pre-decisional and deliberative in nature. Documents 14 and 15 are drafts of Document 2; Documents 16 through 20 are drafts of Document 3; Documents 21 through 28 are drafts of Document 7; Documents 29 through 51 are drafts of Document 8; Documents 52 through 60 are drafts of Document 9, and Document 61 is

a draft of Document 10.  The drafts are pre-decisional, intra-agency documents.  The

drafts also contain privileged communications by FinCEN staff reflecting comments and

opinions on the content of the memoranda and therefore are deliberative.  Release of

these drafts would injure the decision-making process by having a chilling effect on frank

discussions involving staff and/or agency decision makers and could cause confusion in

cases where there is a material difference between the final version of a document and the

drafts that preceded it.  However, FinCEN made a discretionary release of six pages in

redacted format that were drawn from drafts of Document 8.  These drafts are identified

in the *Vaughn* index as Documents 47, 49, 50, and 51.

**Exemption 6**

61. Exemption 6 protects from disclosure information about individuals in personnel and

    similar files when the disclosure of such information would constitute a clearly

    unwarranted invasion of personal privacy which outweighs the public interest in

    disclosure.  5 U.S.C. § 552(b)(6).  All information that applies to a particular person falls

    within the scope of Exemption 6.

62. When withholding information under this exemption, FinCEN is required to balance the

    privacy interests of persons mentioned in the responsive records against any public

    interest in disclosure of information about these persons.  In asserting this exemption,

    each piece of information was analyzed to determine the strength of the privacy

    information of the persons named or identified in the relevant documents.  For purposes

    of this exemption, a public interest exists only when information about a person would

    shed light on FinCEN's performance of its mission.  In each instance where FinCEN

withheld information under this exemption, FinCEN determined that the privacy interests outweighed public interest in disclosure.

FinCEN and Other Government Personnel

63. In Documents 2 through 6, 11 through 12, and 14 through 20, FinCEN withheld, under Exemption 6, in some cases the names and identifying information of FinCEN employees, in some cases the names of federal law enforcement personnel, and in some cases both FinCEN and federal law enforcement personnel who were responsible for conducting, and/or maintaining the investigative activities reflected in the documents responsive to Plaintiffs' FOIA request.[12]  FinCEN personnel work on highly sensitive investigations into financial crimes.  These personnel have a privacy interest in being protected from unnecessary, unofficial questioning as to the conduct of these investigations.  Because of the potentially significant implications of enforcement actions taken by FinCEN or the agencies with which FinCEN shares information, persons targeted for these actions could bear significant ill will toward the FinCEN personnel that participated in the investigations and enforcement proceedings.  Similarly, because these FinCEN personnel may be in positions of access to information regarding investigations with national security implications or other sensitive criminal matters, they could become targets of harassing inquiries for unauthorized access to this information.  Thus, these personnel maintain a substantial privacy interest in not having their identities disclosed.

---

[12] *See generally Vaughn* index for a precise breakdown of the types of federal personnel information withheld in each of these documents.

64. The relevant personnel from these other federal agencies have similar privacy interests. Disclosure of their identities and identifying information could subject employees from these agencies to unauthorized inquiries and harassment for the very reasons that the disclosure of the names and identities of FinCEN personnel would.  Thus, these personnel also maintain a substantial privacy interest in not having their identities disclosed.

65. After determining that these employees have substantial privacy interests, FinCEN then considered whether there was any public interest in disclosing their information. Plaintiffs' request argues for a general public interest in knowing the identities of purchasers identified in the GTO Reports.  FinCEN has determined that whatever public interest may exist in this regard does not weigh in favor of disclosing the identities of these career-level FinCEN and law enforcement personnel, especially as Plaintiffs' interest is rather in knowing the identity of purchasers.  These officials work in sensitive occupations, either to support law enforcement and national security investigations of financial crime, or, in the case of officials at other U.S. Government agencies, in law enforcement itself.  Disclosure of these employees' identities and information would not significantly increase the public's understanding of FinCEN's operations and activities, and it would be Plaintiffs' burden to establish such a public interest.  As a result, FinCEN concluded that disclosure of this information would be an unwarranted invasion of privacy interests of FinCEN and other government personnel and protected the information.

**Exemption 7 Threshold**

66. Exemption 7 protects from mandatory disclosure records or information compiled for law enforcement purposes, but only to the extent that disclosure could reasonably be expected to cause a set of enumerated harms. *See* 5 U.S.C. § 552(b)(7).

67. Before an agency can invoke the protections of Exemption 7, it must first demonstrate that the records or information at issue was compiled for law enforcement purposes. Under 31 U.S.C. § 310, Congress established FinCEN as a bureau of the Treasury Department expressly charged with a number of duties related to supporting law enforcement and combatting financial crime. In Treasury Order 180-01, the Secretary of the Treasury has also delegated to FinCEN enforcement authority over the BSA.

68. FinCEN is also expressly charged with facilitating law enforcement investigations of other agencies and exchanging information with foreign government agencies in furtherance of international efforts to combat financial crime. *See, e.g.,* 31 U.S.C. § 310(b)(2)(C) (authorizing FinCEN to disseminate data to "identify possible criminal activity," "support ongoing criminal financial investigations and prosecutions and related proceedings," "support the conduct of intelligence or counterintelligence activities," and "support government initiatives against money laundering); *id.* at § 310(b)(2)(D) (authorizing FinCEN to "[e]stablish and maintain a financial crimes communications center to furnish law enforcement authorities with intelligence information related to emerging or ongoing investigations and undercover operations"). Information compiled in furtherance of FinCEN's general mission to combat financial crime and promote national security and in furtherance of FinCEN's duties as a source for dissemination of

information to law enforcement agencies is therefore compiled for law enforcement purposes.

69. The responsive records discussed herein were compiled in the course of FinCEN's fulfillment of its statutory duties to support FinCEN's own investigations and actions to enforce statutes that FinCEN administers, facilitation of law enforcement agencies' investigation of financial or other crimes, and cooperation with law enforcement investigations or actions. Thus, these records were compiled for law enforcement purposes and fall squarely within FinCEN's statutory duties, satisfying the threshold requirement of Exemption 7.

### Exemption 7(A)

70. To invoke Exemption 7(A), FinCEN must establish the existence of a pending or prospective investigation or other enforcement proceeding. FinCEN applied this exemption to withhold information related to open investigations and enforcement proceedings by FinCEN or other U.S. government agencies.

71. Here, Plaintiffs' request is not limited to a particular law enforcement investigation or enforcement proceeding. Rather, Plaintiffs direct its request at records related to a broad swath of real estate transactions—those "of all-cash real residential real estate transactions nationally from 2016 to the present…." A true and correct copy is attached hereto as exhibit 3 (Plaintiffs' FOIA request) at 1. Because Plaintiffs' request is so broad, records responsive to its request touch upon a number of law enforcement inquiries with wide-ranging implications.

72. FinCEN has not excluded all GTO information in its possession under Exemption 7(A). Instead, FinCEN has withheld only those documents that could reasonably interfere with enforcement proceedings, specifically Documents 9 and 11 and Documents 52 through 60, which are drafts of Document 9.  The total page count at issue, including drafts, is 106 out of approximately 42,926.

73. In this case, records responsive to Plaintiffs' request relate to prospective investigation into, and enforcement proceedings against, specific subjects that have been identified and about which communications have been sent between FinCEN and other government agencies.

74. Documents 9 and 11 are investigative memoranda prepared on particular subjects involving particular transactions.  These documents were shared with law enforcement for appropriate action.  FinCEN has confirmed with the relevant law enforcement agencies that portions of these documents involve (1) potential targets of grand jury investigation; (2) the subject of a grand jury investigation who is under consideration for possible enforcement action; and (3) persons who are under active investigation.  These law enforcement agencies have further confirmed that the release of the withheld material could reasonably be expected to harm the ongoing investigations or prospective proceedings because the persons identified in these documents are not aware that they are being considered for investigation or are under active investigation.  Documents 52 through 60 are, as explained *supra*, drafts of Document 9; these drafts include information that appeared in the final version of Document 9 that has been confirmed as exempt form disclosure under Exemption 7A.  Releasing this information—whether from

Documents 9 and 11 or from Documents 52 through 60—would frustrate sensitive and complex law enforcement operations involving highly sophisticated criminals taking all available precautions to launder money enough to buy homes—in some cases, lavish ones.  To provide further information about these proceedings would defeat the purposes of Exemption 7(A)—as well as Exemption 7(E), discussed *infra*.

75. Investigations into financial crimes, particularly investigations into money laundering through the purchase of real estate (by nature a large transaction), are complicated matters that involve the exchange of a great deal of information and coordination among law enforcement authorities across jurisdictions.  In this case, the relevant investigations or enforcement proceedings implicate these complicated networks of facts obtained through the exchange of information and cooperation of numerous law enforcement personnel.  FinCEN is relying on Exemption 7(A) to prevent interference with proceedings involving subjects identified through the course of pending investigations.

76. In processing Plaintiffs' request, FinCEN reviewed the responsive records regarding pending investigations or enforcement proceedings to determine whether release of these records would interfere with ongoing or future enforcement proceedings.  FinCEN reviewed the responsive records and concluded that it cannot release the responsive records regarding pending investigations or enforcement proceedings.

### Exemption 7(C)

77. Exemption 7(C) protects from disclosure records or information that could reasonably be expected to constitute an unwarranted invasion of personal privacy when that information is compiled for law enforcement purposes.  5 U.S.C. § 552(b)(7)(C).

78. As with Exemption 6, when withholding information under this exemption, FinCEN is required to balance the privacy interests of persons mentioned in the responsive records against any public interest in disclosure of information about these persons.  In asserting this exemption, each piece of information was analyzed to determine the strength of the privacy interest of the persons named or identified in the relevant documents.  For purposes of this exemption, a public interest exists only when information about a person would shed light on FinCEN's performance of its mission.  In each instance where FinCEN withheld information under Exemption 7(C), FinCEN determined that the privacy interests outweighed public interest in disclosure.

FinCEN and Other Government Personnel

79. In Documents 2 through 6, 11 through 12, 14 through 15, and 16 through 20, FinCEN withheld, under Exemption 7(C), in some cases the names and identifying information of FinCEN employees, in some cases the names of federal law enforcement personnel, and in some cases both FinCEN and federal law enforcement personnel who were responsible for conducting, and/or maintaining the investigative activities reflected in the documents responsive to Plaintiffs' FOIA request.[13]  FinCEN personnel work on highly sensitive investigations into financial crimes.  These personnel have a privacy interest in being protected from unnecessary, unofficial questioning as to the conduct of these

---

[13] *See generally Vaughn* index for a precise breakdown of the types of federal personnel information withheld in each of these documents.  All such names also were withheld under Exemption 6, discussed *supra*, under the higher standard set there for protection of information that, if disclosed, would invade another individual's personal privacy.

investigations.  Because of the potentially significant implications of enforcement actions

taken by FinCEN or the agencies with which FinCEN shares information, persons

targeted for these actions could bear significant ill will toward the FinCEN personnel that

participated in the investigations and enforcement proceedings.  Similarly, because these

FinCEN personnel may be in positions of access to information regarding investigations

with national security implications or other sensitive criminal matters, they could become

targets of harassing inquiries for unauthorized access to this information.  Thus, these

personnel maintain a substantial privacy interest in not having their identities disclosed.

Because Documents 2 through 6, 11 through 12, 14 through 15, and 16 through 20 were

compiled for law enforcement purposes, the names of FinCEN personnel are also

protected under Exemption 7(C).

80. The relevant personnel from these other federal agencies have similar privacy interests.

Disclosure of their identities and identifying information could subject employees from

these agencies to unauthorized inquiries and harassment for the very reasons that the

disclosure of the names and identities of FinCEN personnel would.  Thus, these

personnel also maintain a substantial privacy interest in not having their identities

disclosed.  Similarly, because Documents 2 through 6, 11 through 12, 15, and 17 through

20 were compiled for law enforcement purposes, the names of the other federal

employees are also protected under Exemption 7(C).

81. After determining that these employees have substantial privacy interests, FinCEN then

considered whether there was any public interest in disclosing their information.

Plaintiffs' request argues for a general public interest in knowing the identities of

purchasers identified in the GTO Reports.  FinCEN has determined that whatever public

interest may exist in this regard does not weigh in favor of disclosing.  These officials

work in sensitive occupations, either to support law enforcement and national security

investigations of financial crime, or, in the case of officials at other U.S. Government

agencies, in law enforcement itself, and FinCEN concluded that no such public interest

existed because disclosure of these employees' identities and information would not

significantly increase the public's understanding of FinCEN's operations and activities,

and it would be Plaintiffs' burden to establish such a public interest.  As a result, FinCEN

concluded that disclosure of this information would be an unwarranted invasion of

privacy interests of FinCEN and other government personnel and protected the

information.

<u>Third Parties of Investigative Interest</u>

82. In Documents 1 through 6, 8 through 12, 14 through 20, 30 through 47, 48 through 51, 52

through 60, and 61, FinCEN withheld, under Exemption 7(C), the names and other

personally identifying information of third-party persons identified in these document

which were compiled for law enforcement purposes.  Releasing the identities of these

persons to the public could subject them to undue public attention, harassment,

embarrassment, and severe financial consequences.  The persons identified in these

reports have significant privacy interests in not having their names publicly associated

with BSA Reports that have been filed with FinCEN and/or being associated with

potential law enforcement-related investigations.  These documents do not reflect that the

persons have been charged—much less convicted—of a crime and may well be found not to have broken any law in connection with the information that FinCEN has compiled and has shared with relevant authorities for further inquiry. Accordingly, FinCEN has determined that these individuals' privacy interests in being connected to potential illegal activity, at this point in an investigation, is substantial. These individuals have a great deal to lose if their information were to be released in these documents associated with the GTOs and other BSA Reports at issue in this case.

83. FinCEN then considered whether these persons' names and identifying information would significantly increase the public's understanding of FinCEN operations or activities. FinCEN concluded that identifying these third parties and disclosing their personally-identifying information would not further the public's understanding of how FinCEN carries out its law enforcement mission. Plaintiffs' request argues for a general public interest in knowing the identities of purchasers identified in the GTO Reports. FinCEN has determined, however, that whatever public interest may exist in this regard is outweighed by the privacy interests of persons identified in these documents. As a result, FinCEN has withheld these individuals' names and identifying information after FinCEN concluded that disclosure of this information to the public would be an invasion of privacy interests, could subject them to exposure in a variety of ways, and would not further the public's right to know how FinCEN or other agencies conduct their business.

**Exemption 7(E)**

84. Exemption 7(E) protects records or information compiled for law enforcement purposes
    where disclosure would reveal techniques and procedures for law enforcement
    investigations or prosecutions.  5 U.S.C. § 552(b)(7)(E).  Even records pertaining to
    commonly known procedures are protected from disclosure under Exemption 7(E) when
    the circumstances of their usefulness are not widely known or their use in combination
    with other factors would compromise the underlying techniques or procedures.  As these
    documents were compiled for law enforcement purposes, the withheld material is
    protected by Exemption 7(E) because it would reveal techniques to support law
    enforcement investigations.  Exemption 7(E) applies to all of the same documents as
    Exemption 3 because all of these documents take BSA Report information, which is
    subject to Exemption 3, and analyze it for law enforcement purposes using FinCEN's law
    enforcement techniques and procedures, which are subject to Exemption 7(E).  More
    specifically, most of the pages in these documents apply both exemptions as well.

85. With regard to Document 1, the spreadsheet matches and cross-references information
    drawn from fields appearing in BSA Reports—GTO Reports and SAR reports—and
    specifically details FinCEN's techniques for compiling information regarding BSA
    Reports in connection with identifying potential criminal finance.  With regard to
    Documents 2 and 3, the law enforcement referral memoranda reflect FinCEN's
    techniques in matching information from GTO Reports against information from other
    BSA Reports so as to have led FinCEN to believe that certain individuals merit referral to

law enforcement for potential investigation.  Similarly, with regard to Documents 4 and 5, the email exchange details FinCEN's techniques in supporting law enforcement in connection with persons of investigative interest.  As with Documents 2 and 3, the law enforcement referral email, Document 6, matches information from GTO Reports against information from other BSA Reports so as to have led FinCEN to believe that certain individuals merit referral to law enforcement for potential investigation.  And Documents 7 and 8 contain resource information detailing procedures for recipients to quickly obtain additional support from FinCEN regarding the information contained in the reports.

86. FinCEN also applied Exemption 7(E) to withhold information revealing anti-money laundering processes and investigative techniques for the collection and analysis of information, specifically with regard to intelligence assessments and investigative memoranda (Documents 7 through 11) and with regard to the withheld material identified in Documents 47, 49, 50, and 51 that included pages in the discretionary release.  In particular, FinCEN is withholding reference numbers and resource information intended for recipients of these intelligence products to enable them to quickly obtain additional support from FinCEN regarding the information contained in the reports.  In addition, Exemption 7(E) is being asserted over certain statements that reveal FinCEN's methodology and processes for analyzing BSA information to develop leads for law enforcement.  As this material would reveal a technique to support law enforcement investigations or prosecutions, it is being withheld under Exemption 7(E).

87. Ample evidence exists that information about the real estate GTOs is and has been used to circumvent FinCEN restrictions.  Numerous news outlets have reported on efforts by

professionals and others to understand the rules in order to educate themselves and others about how to get around them.  In March of 2016, a class at the Miami Association of Realtors' headquarters titled "Avoid the Treasury Trap with Foreign Buyers" explicitly discussed methods to avoid reporting real estate transactions that otherwise might be covered by a GTO.  A true and correct copy of an article hosted on a website and printed to PDF is attached hereto as exhibit 24 (Circumvention article 1).  An article around that same time was titled, "Broward Realtors Make Blatant Appeal to Cash Buyers Who Would Be Scrutinized in Miami."  A true and correct copy of an article hosted on a website and printed to PDF is attached hereto as exhibit 25 (Circumvention article 2) at 1.  Major newspapers have run stories that describe the potential for real estate purchasers to attempt to evade GTO reporting in various ways; for example, in discussing real estate GTO #1, *The Wall Street Journal* stated, "the rule can be circumvented if buyers pay the entire purchase price using a bank wire transfer, take out even a small mortgage or choose to forgo title insurance. Some might simply choose to delay a closing until the 181st day."  A true and correct copy of an article hosted on a website and printed to PDF is attached hereto as exhibit 26 (Circumvention article 3) at 1 – 2.  In short, increased information about what FinCEN tracks and how that information is tracked inevitably leads to an increase in efforts at circumvention.  FinCEN must release information about the requirements of these real estate GTOs, of course, so that title insurance companies, among others, can comply with the rules.  But releasing the details of the transactions reported or how that information is processed would severely compromise the very purposes for which the data is collected and the techniques used to digest that data, and

release would compromise the privacy of the data of those individuals involved in such transactions.

88. Release of this information, therefore, reasonably could be expected to facilitate circumvention of the law by money launderers, in that it could divulge a particular law enforcement technique and internal investigative methodology for obtaining money-laundering information that would allow a person to alter his behavior in order to avoid detection.  As such, disclosure would provide money launderers with a tangible reference—knowing that certain information might make its way to FinCEN, and in what way or form—that could be used to alter behavior and thwart intelligence-gathering and other detection efforts.  As to Documents 9, 10, and 11, the information withheld also includes statements relating to law enforcement coordination and the recipient agencies identified in these memoranda.  As this information constitutes a technique for supporting law enforcement investigations or prosecutions, it is being withheld under Exemption 7(E).

89. Release of the withheld information revealing anti-money laundering processes and investigative techniques also would reveal the nature of the communication and cooperation between FinCEN and other government agencies.  The disclosure of any part of these records would reveal this information and damage FinCEN's ability to conduct its own anti-money laundering and national security investigations.  As this information constitutes a technique to support law enforcement investigations or prosecutions, FinCEN withheld portions of Documents 7, 8, 9, 10, and 11 pursuant to Exemption 7(E). In addition, FinCEN withheld information from Documents 12 and 13 under Exemption

7(E).  Specifically, Document 12 details FinCEN's techniques for compiling information

regarding BSA Reports, including GTO Reports, in connection with identifying potential

illicit finance, and Document 13 describes investigative techniques comparing reporting

across multiple real estate-related GTOs that have been issued by FinCEN.

90. FinCEN is withholding Documents 14 through 61, as these versions precede and pre-date

the final versions discussed *supra*.

91. FinCEN has asserted Exemption 7(E) for every page—either in whole or in part—of

every document identified in its responses.[14]  As described *supra*, these documents were

compiled for law enforcement purposes and reflect procedures and techniques which

FinCEN employs to support law enforcement efforts to combat money laundering and

financial crime.  These documents analyze and discuss BSA Reports, including GTO

Reports, and assist law enforcement by identifying specific persons of investigative

interest and/or patterns of financial activity potentially indicative of money

laundering.  The spreadsheets compile GTO reports in a manner where they can be

analyzed against other BSA Reports to enable a wide range of financial analysis.

92. The application of Exemption 7(E) therefore is inextricably linked to FinCEN's

application of Exemption 3 which protects BSA Reports, and records of such reports,

pursuant to 31 U.S.C. § 5319.  For this reason, of the 126 pages[15] of final documents

which consist of Investigative Memos, Intelligence Assessments and Law Enforcement

---

[14] This includes the 11 pages of released material, in which FinCEN redacted material falling under Exemption 7(E).

[15] These 126 pages are the correct total as recalculated per footnote 1, *supra*.

Emails (Documents 2 through 11), Exemption 7(E) is being asserted as to all 126 pages, while Exemption 3 applies to 123 of these same pages.  With respect to the draft memos of Documents 7, 8, 9 and 10, Exemption 7(E) is being asserted over all 1,309 pages while Exemption 3 applies to 1,283 of these same pages.

## **CONCLUSION**

93. For the reasons described above and in the attached *Vaughn* index, FinCEN has withheld in full approximately 42,915 pages of documents that are exempt from disclosure under FOIA and has released in part 11 pages.

94. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 10, 2020.

*Michael Mosier*
_____
Michael G. Mosier
Deputy Director
Financial Crimes Enforcement Network
U.S. Department of the Treasury