# EXHIBIT 12



# ADVISORY

FIN-2017-A003            August 22, 2017

## Advisory to Financial Institutions and Real Estate Firms and Professionals

*Drug traffickers, corrupt officials, money launderers, and other criminals seek to exploit real estate transactions to hide their illicit profits, conceal their identities, and launder funds.*

**This Advisory should be shared with:**
- *Real Estate Professionals*
- *Organization Executives*
- *Comptroller/Treasury/ Accounting Departments*
- *Compliance Departments*
- *Legal Departments*

The Financial Crimes Enforcement Network (FinCEN) is issuing this advisory to provide financial institutions and the real estate industry with information on money laundering risks associated with certain real estate transactions.  As highlighted by recent Geographic Targeting Orders (GTOs) issued by FinCEN, real estate transactions involving luxury property purchased through shell companies—particularly when conducted with cash and no financing—can be an attractive avenue for criminals to launder illegal proceeds while masking their identities.[1]

Each type of financial institution—defined by law to also include "persons involved in real estate closings and settlements"—has certain anti-money laundering obligations and can provide valuable reporting on potential money laundering and terrorist financing.[2]  While real estate brokers, escrow agents, title insurers, and other real estate professionals are not required to, FinCEN encourages them to voluntarily report suspicious transactions involving real estate purchases and sales.  As with other financial institutions under the Bank Secrecy Act (BSA), a safe harbor from liability exists with respect to the filing of suspicious activity reports, including voluntary ones, by persons involved in real estate closings and settlements.[3]

---

1. Although FinCEN to date has focused on residential real estate, money laundering can also involve commercial real estate transactions.
2. FinCEN—a bureau of the U.S. Department of the Treasury—administers and issues regulations pursuant to the Bank Secrecy Act (BSA).  The BSA is the commonly used term for statutory enactments requiring U.S. financial institutions to assist U.S. government agencies to detect and prevent money laundering, terrorism finance, and other illegal activity.  The BSA's definition of "financial institution" includes "persons involved in real estate closings and settlements."  31 U.S.C. § 5312(a)(2)(U).  While that term has not yet been defined under FinCEN's regulations, it is not intended to include individual buyers and sellers.
3. *See* 31 U.S.C. § 5318(g)(3).

## Money Laundering Risks in the Real Estate Sector

Real estate transactions and the real estate market have certain characteristics that make them vulnerable to abuse by illicit actors seeking to launder criminal proceeds.  For example, many real estate transactions involve high-value assets, opaque entities, and processes that can limit transparency because of their complexity and diversity.  In addition, the real estate market can be an attractive vehicle for laundering illicit gains because of the manner in which it appreciates in value, "cleans" large sums of money in a single transaction, and shields ill-gotten gains from market instability and exchange-rate fluctuations.[4]  For these reasons and others, drug traffickers, corrupt officials, and other criminals can and have used real estate to conceal the existence and origins of their illicit funds.

> **Example: Corruption and Residential Real Estate**
>
> A high-profile case illustrating money laundering risks in the real estate sector involves 1Malaysia Development Berhad (1MDB), a Malaysian sovereign wealth fund.  In 2016, the U.S. Department of Justice sought forfeiture of over $1 billion in assets—including luxury real estate—associated with funds stolen by corrupt foreign officials from 1MDB.  This included a hotel, two homes, and a mansion in Beverly Hills, CA; a home in Los Angeles, CA; a condominium, two apartments, and a penthouse in New York, NY; and, a townhouse in London, England; all with a collected value estimated at approximately $315 million.

This money laundering risk in the real estate market was a principal driver of FinCEN's decision to issue GTOs, which, as described below, have provided greater insight into illicit finance risks in the high-end real estate market.  FinCEN's analysis of BSA and GTO reported data, law enforcement information, and real estate deed records, as depicted by the case studies in this advisory, indicates that high-value residential real estate markets are vulnerable to penetration by foreign and domestic criminal organizations and corrupt actors, especially those misusing otherwise legitimate limited liability companies or other legal entities to shield their identities.  In addition, when these transactions are conducted without any financing (*i.e.*, "all-cash"), they can potentially avoid traditional anti-money laundering (AML) measures adopted by lending financial institutions, presenting increased risk.

FinCEN encourages both financial institutions subject to mandatory suspicious reporting requirements, as well as real estate professionals filing voluntary suspicious activity reports, to keep the risks detailed below in mind when identifying and reporting suspicious transactions.

---

4.   Money laundering is a crime orchestrated to conceal the source of illegal proceeds so that the money can be used without detection of its criminal source.  Visit www.fincen.gov for further information.

*Use of Shell Companies Decreases Transparency*

Criminals launder money to obscure the illicit origin of their funds. To this end, money launderers can use a number of vehicles to reduce the transparency of their transactions. One such vehicle, highlighted in the below case study, is the use of shell companies. Shell companies are typically non-publicly traded corporations, limited liability companies (LLCs), or trusts that have no physical presence beyond a mailing address and generate little to no independent economic value.[5] Most shell companies are formed by individuals and businesses for legitimate purposes, such as to hold stock or assets of another business entity or to facilitate domestic and international currency trades, asset transfers, and corporate mergers. Shell companies can often be formed without disclosing the individuals that ultimately own or control them (*i.e.,* their beneficial owners) and can be used to conduct financial transactions without disclosing their true beneficial owners' involvement. Criminals abuse this anonymity to mask their identities, involvement in transactions, and origins of their wealth, hindering law enforcement efforts to identify individuals behind illicit activity.[6]

> **Example: Drug Trafficking, Luxury Real Estate, and Shell Companies**
>
> An example of abuse of the luxury real estate sector involves current Venezuelan Vice President Tareck El Aissami and his frontman Samark Lopez Bello. The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) designated El Aissami under the Foreign Narcotics Kingpin Designation Act for playing a significant role in international narcotics trafficking. Lopez Bello was designated for providing material assistance, financial support, or goods or services in support of the international narcotics trafficking activities of, and acting for or on behalf of, El Aissami.[7] In addition, OFAC designated shell companies tied to Lopez Bello that were used to hold real estate.[8] Lopez Bello is tied to significant property and other assets, which were also blocked as a result of OFAC's action.

The misuse of shell companies to launder money is a systemic concern for law enforcement and regulatory agencies, but it is of particular concern in the "all-cash" segment of the real estate market, which currently has fewer AML protections.

---

5. For further information on shell companies, see FinCEN Guidance FIN-2006-G014 "Potential Money Laundering Risks Related to Shell Companies" (November 2006) and FinCEN's SAR Activity Review Trends, Tips, and Issues: Issue 1 (October 2000), Issue 2 (June 2001), and Issue 7 (August 2004).
6. In May 2018, many financial institutions will be required to implement customer due diligence obligations and collect beneficial ownership information on their legal entity customers at account opening. See, 81 Fed. Reg. 91 (May 2016).
7. See "Treasury Sanctions Prominent Venezuelan Drug Trafficker Tareck El Aissami and His Primary Frontman Samark Lopez Bello" (February 2017).
8. *Id*. Generally, under U.S. law, the assets and accounts of a designated individual, entity, or country must be frozen or blocked by U.S. individuals or entities.

*Use of "All-Cash" Real Estate Purchases Further Decreases Transparency*

Criminals can use all-cash purchases to make payments in full for properties and evade scrutiny—on themselves and the origin of their wealth—that is regularly performed by financial institutions in transactions involving mortgages.[9]  All-cash transactions account for nearly one in four residential real estate purchases, totaling hundreds of billions of dollars nationwide, and are particularly exposed to abuse.[10]  All-cash transactions account for an even larger stake in some U.S. markets.  For instance, nearly 50 percent of residential real estate sales in Miami-Dade County were all-cash transactions in 2015 and 2016.[11]  Many all-cash transactions are routine and legitimate, however, they also present significant opportunities for exploitation by illicit actors.

> **Example: Fraud, Money Laundering, and All-Cash Purchases**
>
> An example highlighting fraud and money laundering through all-cash transactions involves real estate agent Anthony Keslinke, who in 2016 was jailed, ordered to pay $1,427,916 in restitution to victims, and forfeited $3,808,831.  Keslinke was the leader of both a large-scale bank fraud conspiracy and a separate money laundering conspiracy.  Between 2011 and 2014, Keslinke used straw buyers and altered records and documents to purchase real estate with cash throughout Northern California, which he then resold at significant financial gain.[12]

## FinCEN's Geographic Targeting Orders (GTOs)

In 2016 and 2017, FinCEN issued GTOs to better understand the vulnerabilities presented by the use of shell companies to engage in all-cash residential real estate transactions.  A GTO is an order issued by FinCEN under the BSA that imposes additional recordkeeping or reporting requirements on financial institutions or other businesses in a specific geographic area.[13]  In this case, FinCEN issued GTOs requiring certain U.S. title insurance companies to record and report information, including beneficial ownership, about legal entities used to make non-financed purchases of high-value residential real estate in seven major U.S. geographic areas.[14]

---

9. The BSA and FinCEN regulation generally require covered financial institutions—including those providing financing—to conduct diligence on their customers and their source of wealth.
10. The National Association of Realtors (NAR) consistently reports monthly figures on all-cash sales for existing homes to near 25 percent.  See http://www.realtor.org/topics/existing-home-sales.
11. See the Miami Association of Realtors' 2016 Yearly Market Summaries for Single Family Homes and Townhouses and Condos.
12. See the Internal Revenue Service's (IRS) "Examples of Money Laundering Investigations – Fiscal Year 2016."
13. See 31 U.S.C. § 5326(a), 31 CFR § 1010.370, and Treasury Order 180-01.
14. See "GTOs Involving Certain Real Estate Transactions Frequently Asked Questions" (August 2016), "FinCEN Renews Real Estate "GTOs" to Identify High-End Cash Buyers in Six Major Metropolitan Areas" (February 2017), and "FinCEN Targets Shell Companies Purchasing Luxury Properties in Seven Major Metropolitan Areas" (August 2017).

As of May 2, 2017, over 30 percent of the real estate transactions reported under the GTOs involved a beneficial owner or purchaser representative that had been the subject of unrelated Suspicious Activity Reports (SARs) filed by U.S. financial institutions. In other words, the beneficial owners or purchaser representatives in a significant portion of transactions reported under the GTO had been previously connected to a wide array of suspicious activities, including:

- A beneficial owner suspected of being connected to over $140 million in suspicious financial activity since 2009 and who sought to disguise true ownership of related accounts.

- Two beneficial owners (husband and wife) involved in a $6 million purchase of two condominiums were named in nine SARs filed from 2013 – 2016 in connection with allegations of corruption and bribery associated with South American government contracts.

- A beneficial owner suspected of being connected to a network of individuals and shell companies that received over $6 million in wire transfers with no clear business purpose from entities in South America. Much of these funds were used for payments to various real estate related businesses.

- Eleven SARs filed from 2008 through 2015 named either the buyer (an LLC), beneficial owner, or purchaser's representative involved in a GTO-reported $4 million purchase of a residential unit. Law enforcement records indicate that both the purchaser's representative and his business associate were associated with a foreign criminal organization involved in narcotics smuggling, money laundering, health care fraud, and the illegal export of automobiles.

### Review of U.S. Anti-Money Laundering Regulations in the Real Estate Sector

The real estate sector is one of many within the U.S. economy for which anti-money laundering (AML) safeguards have been established to protect the U.S. financial system.[15] More specifically, covered financial institutions—including depository institutions, loan or finance companies, and housing government-sponsored enterprises like Fannie Mae and Freddie Mac—generally have obligations to establish AML programs, report suspicious activity to FinCEN using Suspicious Activity Reports (SARs), and understand their customers and their source of wealth. In addition, beginning in May 2018, many financial institutions will be required to implement customer due diligence obligations and collect beneficial ownership information on their legal entity customers opening accounts.[16] FinCEN provides substantial guidance and information on how to implement these requirements effectively.[17]

---

15. 31 U.S.C. § 5318(h) requires financial institutions, including "persons involved in real estate closings and settlements," to establish an anti-money laundering program that includes, at a minimum: (A) the development of internal policies, procedures, and controls; (B) the designation of a compliance officer; (C) an ongoing employee training program; and (D) an independent audit function to test programs.
16. 81 Fed. Reg. 91 (May 2016).
17. For additional information, see https://www.fincen.gov/resources/financial-institutions/mortgage-co-broker.

While FinCEN currently has exempted them from these broader obligations, persons involved in real estate closings and settlements do participate in efforts to safeguard the U.S. real estate industry and financial system from money laundering and terrorism financing through their existing AML/CFT requirements.[18] They, like all U.S. persons engaged in trade and business, must file reports on transactions in currency and certain monetary instruments involving more than $10,000 (commonly referred to as "Form 8300").[19] They also may be required to annually report on foreign bank and financial accounts they own or control, report the transportation of currency across the U.S. border, and keep associated records, as well as respond to FinCEN-issued GTOs.[20] In addition, as other financial institutions under the BSA, persons involved in real estate closings and settlements—which may include real estate brokers, escrow agents, title insurers, and other real estate professionals—can voluntarily report suspicious activity and such disclosures would be protected from liability under the BSA's safe harbor.

The real estate industry recognizes the seriousness and importance of protecting the U.S. real estate market from abuse. For example, the National Association of Realtors has issued red flags and voluntary guidelines to assist real estate professionals minimize the risk of real estate becoming a vehicle for money laundering.[21]

## Mandatory Reporting of Suspicious Activity

A covered financial institution is required to file a SAR if it knows, suspects, or has reason to suspect a transaction conducted or attempted by, at, or through the financial institution involves funds derived from: illegal activity, attempts to disguise funds derived from illegal activity, is designed to evade regulations promulgated under the BSA, lacks a business or apparent lawful purpose, or involves the use of the financial institution to facilitate criminal activity.[22]

## Voluntary Reporting of Suspicious Activity

SARs play an important role in assisting law enforcement to combat crime as they identify possible illicit activity and criminals. FinCEN encourages persons involved in real estate closings and settlements—which may include real estate brokers, escrow agents, title insurers, and other real estate professionals—to voluntarily file a SAR to report any suspicious transactions.[23] These persons are well-positioned to identify potentially illicit activity as they have access to a more complete view and understanding of the real estate transaction and of

---

18. *See* FinCEN's advance notice of proposed rulemaking "Anti-Money Laundering Program Requirements for 'Persons Involved in Real Estate Closings and Settlements'" (April 2003).
19. 31 CFR § 1010.330 (Form 8300). A Form 8300 also may be filed voluntarily for any suspicious transaction, even if the total amount does not exceed $10,000.
20. 31 CFR §§ 1010.350 (FBAR), 1010.340 (CMIR), 1010.430 (recordkeeping), and 1010.370 (GTO).
21. *See* "Tips for Spotting Global Money Laundering Schemes" (January 2017) and "Anti-Money Laundering Guidelines for Real Estate Professionals" (November 2012).
22. 31 C.F.R. §§ 1020.320, 1021.320, 1022.320, 1023.320, 1024.320, 1025.320, 1026.320, 1029.320, and 1030.320.
23. For instructions on how to file a SAR with FinCEN see https://www.fincen.gov/resources/filing-information.

those involved in the transaction.  For example, real estate brokers may have greater insight as to the potential purpose for which a property is being purchased or the possible origin of a purchaser's funds.  When reporting suspicious activity, persons involved in real estate closings and settlements should note that they can benefit from protection from civil liability.[24]

Real estate brokers, escrow agents, title insurers, and other real estate professionals can identify potential suspicious transactions by reviewing available facts and circumstances.  Real estate professionals may determine a transaction is suspicious after evaluating whether the real estate transaction:

- Lacks economic sense or has no apparent lawful business purpose.  Suspicious real estate transactions may include purchases/sales that generate little to no revenue or are conducted with no regard to high fees or monetary penalties;

- Is used to purchase real estate with no regard for the property's condition, location, assessed value, or sale price;

- Involves funding that far exceeds the purchaser's wealth, comes from an unknown origin, or is from or goes to unrelated individuals or companies; or

- Is deliberately conducted in an irregular manner.  Illicit actors may attempt to purchase property under an unrelated individual's or company's name or ask for records (e.g., assessed value) to be altered.

### Filing Suspicious Activity Reports (SARs)

To report suspicious transactions, financial institutions—including persons involved in real estate closings and settlements—should electronically submit a SAR through FinCEN's BSA E-Filing System.  Additional information on how to complete and file a SAR is available at FinCEN's public website here.

When filing a mandatory or voluntary SAR involving a real estate transaction, financial institutions should provide complete and accurate information, including relevant facts in appropriate SAR fields, and information about the real estate transaction and the circumstances and reasons why such transaction may be suspicious in the narrative section of the SAR.

**FinCEN also requests that financial institutions reference this advisory and include the key term "ADVISORY REAL ESTATE" in the SAR narrative and in SAR field 33(z) (Money Laundering-Other)** to indicate a connection between the suspicious activity being reported and real estate property.

---

24. *See* 31 U.S.C. § 5318(g)(3)(A).  Persons filing SARs should also note that FinCEN protects the confidentiality of such filings.

## For Further Information

Additional questions or comments regarding the contents of this advisory should be addressed to the FinCEN Resource Center at FRC@fincen.gov, (800) 767-2825 (Option 9), or (703) 905-3591 (Option 9).  *Financial institutions wanting to report suspicious transactions that may potentially relate to terrorist activity should call the Financial Institutions Toll-Free Hotline at (866) 556-3974 (7 days a week, 24 hours a day)*.  The purpose of the hotline is to expedite the delivery of this information to law enforcement.  Financial institutions should immediately report any imminent threat to local-area law enforcement officials.

**FinCEN's mission is to safeguard the financial system from illicit use and combat money laundering and promote national security through the collection, analysis, and dissemination of financial intelligence and strategic use of financial authorities.**