# Exhibit 1



FOIA Appeal
Financial Crimes Enforcement Network
P.O. Box 39
Vienna, VA 22183.

January 14, 2018

Via U.S. mail

**Re: FOIA Request #FinCEN 19-041-F, goFOIA 2018-11-142**

To whom it may concern:

The Center for Investigative Reporting ("CIR") hereby writes on behalf of the requester, reporter Mr. Aaron Glantz regarding a recent Freedom of Information Act request.

## I.  Factual and Procedural History

On November 24, 2018, Mr. Glantz submitted a request via email for records to the Financial Crimes Enforcement Network ("FinCEN") within the Department of the Treasury ("Treasury") involving a matter of grave public interest and national attention (hereinafter "the Requests"). A true and correct copy of the Requests is attached as Exhibit A.  More specifically, he requested the following:

- **Any and all records containing information submitted in reports made to FINCEN under the Geographic Targeting Orders for cash real estate transactions in selected markets from 2016 to the present.**
- **Documents that contain the street addresses of properties subject to reporting, the amounts paid, the "individual primarily responsible for representing the purchaser," and the "Beneficial Owner" or "Beneficial Owners" of each the covered transaction.**

To assist Treasury in meeting the request, Mr. Glantz included links to FinCEN factsheets on Geographic Targeting Orders that describe the agency's data collection and factsheets on the GTOs that describe the agency's data collection.  The links are reproduced here:

2016 GTO:
https://www.fincen.gov/sites/default/files/shared/GTO_Phase_2_FAQs%20_0819
16.pdf

2017 GTO: https://www.fincen.gov/sites/default/files/advisory/2017-08-
22/Risk%20in%20Real%20Estate%20Advisory_FINAL%20508%20Tuesday%2
0%28002%29.pdf

2018 GTO:
https://www.fincen.gov/sites/default/files/shared/Real%20Estate%20GTO%20GE
NERIC_111518_FINAL%20508.pdf

On December 11, 2018, Treasury wrote a letter stating that "FinCEN can neither confirm nor deny the existence of the materials that you seek" (hereinafter the Denial). A true and correct copy of the Denial is attached as Exhibit B.  Specifically the Denial states, "records filed under the Bank Secrecy Act and records of such reports are exempt from disclosure under FOIA. 31 U.S.C. 5319; 5 USC 552(b)(3)." *Id.*  It further states that "except to the extent necessary for the performance of official duties FinCEN is prohibited from disclosing Bank Secrecy Act records and information that would reveal whether Bank Secrecy Act records do or do not exist. 31 USC 5318(g); 31 C.F.R. 1020.320(e)(2)." *Id.* It lastly states that agency "rules state explicitly that 'official duties' would not include a 'response to a request for disclosure of non-public information.' 31 C.F.R. 1020.320(e)(2). (System of Records Notice, 79 Fed. Reg. 20969-20976.)."

CIR now writes to challenge the agency's assertion and its decision to withhold records.

## II.   Argument

### A. The agency failed to provide a relatively detailed justification for withholding records.

Under FOIA, there is a presumption of access, so where an agency decides to withhold records information it must provide a detailed and "justified reason for doing so." *See Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (quoting *King v. Dept of Justice*, 830 F.2d 210, 219 (D.C. Cir. 1987). For example, "barren assertions that an exempting statute has been met cannot suffice to establish that fact." Founding Church of Scientology of Washington D.C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 831 (D.C. Cir. 1979). Thus, Courts have recently found the Glomar justification for withholding to be improperly overused. Moreover, courts have specifically faulted Treasury for withholding documents with blanket Bank Secrecy Act assertions. *See Boyd v. Exec. Office for U.S. Att'ys,* 87 F.Supp.3d 58, 90 (D.D.C. 2015) ("Treasury states that it applied Exemption 3 in conjunction with the [BSA] to withhold `references to information collected pursuant to the Bank Secrecy Act.' . . . Treasury's description of this

2

1400 65th, Suite 200  Emeryville, CA 94608 ▪▪▪▪▪
PHONE 510 809 3160 ▪▪▪▪    TWITTER @CIRonline
▪▪▪ WEB cironline.org ▪▪▪▪

withholding is not sufficient: the agency has failed to provide even a general description of the relevant records or the type of information withheld.").

In this case, Treasury relies on the Bank Secrecy Act, 31 U.S.C. § 5319 *et seq.* and Exemption 3 to withhold information obtained from the FinCEN – and also invokes a blanket Glomar response (stating that the agency cannot even confirm nor deny whether the documents exist). Here, Treasury's lack of description for its withholding is similarly insufficient; the agency has failed to provide even a general description of the relevant records or the type of information withheld, let alone the "'relatively detailed justification'" required by law. *See Morley,* 508 F.3d at 1122, quoting *King,* 830 F.2d at 219. By simply providing a blanket Glomar response, the agency tries to sidestep its obligation and provide the necessary justification for withholding.

### B. The agency failed to release and redact all segregable portions as required by FOIA.

Under FOIA, agencies cannot withhold disclosable information merely because the record also contains exempt information. *Hamdan,* 797 F.3d at 779 (discussing FOIA's requirement of segregability); *see also Willamette Industries, Inc. v. United States,* 689 F.2d 865, 867 (1982) ("The focus of the FOIA is information, not documents, and the agency cannot justify withholding an entire document simply by showing that it contains some exempt material."). FOIA states that any "reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). Thus, agencies have a "duty to segregate" and provide releasable information through redaction. *Id.* "The burden is on the agency to establish that all reasonably segregable portions of a document have been segregated and disclosed." *Pac. Fisheries, Inc. v. United States,* 539 F.3d 1143, 1148 (9th Cir. 2008). It is reversible error for the district court "to simply approve the withholding of an entire document without entering a finding on segregability." *Hamdan,* 797 F.3d at 779 (internal quotation and citation omitted).

Here, the federal government failed to meet its obligation to review, redact and release all segregable portions as required under FOIA. In this case, Treasury wholesale relies on the Bank Secrecy Act, 31 U.S.C. § 5319 *et seq.,* to withhold records without disclosing segregable portions. While courts have found records to be exempt from disclosure pursuant to the Bank Secrecy Act under Exemption 3, courts also find that agencies are still required to disclose all segregable portions. *See Davis v. U.S. Dep't of Justice,* No. Civ. A. 00-2457(CKK), 2003 WL 25568468, at *5 (D.D.C.2003); *see also Berger v. I.R.S.,* 487 F. Supp. 2d 482, 496 (D.N.J. 2007).

For instance, in *Berger v. IRS,* after re-reviewing the material withheld pursuant to the Bank Secrecy Act, the IRS disclosed all or part of 22 pages. *Id.* The IRS determined that the information in those 22 pages not derived or extracted directly from Bank Secrecy Act reports could be segregated from exempt information, and the IRS

3


1400 65th, Suite 200  Emeryville, CA 94608
PHONE 510 809 3160                      TWITTER @CIRonline
WEB cironline.org

therefore disclosed portions of the records. The agency therefore "conceded" that certain information should have be disclosed and based on its review of the agency's declarations, the court accepted the IRS's representation. *Id*.

Federal agencies engage in this type of review and release in countless FOIA cases, involving requests of much greater sensitivity. *See* Charlie Savage, *U.S. Releases Rules for Airstrike Killings of Terror Suspects*, N.Y. TIMES, Aug. 6, 2016, http://nyti.ms/2aJTOX8 (declassifying portions of documents about military drone policies). Given these circumstances, the agency should re-review its decision to give a blanket Glomar response (reserved for national security cases) and release any disclosable portions of the records. To do otherwise, appears to merely be a neglectful method to circumvent obligations under FOIA.

### C. Withholding records does not fulfill the purpose of the Bank Secrecy Act and thereby Exemption 3.

Exemption 3 of the Freedom of Information Act incorporates into the FOIA certain nondisclosure provisions that are contained in other federal statutes. However, disclosure should be permitted where the aims of the statute are not being met by withholding. To determine the congressional purpose, courts have not strictly adhered to the actual words of the statute, but have looked to the legislative history of the claimed withholding statute. *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 37 (D.C. Cir. 2002)

The Bank Secrecy Act, commonly referred to as an anti-money laundering law, was not designed to withhold general financial information. It was designed to compel financial actors to furnish records to the government "where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism." 31 U.S.C. 5311. For this reason courts have found that the Bank Secrecy Act does not justify withholding all information and documents related to the Bank Secrecy Act. *BizCapital Bus. & Indus. Dev. Corp. v. OCC*, 467 F.3d 871 (5th Cir. 2006)

The information CIR is requesting is not the type of documents that should be withheld under the Bank Secrecy Act. CIR does not seek records of suspicious financial activity, or any documents relating to the status of ongoing investigations by FiNCEN or any other government agency. Rather, CIR is simply interested in learning the identities of "Beneficial Owners" of much of America's most valuable urban real estate. For most of our country's history, this vital public information has been easily accessible at county recorders offices. Unfortunately, in recent years, an increasing share of residential real estate has been purchased in cash by LLC, LLP and LP shell companies which disguise the property's true owner. Therefore, disclosing the information would not only fail to realize the purpose of the Bank Secrecy Act but go against the public interest and

4

historical practice of having this information made public. Indeed, legal scholars have expressed alarm about this circumstance. Emily Badger, *Anonymous Owner LLC: Why It Has Become So Easy to Hide in the Housing Market*, N.Y. Times, April 30, 2018 (quoting a law professor and expert on studying LLCs since the 1980s, stating that the information should be made public).

### III. Conclusion

By hiding behind dubious exemptions, Treasury is in violation of its obligations under law. The Center for Investigative Reporting respectfully requests that this office remand this matter with instructions to review and release the records responsive to the Request. Should this office need clarification as to any aspect of this letter, I'm available at vbaranetsky@revealnews.org or 510-982-2890. Thank you in advance for your assistance in this matter.

Sincerely,

Victoria D. Baranetsky
General Counsel
The Center for Investigative Reporting

cc: Aaron Glantz

5

# Exhibit A

November 26, 2018

To Whom It May Concern:

This is a request under the Freedom of Information Act. I am a senior reporter at The Center for Investigative Reporting (henceforth "CIR"), a national nonprofit news outlet. We produce a weekly radio show, Reveal, which is broadcast on more than 400 National Public Radio stations each week to an audience of more than one million listeners.

We also regularly syndicate our content through major print and television partners. In recent years, for example, my work has appeared in the New York Times, Chicago Tribune, ABC News, NBC News, and the PBS Newshour.

As an employee of the nation's oldest nonprofit news organization, I  am seeking this information for dissemination to the general public as part of my ongoing reporting on the state of the housing market.

Specifically, I am requesting the following records:

**Any and all records containing information submitted in reports made to FINCEN under the Geographic Targeting Orders for cash real estate transactions in selected markets from 2016 to the present.**

**Specifically, I am interested documents that contain the street addresses of properties subject to reporting, the amounts paid, the "individual primarily responsible for representing the purchaser," and the "Beneficial Owner" or "Beneficial Owners" of each the covered transaction.**

**For your convenience I am linking here FINCEN's factsheets on the GTOs that describe the agency's data collection.**

**2016 GTO:**
**https://www.fincen.gov/sites/default/files/shared/GTO_Phase_2_FAQs%20_081916 .pdf**

**2017 GTO:**
**https://www.fincen.gov/sites/default/files/advisory/2017-08-22/Risk%20in%20R eal%20Estate%20Advisory_FINAL%20508%20Tuesday%20%28002%29.pdf**

**2018 GTO:**
**https://www.fincen.gov/sites/default/files/shared/Real%20Estate%20GTO%20GE**
**NERIC_111518_FINAL%20508.pdf**

I request a fee waiver. 5 U.S.C. § 552(a)(4)(A)(iii). We are a non-profit media organization. This request is made in the public interest and not for commercial use. For additional details about Reveal, please see our web site: <https://www.revealnews.org/>. If possible, I would prefer the documents in electronic format so as to remove the need for any photocopying and shipping costs. Please notify me before incurring any photocopying costs over $100. Any information obtained from this request will be used for the public's interest in news stories written for CIR.

I certify that the above information is true and correct to the best of my knowledge.

I am seeking both incoming request letters and responsive documents. If any of these documents are already available online, please provide a URL. Otherwise, please furnish all responsive records in electronic, searchable format delivered to my email address aglantz@revealnews.org. If that's not possible, please send records on a thumb drive or CD-Rom to the following address:

Aaron Glantz
Center for Investigative Reporting
1400 65th St, Suite 200
Emeryville, CA 94608

Further Correspondence:

All correspondence regarding this request can be directed to me at
aglantz@revealnews.org

I am also requesting expedited processing on this request. 5 U.S.C. § 552(a)(6)(E)(v)(II); *see also Al-Fayed v. CIA*, 254 F.3d 300, 306 (D.C. Cir. 2001). The records requested involve up to a third of residential purchases in many of the nation's most populous metropolitan areas.

As FINCEN said in one news release. "Shell companies can often be formed without disclosing the individuals that ultimately own or control them." The public has a compelling right to know who is purchasing homes in our largest cities - this is a clear matter of grave public interest.

Please be aware that under 5 U.S.C. § 552(a)(6)(A), a FOIA request is considered constructively denied after twenty business days and is subject to litigation on that basis. If my request is denied in whole or part, I ask that you justify all deletions by reference to specific exemptions of the act. As the law requires, I will also expect you to release all segregable portions of otherwise exempt exempt material.

I reserve the right to appeal your decision to withhold any information or to deny a waiver of fees.

If you have any questions, do not hesitate to contact me at 415-632-6483.

I am also copying our chief legal counsel, Victoria Baranetsky on this request. Her email is vbaranetsky@revealnews.org.

Thank you for your prompt attention to this request.

Sincerely,

Aaron Glantz

Cc: Victoria Baranetsky, chief legal council, Reveal from the Center for Investigative Reporting.

# Exhibit B



Financial Crimes Enforcement Network
U.S. Department of the Treasury

*Washington, D.C. 20220*

December 11, 2018

Aaron Glantz
Center for Investigative Reporting
1400 65th St, Suite 200
Emeryville, CA 94608
vbaranetsky@revealnews.org

Case Numbers: FinCEN 19-041-F
                goFOIA 2018-11-142

Dear Mr. Glantz:

This letter responds to your November 26, 2018, Freedom of Information Act request/Privacy Act (FOIA/PA) request, addressed to the Financial Crimes Enforcement Network (FinCEN) FOIA Office, seeking:

- Any and all records containing information submitted in reports made to FinCEN under the Geographic Targeting Orders for cash real estate transactions in selected markets from 2016 to the present.

- Specifically, I am interested documents that contain the street addresses of properties subject to reporting, the amounts paid, the "individual primarily responsible for representing the purchaser," and the "Beneficial Owner" or "Beneficial Owners" of each the covered transaction.

FinCEN can neither confirm nor deny the existence of the materials that you seek. Reports filed under the Bank Secrecy Act and records of such reports are exempt from disclosure under FOIA. 31 USC 5319; 5 USC 552(b)(3). Except to the extent necessary for the performance of official duties, FinCEN is prohibited from disclosing Bank Secrecy Act records and information that would reveal whether Bank Secrecy Act records do or do not exist. 31 USC 5318(g); 31 C.F.R. 1020.320(e)(2). Our rules state explicitly that "official duties" would not include a "response to a request for disclosure of non-public information." 31 C.F.R. 1020.320(e)(2). (System of Records Notice, 79 Fed. Reg. 20969-20976.)

<u>Fees</u>

There are no fees associated with processing this request because the fees incurred do not exceed the minimum threshold necessary for charge.

<u>Administrative Appeal</u>

In the event that you wish to appeal this determination, an administrative appeal may be made in writing to FOIA FinCEN P.O. Box 39 Vienna, VA 22183. Please be sure to clearly mark "FOIA/PA Appeal" on both the letter and envelope. Your appeal **must be submitted within 90 days** from the date of this determination. It should contain your FOIA request number and, to the extent possible, the reasons why you believe the initial determination should be reversed. In addition, the envelope in which the appeal is mailed should be prominently marked "FOIA Appeal." Please note that the determination of the appeal will be administratively final.

Additionally, you have the right to seek dispute resolution services from the Office of Government Information Services (OGIS) which mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974. You may contact OGIS as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5796.

If you have any questions pertaining to your request, please feel free to contact the FOIA Office at 703-905-5034 or email FinCENFOIA@fincen.gov.

Sincerely,

Rosemary Law
FOIA Officer

# Exhibit 2



**Financial Crimes Enforcement Network**
**U.S. Department of the Treasury**

*Washington, D.C. 20220*

January 31, 2019

Victoria D. Baranetsky
General Counsel
The Center for Investigative Reporting
1400 65th St., Suite 200
Emeryville, CA  94608
vbaranetsky@revealnews.org

Case Numbers: FinCEN 19-041-F
                          goFOIA 2018-11-142

Dear Ms. Baranetsky,

This letter acknowledges your January 14, 2019, Freedom of Information Act/Privacy Act appeal received on January 23, 2019, in the Financial Crimes Enforcement Network (FinCEN) FOIA Office.

Your appeal is being directed to FinCEN's Office of Chief Counsel.  Every effort will be made to provide you with a timely response within 20 business days.

Further inquiries concerning your appeal should be mailed to:

> Freedom   of   Information   Act   Appeal
> FinCEN
> P.O. Box 39
> Vienna, VA  22183

Sincerely,

Rosemary Law FOIA
Officer

*www.fincen.gov*

# Exhibit 3

# The Guardian



This article is more than **2 years old**

# Michael Cohen case shines light on Sean Hannity's property empire

**Fox News host who said Trump's fixer 'knows real estate' has a portfolio that includes support from Department of Housing, a fact he did not mention when interviewing Ben Carson last year**

· **Sean Hannity's real estate venture linked to fraudulent property dealer**

**Jon Swaine** *in New York*

Mon 23 Apr 2018 02.36 EDT

When Sean Hannity was named in court this week as a client of Donald Trump's embattled legal fixer Michael Cohen, the Fox News host insisted their discussions had been limited to the subject of buying property.

"I've said many times on my radio show: I hate the stock market, I prefer real estate. Michael knows real estate," Hannity said on television, a few hours after the dramatic hearing in Manhattan, where Cohen is under criminal investigation.

Hannity's chosen investment strategy is confirmed by thousands of pages of public records reviewed by the Guardian, which detail a real estate portfolio of remarkable scale that has not previously been reported.

The records link Hannity to a group of shell companies that spent at least $90m on more than 870 homes in seven states over the past decade. The properties range from luxurious mansions to rentals for low-income families. Hannity is the hidden owner behind some of the shell companies and his attorney did not dispute that he owns all of them.

Dozens of the properties were bought at a discount in 2013, after banks foreclosed on their previous owners for defaulting on mortgages. Before and after then, Hannity sharply criticised Barack Obama for the US foreclosure rate. In January 2016, Hannity said there were "millions more Americans suffering under this president" partly because of foreclosures.

Hannity, 56, also amassed part of his property collection with support from the US Department for Housing and Urban Development (Hud), a fact he did not disclose when praising Ben Carson, the Hud secretary, on his television show last year.

Christopher Reeves, Hannity's real estate attorney, said in an email he would "struggle to find any relevance" in Hannity's property holdings, which he said were highly confidential.

"I doubt you would find it very surprising that most people prefer to keep their legal and personal financial issues private," said Reeves. "Mr Hannity is no different."

Spokespeople for Hud and Fox News declined to comment on the record.

The real estate holdings linked to Hannity are spread across more than 20 shell companies formed in Georgia. Each of the companies uses a variant of the same name, which combines the initials of Hannity's children. Public records show the companies have bought up dozens of properties in Alabama, Florida, Georgia, New York, North Carolina, Texas and Vermont.

Among the most valuable are two large apartment complexes in Georgia that Hannity bought in 2014 for $22.7m. The developments are in the cities of Perry and Brunswick, which have higher poverty rates and lower median incomes than the US averages. One- and two-bedroom units in Hannity's apartment complexes are available to rent for $735 to $1,065 per month, according to brochures.

The Georgia purchases were funded with mortgages for $17.9m that Hannity obtained with help from Hud, which insured the loans under a program created as part of the National Housing Act. The loans, first guaranteed under the Obama administration, were recently increased by $5m with renewed support from Carson's department.

Hannity, who is reportedly paid $36m per year for his television and radio shows, was criticised this week following Cohen's court hearing, after it became clear he had defended Cohen and Trump on the air without disclosing that he also consulted Cohen for legal services.

He also declined to note his financial interest when he hosted Carson on Fox News last June for a discussion about Hud and housing. Hannity praised privatisation plans pushed by Trump and Carson.



Michael Cohen, second left, leaves court in New York. Photograph: Pacific Press/Barcroft Images

"I know you've done a good job," Hannity told Carson.

Hannity complained during the discussion that home ownership in the US was at a 51-year low – a false claim he has made several times on air – and criticised the state of public housing.

"I like the idea of them owning the place," Hannity said of people who receive housing assistance. "Well, that's the real ideal," said Carson.

The shell companies used to buy the properties are registered to the offices of Henssler Financial, a wealth management firm outside Atlanta. Bill Lako, a principal at the firm, has appeared on Hannity's radio show as an expert on money issues.

Lako recently wrote an article for the show's website berating Robert Mueller, the special counsel investigating ties between Trump's 2016 election campaign and Russia, without noting his ties to Hannity. He did not respond to an email.

When Lako appeared on Hannity's radio show last month, Hannity disclosed that he was a Henssler client. He joked to Lako that the company took him on as a "charity case" when he worked in Georgia, but "now I'm the best client you have".

The Georgia mortgages supported by Hud were guaranteed as part of a program aimed at protecting investors such as Hannity who buy rental apartment buildings. The government promises to cover losses if borrowers default on their mortgages. Borrowers pay an insurance premium to Hud in return. Bigger loan guarantees are available if the building houses low-income families.

Paperwork relating to the agreements with Hud, which was filed to county authorities, named Hannity as the principal of the shell companies used to buy the apartment complexes and to borrow the funds. Hannity personally signed several of the documents. A Hud source said Hannity was identified in non-public filings as the 100% owner of the apartment complexes.

Late last month, Hannity's mortgages were replaced with loans for $22.9m that were rewritten with Carson's Hud and a new bank. There was no indication that Carson was personally involved in the process. Carson does, however, have the authority to allow Hannity from 2019 to convert the rental complexes into condominiums for sale, which could be lucrative for the television host.

The shell companies used to buy the properties are limited liability companies (LLCs). Like in most states, they are not required to disclose their owners to Georgia regulators. LLCs are popular among well-known figures such as Hannity who wish to keep their business arrangements private.

But the Guardian obtained records in which Hannity signed deeds and other documents on behalf of four of the LLCs, sometimes being named as principal or manager. Four more of the shell companies have owned properties in which public records say Hannity or members of his family have lived.

Hannity also uses a separate company with a similar name to handle contracts relating to his syndicated radio show, according to records filed in two federal court cases. Georgia records say Hannity was chief executive, chief financial officer and secretary of this company before Lako took over the titles during 2016.

In other cases, only the relevant LLC's name and a contact at Henssler Financial were identified in the real estate paperwork, meaning that it could not be confirmed whether Hannity was the hidden owner.



Hud secretary Ben Carson testifies on Capitol Hill. Photograph: Win McNamee/Getty Images

The list of properties bought by the Hannity-linked companies includes multimillion-dollar homes used by Hannity. It also features single-family units priced as low as $50,000 in relatively poor suburbs. In at least two cases, batches of homes were bought simultaneously at a discount, after they were repossessed by banks from their previous owners in foreclosure proceedings.

The entire portfolio connected to Hannity comprises at least 877 residential units, which were bought for a total of just under $89m. Another seven properties bought by the companies over recent years have subsequently been sold on for more than $4m, according to public records.

When Hannity this week stressed that his business relationship with Cohen related to real estate, he pointedly denied that it involved any financial settlements with other people.

Cohen previously arranged for a $130,000 payment to Stephanie Clifford, the pornographic actor known as Stormy Daniels, who alleged she had sex with Trump. Cohen also helped Elliott Broidy, a prominent Republican fundraiser, pay $1.6m to a woman who said she had become pregnant during an affair.

Hannity said he had only "occasional brief conversations" with Cohen. He made varying statements about whether Cohen was compensated, initially stating that he had not been billed but later saying: "I might have handed him 10 bucks."

In footage unearthed this week that was broadcast on Fox News in January last year, Hannity mentioned having discussed an unidentified $2bn property venture in Dubai with Cohen.

"I said, 'I'm interested in that deal myself,'" said Hannity.

## America faces an epic choice ...

... in the coming months, and the results will define the country for a generation. These are perilous times. Over the last four years, much of what the Guardian holds dear has been threatened – democracy, civility, truth.

The country is at a crossroads. The Supreme Court hangs in the balance – and with it, the future of abortion and voting rights, healthcare, climate policy and much more. Science is in a battle with conjecture and instinct to determine policy in the middle of a pandemic. At the same time, the US is reckoning with centuries of racial injustice – as the White House stokes division along racial lines. At a time like this, an independent news organization that fights for truth and holds power to account is not just optional. It is essential.

Like many news organizations, the Guardian has been significantly impacted by the pandemic. We rely to an ever greater extent on our readers, both for the moral force to continue doing journalism at a time like this and for the financial strength to facilitate that reporting.

We believe every one of us deserves equal access to fact-based news and analysis. We've decided to keep Guardian journalism free for all readers, regardless of where they live or what they can afford to pay. This is made possible thanks to the support we receive from readers across America in all 50 states.

As our business model comes under even greater pressure, we'd love your help so that we can carry on our essential work. **If you can, support the Guardian from as little as $1 – and it only takes a minute. Thank you.**

# Exhibit 4

# The Guardian



This article is more than **2 years old**

# Sean Hannity: 400% rise in eviction orders since host bought Georgia apartment complex

**Records show 61 different residents have received notice to vacate their homes in Perry complex since Hannity took over in 2014**

**Jon Swaine** *in Atlanta*

Fri 27 Apr 2018 10.39 EDT

The number of eviction orders obtained against tenants in a Georgia apartment complex owned by Sean Hannity has sharply increased since the property was bought by the Fox News host.

County court records say that judgments approving the removal of 61 different residents of the Hampton Place apartments in Perry have been issued during the three years and 10 months since Hannity took over.

The previous owner of the 152-unit apartment complex obtained similar orders against 12 different tenants during the preceding three years and 10 months, according to the records, before selling it to Hannity for almost $8m.

Christopher Reeves, an attorney for the Fox News host, said in an email: "Mr Hannity is not involved in the management of these properties. Evictions only occur after a material breach of the lease terms."

The Guardian first reported on Sunday that Hannity was the secret owner connected to a group of 20 shell companies that have spent $90m on more than 870 homes across seven states over the past decade.

Hampton Place is one of two apartment complexes in Georgia that Hannity bought in 2014 for $22.7m. The purchases were partly funded with $17.9m in mortgages guaranteed by the US Department of Housing and Urban Development. Apartments at the site are currently advertised for rent from $860 a month.

The court records suggest the rate of eviction orders at Hampton Place has increased by more than 400% under Hannity's ownership. Landlords can obtain the orders from a magistrate judge when a tenant taken to court for unpaid rent fails to respond or pay within seven days. The orders empower local sheriff's deputies to forcibly remove tenants and their property.

Betsy Coleman, a Hampton Place tenant who was evicted by Hannity's company last year, said she had to leave the property after falling behind on her rent.

"It feels awful, because you don't have anywhere else to go," said Coleman, who is 49. "You're trying to work to get the rent up, and you promised to get the money, and when you don't get it, you have to go to court."

Hannity is reportedly paid $36m a year for his primetime Fox News show and syndicated radio program.

Not all the tenants who received eviction orders were ultimately removed from the property. One who asked not to be identified said he was given a reprieve last year after agreeing to pay about $300 in extra fees in addition to a late $725 monthly rent payment for his two-bedroom apartment. "It seemed kind of harsh," he said.

In any case, the court orders are likely to be flagged on background checks and some credit reports that may be screened by future employers and landlords when considering applications from the tenants.

The records show that Hannity's property managers have moved to evict several other tenants who challenged the court action and were instead ordered by the court to pay outstanding debts as low as $232.

Perry, which is in Houston County and about 100 miles south of Atlanta, has a population of about 16,200. According to the US census bureau, 22.6% of residents are living in poverty, compared with 16% of Georgia and 12.7% across the US. At $20,470 a year, Perry's average income is about 31% lower than the US average.

Lindsey Siegel, a senior attorney at the Atlanta Legal Aid Society, said Georgia state law made it relatively easy for landlords to force tenants out of rented homes.

"Georgia is one of the harshest states for tenants," said Siegel. "You can be evicted for being a single day late on your rent – regardless of whether you've paid on time for the past five years."

The court records state that 37 eviction orders were issued after tenants were taken to court by SPMK XVI Hampton, the Hannity-backed shell company that owns the complex. Another 24 were given in response to eviction actions by the property's management company, which is co-owned by Hannity and his financial advisers.

Latonia Grady, who left the Hannity apartments after receiving an eviction order in August 2015, said the managers were unhelpful when her home needed repairs. "They were aggressive," said Grady, who is now 51. The management company says that it offers comprehensive on-site and emergency maintenance services.

Hannity has defended his real estate investment decisions, stating in a post to his website that he had chosen to invest his wealth in "communities that badly need such investment" and that he had limited involvement in the venture's day-to-day operation.

"The fact is, these are investments that I do not individually select, control or know the details about; except that obviously I believe in putting my money to work in communities that otherwise struggle to receive such support," Hannity wrote.

Paperwork on the deal for Hampton Place between Hannity, his lender and Hud state that from June 2019 he may apply for permission from Ben Carson, the Hud secretary, to convert the property to sellable condominiums.

Another of the companies linked to Hannity bought foreclosed houses through a property dealer who later pleaded guilty to fraud and was sent to prison.

Eleven homes purchased by Jeff Brock in foreclosure auctions in Georgia during 2011 and 2012 were transferred to corporate vehicles and then sold on to the Hannity-linked company.

US investigators found Brock and accomplices rigged foreclosure auctions to obtain properties at lower prices. They secretly agreed not to make competing bids at the auctions and then gave payoffs to one another in return. Hannity has not been accused of any wrongdoing.

Reeves, the attorney for Hannity, said the Fox News host had no direct involvement in selecting the houses that Brock had bought at auction. Reeves also said they had been unaware of Brock's fraud before being alerted by the Guardian.

# America faces an epic choice ...

... in the coming months, and the results will define the country for a generation. These are perilous times. Over the last four years, much of what the Guardian holds dear has been threatened – democracy, civility, truth.

The country is at a crossroads. The Supreme Court hangs in the balance – and with it, the future of abortion and voting rights, healthcare, climate policy and much more. Science is in a battle with conjecture and instinct to determine policy in the middle of a pandemic. At the same time, the US is reckoning with centuries of racial injustice – as the White House stokes division along racial lines. At a time like this, an independent news organization that fights for truth and holds power to account is not just optional. It is essential.

Like many news organizations, the Guardian has been significantly impacted by the pandemic. We rely to an ever greater extent on our readers, both for the moral force to continue doing journalism at a time like this and for the financial strength to facilitate that reporting.

# Exhibit 5

# The Washington Post

*Democracy Dies in Darkness*

# At Sean Hannity properties in working-class areas, an aggressive approach to rent collection

By **Aaron C. Davis** and **Shawn Boburg**

May 11, 2018 at 1:46 p.m. PDT

PERRY, Ga. — For years, Fox News host Sean Hannity has poured his fortune into a surprising side venture: a vast portfolio of rental properties in working-class neighborhoods. He described those holdings in compassionate terms when they came to light last month, saying he invests in places that "otherwise might struggle to receive such support."

But a Washington Post analysis shows that managers at Hannity's four largest apartment complexes in Georgia have taken an unusually aggressive approach to rent collection. They have sought court-ordered evictions at twice the statewide rate — in a state known for high numbers of evictions and landlord-friendly laws — and frequently have done so less than two weeks after a missed payment.

Property managers at the complexes sought to evict tenants more than 230 times in 2017, court records show. At one, a 112-unit subdivision in a suburb west of Atlanta, 94 eviction actions were filed last year, records show.

Among the tenants Hannity's property managers sought to evict, records show, were a former corrections officer and her wife, who fell behind while awaiting a disability determination; a double amputee who had lived in an apartment with her daughter for five years but did not pay on time after being hospitalized; and a single mother of three whose $980 rent check was rejected because she could not come up with a $1,050 cleaning fee for a bedbug infestation.

Some of the court files include notes showing that sheriff's deputies removed residents. More often, though, tenants who were taken to court avoided eviction by paying their past-due rent along with hundreds of dollars in late fees and other costs, records show. The Post found that property managers repeatedly filed eviction actions against many of those residents.

Told of The Post's findings, three experts said the pattern suggests that the threat of eviction is being used not just to remove tenants but also to generate revenue.

"When they are serially filing against the same tenants, they are using the courts as collection agencies," said Susan Reif, head of the Eviction Prevention Project at the publicly funded Georgia Legal Services Program. "It appears they are just trying to increase their profit margin by demanding fees under the threat of being evicted from your home."

In response to questions from The Post, Hannity's attorney said in an email that the evictions were appropriate under the circumstances and that Hannity was not involved.

"Mr. Hannity is not and has never been involved in the management of these properties," Christopher E. Reeves wrote. "Evictions only occur after a material breach of the lease terms, which under Georgia law includes the failure to pay

rent when due."

Hannity is a part owner of Hensler Property Management, the firm that manages the apartments, records show. The other partners are people Hannity has worked with for many years, including Reeves, who has represented him in litigation, and William G. Lako Jr., whom Hannity has identified as one of his financial advisers.

The firm was created in 2012, under the name New Millennium Property Management, as Hannity expanded his holdings to include large rental properties in Georgia. Hannity's ownership stake, through a limited liability company called SPMK II, was revealed this year in a disclosure required by the Securities and Exchange Commission.

Emails to Lako, New Millennium and Hensler Property Management also were returned by Reeves, who wrote, "We have no further comment."

Hannity's real estate holdings were first revealed by the Guardian last month after President Trump's personal attorney Michael Cohen disclosed in court that Hannity was one of his three clients. Without offering details, Hannity said he had not paid Cohen for legal work but had asked him for real estate advice. The Guardian also reported that eviction filings spiked at one of Hannity's apartment complexes after he purchased it in 2014.

"It is ironic that I am being attacked for investing my personal money in communities that badly need such investment and in which, I am sure, those attacking me have not invested their money," Hannity said in a statement last month.

Hannity, who reportedly makes $36 million a year, owns more than 1,000 rental units in seven states, records show. They are held through more than two dozen limited liability companies that generally start with SPMK, the combined first initials of Hannity and his two children. SPMK entities have spent more than $84 million on properties since 2003, most of them in Georgia, records show. Although ownership of LLCs is not public, Hannity signed a public document in Georgia in 2007 listing himself as general manager of SPMK II. He also signed government documents for loans on two of the complexes.

Hannity's four largest apartment complexes in Georgia, with a combined 613 units, are the Meadows in Lithia Springs, Hampton Place Apartments in Perry, Vista Ridge Apartments in Gainesville and Legacy Apartment Homes in Brunswick. There were nearly four eviction filings last year for every 10 apartments in those complexes, The Post found.

Landlords statewide have sought an eviction for nearly 2 of every 10 apartments, on average, according to a Post review of the most recent five years of available information on Georgia eviction filings and census data.

In conducting the analysis, The Post consulted with Matthew Desmond, author of the Pulitzer Prize-winning book "Evicted: Poverty and Profit in the American City," and head of the Eviction Lab, a project at Princeton University to build the first national database of evictions. Court actions against tenants at Hannity's properties stand out, Desmond said, and at one property, they were "orders of magnitude bigger" than what researchers have found in any county in Georgia.

# 'Pretty darned quick'

Records show that for residents of Hannity's properties, an unpaid cleaning fee, a dispute over removing mold or a single missed payment can be the breach that leads to an eviction filing. For Zandra Cosby, it began with a bounced check.

Cosby and her wife, Lashondra Cosby, moved into Hampton Place Apartments — a wooded subdivision with a pool and tennis court about 100 miles south of Atlanta — in 2015, the year after a Hannity company bought the property.

For most of the next year, the couple reliably paid their $750 rent on the first of the month, ledgers show. It was of no concern to them when the new property manager announced that late fees would be imposed on the 4th of each month rather than on the 15th, as they had been, or that, on orders from "corporate," eviction papers would be filed against anyone who had not paid by the 20th.

Then, health problems forced Lashondra Cosby, 40, to take a leave from her job as a corrections officer. Soon, the Cosbys needed until the second or third week of the month to make rent, along with a $100 late fee.

In late February 2017, one of their rent checks bounced, court records show. A follow-up payment cleared a week later, but when the couple didn't pay their March rent before the 20th, Hampton filed for eviction, and a judge ordered them to pay $330 in court and eviction fees or move out.

The breaking point was not atypical. The Post found that in a sampling of 50 eviction cases at Hampton last year, tenants owed an average of $760 in rent and were an average of 17 days late when Hannity's property manager filed for eviction. The average fees charged to those tenants amounted to $376.

To file the eviction papers, Hannity's property managers turned to PDQ Services, an Atlanta-area eviction services firm whose acronym stands for Prompt Dependable Quality but that advertises it as a play on "pretty darned quick." PDQ promises on its website that its eviction crews "can remove your tenants quicker and more effectively than anyone else in the business."

PDQ did not respond to requests for comment.

The Cosbys pawned their PlayStation, video games and a camera to cover the fees. But in each of the next two months, a nearly identical scenario played out: a late payment, an eviction filing and a judge ordering another $330 in penalty payments, court records show.

"They kept us down at the courthouse all the time," Zandra Cosby said. "I'd have to call out a half-day and try not to cut off my nose to spite my face. I needed to be at work to pay them to stay but in court to explain it to the judge."

In July, after five eviction filings in as many months, and paying more than $1,000 in late and collection fees, the Cosbys were finished.

Out of money and knowing a PDQ eviction crew could show up any day, they left most of their belongings with friends or in a dumpster and moved into Zandra Cosby's mother's one-bedroom apartment in North Carolina. There they remain, the evictions on their records, unsure when they may again have the credit needed to rent on their own.

"I think they just wanted us out of there," Zandra Cosby said of Hannity's property managers. "We kept trying, but I finally said, 'I give up.' "

# 'I had a pretty good plan'

Hannity spoke of the success of his personal investment strategy in March, when he had Lako on his afternoon radio program as a guest. The Fox News host said the vision for his real estate empire was his own, one that required him to buck counsel from his longtime financial adviser Gene Henssler that he invest in stock.

"Slowly but surely, I convinced him that I was more interested in bricks and mortar and real estate investments and things like that. And I think I've convinced you that I had a pretty good plan," Hannity told Lako, the managing director of Henssler Financial.

"You did. You did. You stressed us pretty good, though," Lako said. "We weren't in the real estate business back then. So you said, 'Get in the business,' and we got in it. We know how to do it now."

Although Hannity occasionally purchased individual properties through LLCs as early as 2007, his SPMK companies went on a three-year buying binge of multifamily buildings beginning in 2013, acquiring complexes with a combined 982 units, records show.

The purchases in the state were concentrated in the years after housing prices bottomed out. Some properties were bought from distressed owners or following foreclosures.

The first of the apartment complexes, purchased in 2013, was the Meadows, a subdivision of duplexes in a treeless expanse in a suburb of Atlanta.

The Post found that of Hannity's large complexes, evictions were most frequent there, with 94 requests to evict residents last year, according to court records. Many tenants were taken to court multiple times only to have the cases dismissed after paying late.

A judge ordered Phyllis McKenzie, who lives with her husband and 20-year-old daughter, out of her duplex six times since 2014, records show. Each time, McKenzie said, she managed to stay in her home by paying late fees and court costs.

"The fees add up," the mail truck driver said recently, shortly after she wrote a check for the latest rent payment, which included $200 in late fees.

In 2014, Hannity added the largest number of rental units to his portfolio with help from a Department of Housing and Urban Development program that insures developers' private loans. Hannity signed the HUD-insured loans, $6.4 million in borrowing for Hampton and $14.75 million for Legacy, a gated complex in southeast Georgia.

He continues to expand and upgrade his holdings. He took out an additional $5 million in loans insured by HUD last year, this time under the Trump administration, to improve the properties, mortgage records show.

Hannity, through SPMK II, and his partners in the property-management firm — Lako, Henssler and Reeves — are seeking investors to fund another real estate venture, SEC records show. They co-own a property investment fund that has assets valued at $5 million to $25 million.

As of February, the fund had sold $13 million in securities to investors who contributed at least $25,000 each, records show. The fund's 65 investors are not disclosed in public filings.

In a notice to investors, however, the firm disclosed that the latest venture involves the management of rental properties, receiving "management, maintenance and leasing and referral fees from its clients."

Veronica McCoy, who managed Legacy Apartment Homes for New Millennium for about four months in 2016, said the company had "a very low tolerance for not paying rent" and charged "stiff" late fees.

McCoy, 46, who said she left New Millennium over differences with a regional manager, said the company's "aggressive" tactics rubbed her the wrong way.

"I was told that if someone's rent was short $2, I couldn't accept it," she said, recalling an issue that arose with a particular tenant. "I thought it was ridiculous."

*Alice Crites contributed to this report.*

**Your profile is incomplete**
Before you can contribute to our community, please visit your Profile page in order to complete your profile.

# Exhibit 6

In Georgia, Sean Hannity is just another landlord hiking the rent - Los Angeles Times

ADVERTISEMENT

WORLD & NATION

# In Georgia, Sean Hannity is just another landlord hiking the rent



Keith Jones, a 62-year-old pipe layer, stands in front of his small rental duplex in Lithia Springs, Ga., which is owned by a shell company linked to Fox News host Sean Hannity. "They need to freeze the rents," he said. "It gets higher and higher all the time." (Jenny Jarvie / Los Angeles Times)

10/2/2020
Case 3:19-cv-08181-JCS Document 32-2 Filed 10/08/20 Page 42 of 125
Sean Hannity, America's famous landlord, hooking up - Los Angeles Times

By JENNY JARVIE, MATT PEARCE

APRIL 27, 2018 | 12:50 PM



Reporting from Lithia Springs, Ga. —  Fox News host Sean Hannity is one of the most recognizable media figures in America. He has the ear of President Trump. His show is one of the most popular on cable news.

But you wouldn't know it from talking to the tenants at the Meadows, a modest neighborhood of duplexes in Lithia Springs, about 15 miles west of downtown Atlanta.

**For the record:**

**5:55 PM, Apr. 28, 2018** *An earlier version of this story said that rents at a property owned by Sean Hannity had increased 10% a year from 2013 to 2018. They increased 50% since 2013.*

"Who?" Keith Jones, a 62-year-old pipe layer, said blankly in an interview this week.

"I don't know who he is," said Sherrice Rouster, a 38-year-old self-employed childcare worker and tax preparer.

ADVERTISING

Hannity is their landlord, and he's raising their rent — a lot.

In this March 4, 2016, file photo, Sean Hannity of Fox News appears at the Conservative Political Action Conference (CPAC) in National Harbor, Md. (Carolyn Kaster / AP )

Case 3:19-cv-08181-JCS Document 32-2 Filed 10/08/20 Page 44 of 125

Journalists [uncovered Hannity's extensive rental holdings](#) in Georgia and Alabama this week after he said he had consulted with the president's lawyer, Michael Cohen, about real estate issues.

Through a series of limited-liability companies — each using the name SPMK, followed by Roman numerals — documents revealed that Hannity is the owner of apartment complexes and houses worth tens of millions of dollars and capable of housing hundreds of people.

ADVERTISEMENT



SPONSORED CONTENT

**Diamond Cotton Quilt - Multi - $189** ⬈

By The Company Store

We're All About Comfort.

A Nassau County, New York, property document revealed Fox News host as the owner of a property-holding company called "SPMK IV." A series of "SPMK" companies, registered to the same address at a financial firm in Georgia, own rental complexes in Georgia and Alabama. (Los Angeles Times )

Some observers tittered at the revelation that Hannity, a vocal critic of government assistance, had accepted taxpayer help from the Department of Housing and Urban Development to insure the mortgages for at least two of his rental complexes.

Case 3:19-cv-08181-JCS  Document 32-2  Filed 10/08/20  Page 46 of 125

But there was little unique about the way Hannity built his empire, using limited-liability companies, as many wealthy people do, to shield his identity while legally buying properties. It's the same story of how Wall Street became a major Main Street landlord — and began jacking up rents.

In 2012, Hannity joined a wave of big-money investors to sweep in after the Great Recession's housing crash, often snatching up foreclosed properties across the U.S. at bargain-bin prices.

ADVERTISEMENT

"Historically, the typical single-family landlord was a local person who owned a few houses," said Julia Gordon, executive vice president of the National Community Stabilization Trust, an anti-blight nonprofit organization. "They would basically oversee things like collecting the rent, do home repairs themselves, or employ a handyman to do home repairs. It was a very mom-and-pop type-industry."

Today, Gordon said, it seems like rental homes "are almost always owned by somebody whose last name is 'LLC.' "

The rise in out-of-town ownership also coincided with the rise of companies like Renters Warehouse, a national property-management service that received a celebrity endorsement from Hannity.

The duplexes at the Meadows, in Lithia Springs, were built on a former cow pasture in the 1980s by Paul Robinson Jr., a local home builder and small businessman. The subdivision has more than 100 units, which average about 944 square feet.

ADVERTISEMENT

A neighborhood of duplexes in Lithia Springs, Ga., called the Meadows, is owned by a company linked to Fox News host Sean Hannity. (Los Angeles Times )

It was an investment for his retirement, Robinson said in an interview this week. Living next door, he adopted a hands-on approach, taking on much of the day-to-day work of cleaning up, painting, replacing carpet and collecting rent.

Case 3:19-cv-08181-JCS Document 32-2 Filed 10/08/20 Page 48 of 125

Robinson didn't raise the rent much, he said, because many of his tenants had lived there for 10 or 20 years and were elderly.

But after the financial crisis hit, Robinson lost the complex, he said, when his bank went under and the new bank demanded that he pay $500,000 of the $2.5 million loan.

ADVERTISEMENT

With 112 duplex units bringing in a cash flow of about $60,000 a month, Robinson said, he had $500,000. But it was only a one-year deal and, having heard of horror stories of banks upping demands each year, he decided to let the bank foreclose on the property.

Eventually, the loss of rental income led Robinson to lose his own home too.

Then, in March 2013, an LLC named SPMK XII Meadows bought the property from Robinson's bank for $3.15 million.

A housing development of rental duplexes called the Meadows, in Lithia Springs, Ga., is owned by a limited-liability company owned by Fox News host Sean Hannity. (Jenny Jarvie / Los Angeles Times )

ADVERTISEMENT

There was nothing in the company's registration records indicating its owner was a famous TV host. The complex is managed by Henssler Property Management, which is co-owned by another LLC called SPMK II.

Case 3:19-cv-08181-JCS Document 32-2 Filed 10/08/20 Page 50 of 125

After Hannity was named as the owner of the SPMK companies this week, he defended his holdings.

"It is ironic that I am being attacked for investing my personal money in communities that badly need such investment and in which, I am sure, those attacking me have not invested their money," Hannity said in a statement. "The fact is, these are investments that I do not individually select, control, or know the details about; except that obviously I believe in putting my money to work in communities that otherwise struggle to receive such support."

Since SPMK took over, the homes got renovated. Old carpets were replaced with hardwood floors; kitchens got new cabinets and appliances. Outside, fresh siding went up and flower beds were filled with uniform rows of privet and pink roses.

ADVERTISEMENT

But longtime tenants of this predominantly blue collar, African American neighborhood also said their monthly payments on their small two-bedroom apartments had gone up 50% over the last five years, increasing from about $650 to as much as $1,000.

Rents are rising nationally. But a rate increase of roughly 50% since 2013 is surprisingly high, about double the rate of rentals in the Lithia Springs area, said Dan Immergluck, a professor at Georgia State University's Urban Studies Institute, who specializes in neighborhood change and housing markets.

"That's a lot, and it's fast," Immergluck said, noting that even if Hannity spent thousands of dollars on renovations for each unit, "he is probably doing quite well" in terms of profit.

"It's not really affordable," said Rouster, a Meadows resident, as a pair of toddlers waddled around her tiny living room.

ADVERTISEMENT

"He's not helping. He's making money," said Iyabo Balogun, a 51-year-old home-helper who works with the elderly and lives in a unit with her niece and her two children. "If he was helping, he wouldn't be increasing rents every year."

Olander Ragan, a 29-year-old warehouse forklift truck driver, is taking on extra jobs – cutting grass every Saturday and fixing cars to meet his monthly $850 rental payments for the cramped apartment he shares with his wife and daughter. Next month, his payment will jump to $950 a month.

"They wanted to raise it to $1,000, but I told them I'm not going to pay that much," he said, as he sat cross-legged on the asphalt outside his tiny duplex, surrounded by a hammer, ratchets and lug nuts as he installed new brake pads on a Honda Accord.

Olander Ragan, a 29-year-old warehouse forklift truck driver, repairs a car to help pay rent for his home in the Meadows, a Lithia Springs, Ga., housing development owned by a limited-liability company linked to Fox News host Sean Hannity. (Jenny Jarvie / Los Angeles Times )

ADVERTISEMENT

For Ragan, his prospect of financial security is bleak, whether or not Hannity is his landlord.

"I'm a black man living in America. Doesn't matter who my landlord is. Doesn't matter if he's a racist S.O.B.," Ragan said bitterly as his friend watched him work. "I've been a slave all my life. What am I supposed to do?"

An attorney who handles Hannity's real-estate holdings, Christopher Reeves, did not respond to a request for comment.

Even if they felt the odds were against them, many residents said they hoped to eventually own their own place.

ADVERTISEMENT

"I ain't planning on being around here much longer," Ragan said. "I don't want to keep paying rent for something I can never own. It's a waste of my time."

While Robinson, the builder of the complex, still thinks the banks treated him unfairly — "They killed all the little guys" — he has no hard feelings against the current owner of his property.

"The rents needed to go up," Robinson said. "I should have gone up on them, but we all knew each other."

Of Hannity's decision to snap up the property out of foreclosure, Robinson added: "If he had the money to buy all that during the bad times, that's how you get ahead. I wish I'd have had that myself, but it just didn't work out that way."

ADVERTISEMENT

Now working as a property manager more than 100 miles away in Pell City, Ala., Robinson has not given up on real estate. Even with more big corporations swooping in to buy properties, he said, there are still deals to be had.

Case 3:19-cv-08181-JCS Document 32-2 Filed 10/08/20 Page 54 of 125

"It's a free market," he said. "They have opportunities. There's also opportunities for a little guy like me, to kind of move around and manipulate in between the big guys. … There are opportunities for all of us."

*Pearce reported from Los Angeles and special correspondent Jarvie reported from Lithia Springs.*

**matt.pearce@latimes.com**

ADVERTISEMENT

**Matt Pearce is a national reporter for The Times. Follow him on Twitter at @mattdpearce.**

**More national headlines**

WORLD & NATION

---



## Must-read stories from the L.A. Times

Get all the day's most vital news with our Today's Headlines newsletter, sent every weekday morning.

| Enter Email Address |
| --- |

| SIGN ME UP |
| --- |

You may occasionally receive promotional content from the Los Angeles Times.

     Matt Pearce

 Twitter      Instagram      Email      Facebook

# Exhibit 7



*Fontana Village, a Baltimore-area apartment complex owned by Jared Kushner's real-estate company, Kushner Companies. (Philip Montgomery for The New York Times)*

## The Beleaguered Tenants of 'Kushnerville'

Tenants in more than a dozen Baltimore-area rental complexes complain about a property owner who they say leaves their homes in disrepair, humiliates late-paying renters and often sues them when they try to move out. Few of them know that their landlord is the president's son-in-law.

by Alec MacGillis, May 23, 2017, 5 a.m. EDT

*ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive our biggest stories as soon as they're published.*

*This story was co-published with The New York Times Magazine.*

The Townhouse on High Seas Court in the Cove Village development, in the Baltimore suburb of Essex, was not exactly the Cape Cod retreat that its address implied: It was a small unit looking onto a parking lot, the windows of its two bedrooms so high and narrow that a child would have had to stand on a chair to see out of them. But to Kamiia Warren, who moved into the townhouse in 2004, it was a refuge, and a far cry from the East Baltimore neighborhood where she grew up. "I mean, there were bunny rabbits all hopping around," she told me recently.

In the townhouse next door lived an older woman with whom Warren became friendly, even doing her grocery shopping once in a while. But over the course of a few months, the woman started acting strangely. She

began accosting Warren's visitors. She shouted through the walls during
the day. And at night she banged on the wall, right where Warren kept the
bassinet in which her third child slept, waking him up.

Warren sent a letter reporting the problem to the complex's property
manager, a company called Sawyer Realty Holdings. When there was no
response, she decided to move out. In January 2010, she submitted the
requisite form giving two months' notice that she was transferring her
Section 8 voucher — the federal low-income subsidy that helped her pay
the rent — elsewhere. The complex's on-site manager signed the form a
week later, checking the line that read "The tenant gave notice in
accordance with the lease."

So Warren was startled in January 2013, three years later, when she
received a summons from a private process server informing her that she
was being sued for $3,014.08 by the owner of Cove Village. The lawsuit,
filed in Maryland District Court, was doubly bewildering. It claimed she
owed the money for having left in advance of her lease's expiration, though
she had received written permission to leave. And the company suing her
was not Sawyer, but one whose name she didn't recognize: JK2
Westminster LLC.

Warren was raising three children alone while taking classes for a
bachelor's degree in health care administration, and she disregarded the
summons at first. But JK2 Westminster's lawyers persisted; two more
summonses followed. In April 2014, she appeared without a lawyer at a
district court hearing. She told the judge about the approval for her move,
but she did not have a copy of the form the manager had signed. The judge
ruled against Warren, awarding JK2 Westminster the full sum it was
seeking, plus court costs, attorney's fees and interest that brought the
judgment to nearly $5,000. There was no way Warren, who was working as
a home health aide, was going to be able to pay such a sum. "I was so
desperate," she said.

If the case was confounding to Warren, it was not unique. Hundreds like it
have been filed over the last five years by JK2 Westminster and affiliated
businesses in the state of Maryland alone, where the company owns some
8,000 apartments and townhouses. Nor was JK2 Westminster quite as
anonymous as its opaque name suggested. It was a subsidiary of a large
New York real-estate firm called Kushner Companies, which was led by a
young man whose initials happened to be J.K.: Jared Kushner.

---

When Americans were introduced last year to Ivanka Trump's husband
and the nation's prospective son-in-law in chief, it was as the
preternaturally poised, Harvard-educated scion of a real-estate empire
whose glittering ambitions resembled Donald Trump's own. In 2007,

Kushner Companies, run at the time by Jared and his father, Charles, bought the aluminum-clad skyscraper at 666 Fifth Avenue for a record-breaking $1.8 billion; they are now seeking partners for a $12 billion plan to replace it with a glass tower that would be 40 stories taller. In 2013 they acquired 17 buildings in Manhattan's East Village for about $130 million, and three years later they spent $715 million on a cluster of buildings owned by the Jehovah's Witnesses on prime land in Brooklyn's fast-developing Dumbo district.

But the Kushners' empire, like Trump's, was underwritten by years of dealing in much more modestly ambitioned properties. Jared's grandfather Joseph Kushner, a Holocaust survivor from Belarus, over his lifetime built a small construction company in New Jersey into a real-estate venture that owned and managed some 4,000 low-rise units concentrated in the suburbs of Newark. After taking over the business, Charles expanded Kushner Companies' holdings to commercial and industrial spaces, but the company's bread and butter remained the North Jersey apartment complexes bequeathed to him by his father.

In the mid-2000s, the company began to sell off the more than 25,000 multifamily rental units it owned, culminating in a 2007 sale of nearly 17,000 units for $1.9 billion. The sale — near the peak of the housing boom, just months before the crash — was impeccably timed, but it also reflected a shift in the attentions of what would soon be a three-generation real-estate dynasty. Charles, a major Democratic Party donor, had returned late the previous year from a brief stint in federal prison after pleading guilty to 18 counts of tax evasion, witness tampering and illegal campaign donations. Back at the helm of the company, he began to shift its focus from New Jersey to New York City — and prepared to pass the reins to his son Jared, who had just received a degree in law and business from New York University.

But amid the high-profile Manhattan and Brooklyn purchases, in 2011, Kushner Companies, with Jared now more firmly in command, pulled together a deal that looked much more like something from the firm's humble past than from its high-rolling present. That June, the company and its equity partners bought 4,681 units of what are known in real-estate jargon as "distress-ridden, Class B" apartment complexes: units whose prices fell somewhere in the middle of the market, typically of a certain age and wear, whose owners were in financial difficulty. The properties were spread across 12 sites in Toledo, Ohio; Pittsburgh; and other Rust Belt cities still reeling from the Great Recession. Kushner had to settle more than 200 debts held against the complexes before the deal could go through; at one complex, in Pittsburgh, circumstances had become so dire that some residents had been left without heat and power because the previous owner couldn't pay the bills. Prudential, which was foreclosing on

the portfolio, sold it for only $72 million — half the value of the mortgages on the properties.

In the following months, Kushner Companies bought another 1,700 multifamily units in similar markets, according to the trade publication Multifamily Executive. Unlike the company's big New York investments, the complexes were not acquired with an eye toward appreciation — these were not growing markets, after all — but toward producing a steady cash flow. "Our goal is to keep buying and incrementally growing — they're good markets where you can get yield," Jared Kushner told Multifamily Executive in October 2011, predicting that the net income for the year's purchases would be $14 million within a year. The complexes buttressed the Kushner portfolio in another way, he said: They would serve as a hedge against an upswing in inflation he believed was looming on the horizon.

A year later, in August 2012, a Kushner-led investment group bought 5,500 multifamily units in the Baltimore area with $371 million in financing from Freddie Mac, the government-backed mortgage lender — another considerable bargain. Two years later, Kushner Companies picked up three more complexes in the Baltimore area for $37.9 million. Today, Westminster Management, Kushner Companies' property-management arm, lists 34 complexes under its control in Maryland, Ohio and New Jersey, with a total of close to 20,000 units.

Kushner's largest concentration of multifamily units is in the Baltimore area, where the company controls 15 complexes in all — which, if you assume three residents per unit, could be home to more than 20,000 people. All but two of the complexes are in suburban Baltimore County, but they are only "suburban" in the most literal sense. They sit along arterial shopping strips or highways, yet they are easy to miss — the Highland Village complex, for example, is beside the Baltimore-Washington Parkway, but the tall sound barriers dividing it from the six-lane highway render its more than 1,000 units invisible to the thousands traveling that route every day.

The complexes date mostly from the 1960s and '70s, when white flight from the city was creating a huge demand for affordable housing in Baltimore County. They were meant to exude middle-class respectability — unglamorous but safe and pleasant enough, a renter's Levittown. Since then, however, they have slipped socioeconomically, along with the middle class itself, into the vast gray area of the modern precariat — home to casino workers, distribution-warehouse pickers, Uber drivers, students at for-profit colleges. Although most of the tenants I met in a series of recent visits to the complexes pay their own rent, ranging from about $800 to $1,300, some of them receive Section 8 assistance, as Kamiia Warren did; Baltimore County has no public housing for a population of more than 825,000, so these and similar complexes have become the de facto substitute.

At the time of the 2012 Baltimore purchase, Kushner raved about the promise of the low-end multifamily market. "It's proven over the last few years to be the most resilient asset class, and at the end of the day, it's a very stable asset class," he told Multifamily Executive. He said things were proceeding well in the Midwestern complexes he purchased a year earlier. "It was a lot of construction and a lot of evictions," he said. "But the communities now look great, and the outcome has been phenomenal."

———————

Kamiia Warren still had not paid the $4,984.37 judgment against her by late 2014. Three days before Christmas that year, JK2 Westminster filed a request to garnish her wages from her in-home elder care job. Five days earlier, Warren had gone to court to fill out a handwritten motion saying she had proof that she was given permission to leave Cove Village in 2010 — she had finally managed to get a copy from the housing department. "Please give me the opportunity to plead my case," she wrote. But she did not attach a copy of the form to her motion, not realizing it was necessary, so a judge denied it on Jan. 9, on the grounds that there was "no evidence submitted."

The garnishing started that month. Warren was in the midst of leaving her job, but JK2 Westminster garnished her bank account too. After her account was zeroed out, a loss of about $900, she borrowed money from her mother to buy food for her children and pay her bills. That February — five years after she left Cove Village — Warren returned to court, this time with the housing form in hand, asking the judge to halt garnishment. "I am a single mom of three and my bank account was wiped clean by the plaintiff," she pleaded in another handwritten request. "I cannot take care of my kids when they snatch all of my money out of my account. I do not feel I owe this money. Please have mercy on my family and I." She told me that when she called the law office representing JK2 Westminster that same day from the courthouse to discuss the case, one of the lawyers told her: "This is not going to go away. You will pay us."

The judge denied Warren's request without explanation. And JK2 Westminster kept pressing for the rest of the money, sending out one process server after another to present Warren with legal papers. Finally, in January 2016, the court sent notice of a $4,615 lien against Warren — a legal claim against her for the remaining judgment. Warren began to cry as she recounted the episode to me. She said the lien has greatly complicated her hopes of taking out a loan to start her own small assisted living center. She had gone a couple of years without a bank account, for fear of further garnishing. "It was just pure greed," she said. "It was unnecessary." I asked why she hadn't pushed harder against the judgment once she had the necessary evidence in hand. "They know how to work this stuff," she replied. "They know what to do, and here I am, I don't know anything



*Kamiia Warren at Cove Village, the Kushner Companies property in Essex, Maryland, where she once lived (Philip Montgomery for The New York Times)*

about the law. I would have to hire a lawyer or something, and I really can't afford that. I really don't know my rights. I don't know all the court lingo. I knew that up against them I would lose."

A search for "JK2 Westminster" in the database of Maryland's District Court system brings back 548 cases in which it is the plaintiff — and that does not include hundreds of other cases that have been filed in the name of the company's individual complexes.

The vast majority of these cases have been filed by a single small law firm in the Baltimore suburb of Owings Mills. The law office of Jeffrey Tapper specializes in "collections" work, with an emphasis on landlord-tenant cases. It has represented several other real-estate management companies, including Sawyer, which retains a stake in many of the Kushner complexes.

In April, I drove to Owings Mills in hopes of speaking to Tapper. As I waited for him by reception, I overheard an assistant making a call about a new case, saying that the firm would continue to pursue one tenant even if the other person on the lease had filed for bankruptcy. Tapper emerged, a man in his mid-60s with white hair, a paunch and a large smartphone clipped to his belt. Our interview was brief. "I'm not having any conversation with you that has to do with one of my clients," he said. "I'm not helping you with any of whatever you're trying to do."

In the cases that Tapper has brought to court on behalf of JK2 Westminster and individual Kushner-controlled companies, there is a clear pattern of Kushner Companies' pursuing tenants over virtually any unpaid rent or broken lease — even in the numerous cases where the facts appear to be on the tenants' side. Not only does the company file cases against them, it pursues the cases for as long as it takes to collect from the overmatched defendants — often several years. The court docket of JK2 Westminster's case against Warren, for instance, spans more than three years and 112 actions — for a sum that amounts to maybe two days' worth of billings for the average corporate law firm associate, from a woman who never even rented from JK2 Westminster. The pursuit is all the more remarkable given how transient the company's prey tends to be. Hounding former tenants for money means paying to send out process servers who often report back that they were unable to locate the target. This does not deter Kushner Companies' lawyers. They send the servers back out again a few months later.

In March 2009, Joan Beverly, a probation agent, signed the lease for her daughter, Lennettea, for a unit at Dutch Village, a complex on the northern edge of Baltimore. Lennettea moved out a year later, several months before her lease was up. Kushner Companies bought Dutch Village more than two years later. In December 2012, JK2 Westminster filed suit in Baltimore County District Court against Beverly, seeking $3,810.16 — several months of rent it said it was owed, plus about $1,000 in repair costs, including $10 for "failure to return laundry room card."

That February, Lennettea filed a written court notice explaining that her mother, who was dying of pancreatic cancer, was "in terminal hospice care and is not eligible to work." She added by way of supporting evidence a letter from the hospice provider to Joan Beverly's bank, explaining her and her husband's late mortgage payments on their home: "There has been added financial stress because Mrs. Beverly is very ill at this time." But JK2 Westminster persisted in seeking a hearing on the suit. In March, a district court judge found in favor of the company — a total judgment against Joan of more than $5,500.

Joan died two weeks later. Her husband, Tyrone Beverly, a retired longshoreman, requested that the judgment against his deceased wife be removed but was denied. The case remains open in the court database.

Tyrone, who was married to Joan for 32 years, told me that he had assumed the judgment had been dismissed and was unaware that it was still listed as awaiting payment. "They just didn't treat us fair," he said.



*Dutch Village, a Kushner Companies-owned complex in Baltimore (Philip Montgomery for The New York Times)*

The sweeping nature of the company's pursuit of tenants was most evident when those tenants were, in fact, prepared to defend themselves. Shawanda Hough moved out of her unit in the Carriage Hill complex in the northwestern Baltimore suburb of Randallstown in early 2012 after black mold worsened her son's asthma, landing him in the hospital twice. After the maintenance crew tried and failed to fix the problem, she got the rental office's written permission to move out in advance of her lease. But then Kushner Companies bought Carriage Hill, and a year and a half later, in August 2013, JK2 Westminster filed a lawsuit against Hough, seeking $4,068.53.

Hough fought back. In a court filing, she said that she had kept all of her documentation, and that the company had assured her that it had not lost a dime in rent; she had gone so far as to coordinate the time of her departure with the arrival of a new tenant. JK2 Westminster went ahead with a hearing before a judge a month later, but the judge ultimately found for Hough.

Cases like Hough's, however, were the exception rather than the rule. Overall, about nine out of every 10 cases brought by JK2 Westminster that I surveyed resulted in judgments against the defendants, who often did not appear in person for the hearings — and if they did, almost never had legal representation. How could it possibly be worth Kushner Companies' while to pursue hundreds of people so aggressively over a few thousand dollars

here and there? After all, the pursuit itself cost money. And it wasn't happening just in Baltimore — Doug Wilkins, a lawyer in Toledo who has represented some of the complexes bought there by Kushner, told me the company is seeking far more monetary judgments than did previous owners.

When I presented JK2 Westminster's record of litigation to Matthew Cypher, a Georgetown University business professor who used to work for the real-estate giant Invesco, he said it was highly unusual to put so much effort into pursuing former tenants in court. "These people fade into the shadows of the night," he said. "It's amazing to me that there's that much to go after." Brian Pendergraft, an attorney in Greenbelt, Maryland, who works on both sides of landlord-tenant litigation, told me he had heard of large property-management companies pursuing former tenants for unpaid rent but not going so far as to pursue tenants who predated the company's ownership of a complex. "I guess you can do it," he said, "but I don't think it's cool."

But Matthew Hertz, whose Bethesda, Maryland, firm represents landlords and tenants in similar cases, explained to me that there is a logic behind such aggressive tactics. The costs of the pursuit are not as high as you might imagine, he said — people are not that hard to find in the age of cellphones and easily accessible databases. "If I give my process server a name and phone number, it's generally enough to trace you," he said. "If I have a date of birth and Social Security number, it's even easier." The legal costs can be billed to the defendant as attorney's fees, if the terms of the lease allow. And garnishing wages is relatively easy to do by court order, assuming the defendant has wages to garnish.

As for pursuing former tenants from years before the new company's ownership of a complex, Hertz said it was hardly different from an investor's buying a portfolio of mortgages: It's debt to be collected on. "If you buy someone's properties, you're buying their debts, not just their assets. You take the good with the bad, and try to collect on the bad. Even if you only get back 5 percent, you're making something," he said. "It's, 'I'm buying up this property and if I can collect anything, it's gravy on top.'"

There was, Hertz added, an ancillary benefit to such relentless pursuit: sending a message to current tenants. One way to make sure that tenants are paying their rent and to keep them from breaking leases early — which brings with it the costs and hassles of having to clean apartments and find new tenants — is to instill a sense of fear about violating a lease. "Any landlord takes that into account," Hertz said. "They know tenants are going to talk to each other. If they say, 'He's going to come after you,' it's deterrence."

When Kushner Companies finally responded to my questions about the cases, they essentially affirmed Hertz's reasoning. As manager for the

10/2/2020
Case 3:19-cv-08181-JCS   Document 32-2   Filed 10/08/20   Page 65 of 125
The beleaguered tenants of 'Kushnerville' — ProPublica

Baltimore complexes, the company had a "fiduciary obligation" to its ownership partners to collect as much revenue as it could, said Kushner Companies' chief financial officer, Jennifer McLean, in a written response. She said the company's legal costs have been "minimal" compared with what it seeks to recover.

McLean declined to comment on several cases, including Kamiia Warren's. But she said the pursuit of Joan Beverly, the woman dying of cancer, was justified. "This tenant owed the landlord $3,819.16," she said in the written statement. "As property manager, it's our job to collect rent payments."

In general, "Westminster Management only takes legal action against a tenant when absolutely necessary," McLean said. "If legal action is pursued, however, the company follows guidelines consistent with industry standards." She added: "While taking a tenant to court is far from an ideal outcome, that option — and clear rules governing it — must exist as a last resort."

---

The Highland Village complex, along the Baltimore-Washington Parkway, is one of Kushner Companies' largest, a vast maze of lanes and courts lined with rows of short brick-and-siding-fronted homes. Like the other Kushner complexes I visited in Baltimore's southern and eastern suburbs, it is situated in what was once a predominantly white working-class community, within reasonable commuting distance of the harbor and industrial plants, now defunct, like Bethlehem Steel. In recent decades, many black transplants from the city and Hispanic immigrants have arrived as well, and Highland Village is an unusually integrated place.

The complex, like the others I saw, seemed designed to preclude neighborliness — most of the townhouses lack even the barest stoop to sit out on, and at least one complex has signs forbidding ball-playing ("violators will be prosecuted"). At another complex, kids had drawn a rectangle on the side of a storage shed in lieu of a hoop for their basketball game. The only meeting points at many of the complexes are the metal mailbox stands, the dumpsters and the laundry room. And the only thing that united many of the residents I spoke to, it seemed, was resentment of their landlord.

They complained about Westminster Management's aggressive rent-collection practices, which many told me exceeded what they had experienced under the previous owners. Rent is marked officially late, they said, if it arrives after 4:30 p.m. on the fifth day of the month. But Westminster recently made paying the rent much more of a challenge. Last fall, it sent notice to residents saying that they could no longer pay by money order (on which many residents, who lack checking accounts, had relied) at the complex's rental office and would instead need to go to a

Case 3:19-cv-08181-JCS   Document 32-2   Filed 10/08/20   Page 66 of 125

Walmart or Ace Cash Express and use an assigned "WIPS card" — a plastic card linked to the resident's account — to pay their rent there. That method carries a $3.50 fee for every payment, and getting to the Walmart or Ace is difficult for the many residents without cars.



Tenants who pay after the fifth are hit with late fees that start around $40 to $50 and escalate from there, with court fees usually added on as well. What upsets residents most, though, are not the fees themselves but that the property managers, instead of putting pink or yellow late notices and court summonses discreetly

*Highland Village, where many residents complained about the owners' aggressive rent-collection practices (Philip Montgomery for The New York Times)*

in mailboxes or under doors, post them in public — on the front doors of townhouse units or on lobby walls or lobby doors of apartment buildings. This bothered even tenants who said they always paid their rent on time. "The whole neighborhood knows," said Marquita Parmely, a truck driver who pays $1,010 a month to rent a townhouse at Essex Park, near Cove Village. Dareck Cromwell, a retiree living at Carriage Hill, told me: "They put them in the windows for everybody to see, to see your business. That's not right. You don't put people's business out like that."

Compounding these grievances was Westminster's maintenance of the properties — or lack thereof. Their complexes comprise hundreds of units, but typically have only four or so workers looking after them. Alishia Jamesson, a 30-year-old Highland Village resident, invited me into the small living room of the $842-a-month townhouse she and her fiancé share with her two children. The room was cluttered with bags from Walmart and Dollar Tree, ketchup packets and supplies for the work Jamesson took up after she lost her cashier's job at Walmart for missing too many shifts for parenting duties: making personalized tote bags and gift baskets for weddings.

Jamesson showed me three large holes in the walls of the townhouse, which Westminster charged her and her fiancé, Keith Riggs, $150 to fix in October but had not yet repaired. "Every time I ask about drywall they say, 'Oh, well, we only have one drywall person,'" Riggs told me. There was also black mold spreading around the bathtub, a large brown stain and crack on the wall adjacent to the stove and a gap in the bathroom skylight that allowed in rain and snow. Jamesson told me that the refrigerator hadn't

10/2/2020
Case 3:19-cv-08181-JCS   Document 32-2   Filed 10/08/20   Page 67 of 125
The beleaguered tenants of 'Kushnerville'

worked for more than a month before being replaced; her family had lived on canned food and boxed milk.

Complaints about poor upkeep abounded at the other complexes too. At Highland Village, there was the matter of the vacant unit that burned down one night a couple of months ago: Its shell was still standing, attended by nothing but plywood and a tarp. At Essex Park, east of the city, Marquita Parmely, the truck driver, told me she had a mouse infestation that was severe enough that her 12-year-old daughter recently found one in her bed. Parmely also has a 2-year-old with asthma, which is aggravated by allergens in mice droppings. She moved her own bed and other furniture away from the walls to dissuade mice, kept the family's laundry in tote bags after mice started appearing in the hamper and vacuumed twice a day. Her neighbor told me it took weeks for staff members to replace a rear window that had been shot out by kids with a BB gun.



*A late-rent notice left on the front door of a Kushner Companies complex in a suburb of Baltimore (Philip Montgomery for The New York Times)*

At the Carroll Park complex in Middle River, Maryland, Jen Jackson showed me a ceiling leak that was causing a mold problem. At the Whispering Woods townhouses nearby, a resident named Nicole, who asked that I not use her last name, told me she had filed unheeded complaints about loose plastic shutters, one of which finally fell off and hit her in the head. (When I visited Nicole again a few weeks later, she told me that Westminster staff had scolded her for speaking with me and told her not to do so again. A large black pickup followed me and a photographer as we walked through the complex until we left.) In the same complex, Renee Cook showed me the large swath of her downstairs ceiling that had

collapsed and the mold and mildew beneath the carpet, each resulting from a leak from her neighbor's (illicit) washer-dryer.

Asked about such conditions, Kushner Companies said it follows industry standards for maintenance staffing and exterminator visits, and that it and its partners had spent $10 million on upgrades across the complexes. "Despite those improvements, issues still arise, given the age of the properties," said McLean, the chief financial officer. Shortly after I put questions to the company about specific tenants' complaints, Cook's ceiling was repaired.

The worst troubles may have been those described in a 2013 court case involving Jasmine Cox's unit at Cove Village. They began with the bedroom ceiling, which started leaking one day. Then maggots started coming out of the living room carpet. Then raw sewage started flowing out of the kitchen sink. "It sounded like someone turned a pool upside down," Cox told me. "I heard the water hitting the floor and I panicked. I got out of bed and the sink is black and gray, it's pooling out of the sink and the house smells terrible."

Cox stopped cooking for herself and her son, not wanting food near the sink. A judge allowed her reduced rent for one month. When she moved out soon afterward, Westminster Management sent her a $600 invoice for a new carpet and other repairs. Cox, who is now working as a battery-test engineer and about to buy her first home, was unaware who was behind the company that had put her through such an ordeal. When I told her of Kushner's involvement, there was a silence as she took it in.

"Get that [expletive] out of here," she said.

———————————————

Very few of the complex residents I met, even ones who had been pursued at length in court by JK2 Westminster, had any idea that their rent and late fees were going to the family company of the president's son-in-law. "*That* Jared Kushner?" Danny Jackson, a plumber in his 15th year living at Harbor Point Estates, exclaimed. "Oh, my God. And I thought he was the good one."

Jackson said he voted for Hillary Clinton in 2016. Many of the others I spoke with had not voted — in that or any other election. "I'm not a big political person, so I feel like I don't think I should vote on something I know nothing about," Alishia Jamesson told me. But eastern Baltimore County was a Trump stronghold, a formerly staunch Democratic territory with many downwardly mobile white voters — and Kushner's complexes were no exception.

East of the city, I met Chris Freimiller, a 38-year-old resident of the company's Morningside Park complex, who was smoking Newports in his



*Mike McHargue, whose girlfriend Patricia Howell is a Trump supporter, did not know that Jared Kushner owns the housing complex in Middle River, Maryland, where he lives. (Philip Montgomery for The New York Times)*

car before heading to work at a Rite Aid distribution center. Freimiller complained to me about the persistent leaks from the toilet and the ceiling damage it had caused, and about being hit repeatedly with late fees. He told me he voted for president for the first time ever last year — for Donald Trump. His vote, he said, was motivated by "the racial and police issues. How bad it got with Obama and how he seemed to promote the cop-bashing and the racial divide." Did knowing that he was sending his late fees to Trump's son-in-law change anything? "Yeah, actually," he said. "As if they need any more money."

At the Carroll Park complex, I met Mike McHargue, a private investigator, and his girlfriend, Patricia Howell. "They're nothing but slumlords," Howell told me of Westminster Management. "They take everyone's money." When I asked if they knew who was behind the company, they

said they did not. "Oh, really?" Howell said when I mentioned Kushner's name. "Oh, *really*. And I'm a Trump supporter."

————————————————

Jared Kushner stepped down as chief executive of Kushner Companies in January. But he remains a stakeholder in the company — his share of company-related trusts is estimated to be worth at least $600 million — and the company says it has no intention of selling off its multifamily holdings. (JK2 Westminster was formally dissolved in December, but Kushner Companies still owns the complexes through other entities; lawsuits against tenants are now typically filed in the names of the complexes themselves.) Because Kushner retains his interest in the complexes, the White House told The Baltimore Sun in February that he would recuse himself from any policy decisions about Section 8 funding, as many of his tenants rely on it for their rent. But even as Kushner now busies himself with his ever-expanding White House portfolio, his company is carrying on its vigorous efforts in court.

On April 17, three cases were being held consecutively in Baltimore's District Court involving tenants of the Dutch Village complex. One was against Catherine Silver, a Morgan State University student who had given notice that she was moving at the end of March — she was fed up with lousy maintenance (among other things, a perpetually clogged toilet and a ceiling leak in her closet). But when Silver went to Walmart to pay her March rent with her WIPS card, the money mistakenly ended up not in the account for Dutch Village but the one for Kushner Companies' adjacent complex, Pleasantview.

Westminster Management started eviction proceedings. On March 23, a sheriff's deputy changed the locks on the unit. Silver was traveling at the time — it was spring break — and it was not until March 31 that she was able to explain to a judge what happened and get her keys back. By that point, it was too late to get her possessions into the moving truck she'd rented, and classes had resumed. She stayed in the unit, in which Westminster had turned off the heat and hot water, trying again to plan her departure. But Westminster was now after her for April's rent, despite the fact that the company had literally barred her from being able to move before April, as she had intended. On April 25, a judge ruled that she needed to pay half of April's rent, plus court costs: $471.

Westminster had a lawyer from Tapper's firm, Andrew Rabinowitz, at the April 25 hearing, which lasted more than three hours — all over less than $500. The next day Rabinowitz was back to defend Westminster against Silver's criminal complaint over the unfounded eviction. This time, he was more accommodating, perhaps because he realized a reporter was present. After conferring with Dutch Village's property manager, who was also in attendance, Rabinowitz agreed to let Silver have until the end of May to

move out, rent-free, as long as she paid for April. Silver asked if she could have her hot water turned back on. He said he would look into it. But when I visited Silver two weeks later, the hot water was still off. The stove was covered with the pots she was using to boil water for bathing.

On May 10 at the Highland Village complex, a woman was distributing the yellow "failure to pay rent" notices filed with the District Court to tenants who were behind on their May rent. One went up on the door of a man who introduced himself to me as Tommy, a recently divorced house painter with two children, who was at that moment sitting in his pickup truck reading Psalm 91 to gird himself for a visit to traffic court. He said he didn't know why he kept being hit with late fees and court fees at Highland Village because he was up to date on the rent itself.

Over at Carroll Park, Mike McHargue, the private investigator, had also received a yellow notice and was trying to find out when he needed to come up with money to avoid eviction. So was Chris Freimiller, the Rite Aid worker. He had missed a couple weeks of work with back pain related to a metal bar in his leg from an earlier car accident, and Westminster Management had moved quickly to file for eviction over $722.09 in missing rent, plus $66 in fees. When I arrived, Freimiller was sleeping on the couch after a night shift, and his wife, Jaclyn Meador, was trying to get an eviction date from the constable while their 11-year-old son, Ethan, looked on.

One more yellow notice was affixed at the Highland Park home of Alishia Jamesson, the wedding-basket maker. Her fiancé had left his job as a casino housekeeper to take a job handling Amazon packages near the airport, but his first check hadn't come through yet. Jamesson was working at Walmart again. The couple's car tags had expired, so both were enduring long public transit commutes. No one had come from maintenance. There were still three holes in the wall.

*Do you have access to information about the Trump family's businesses that should be public? Email alec.macgillis@propublica.org, or here's how to send tips and documents to ProPublica securely.*

*For more coverage, read ProPublica's ongoing coverage of the Trump administration.*

## Protect Independent Journalism

ProPublica is a nonprofit newsroom that produces nonpartisan, evidence-based journalism to expose injustice, corruption and wrongdoing. We were founded ten years ago to fill a growing hole in journalism: newsrooms were (and still are) shrinking, and legacy funding models failing. Deep-dive reporting like ours is slow and expensive, and investigative

10/2/2020
Case 3:19-cv-08181-JCS   Document 32-2   Filed 10/08/20   Page 72 of 125
The beleaguered tenants of 'Kushnerville'

journalism is a luxury in many newsrooms today — but it remains as critical as ever to democracy and our civic life. A decade (and five Pulitzer Prizes) later, ProPublica has built the largest investigative newsroom in the country. Our work has spurred reform through legislation, at the voting booth, and inside our nation's most important institutions.

This story you've just finished was funded by our readers and we hope it inspires you to make a gift to ProPublica so that we can publish more investigations like this one that holds people in power to account and produces real change.

Your donation will help us ensure that we can continue this critical work. From the Trump Administration, criminal justice, health care, immigration and so much more, we are busier than ever covering stories you won't see anywhere else. Make your gift of any amount today and join the tens of thousands of ProPublicans across the country, standing up for the power of independent journalism to produce real, lasting change. Thank you.

**DONATE NOW**



**Alec MacGillis**

Alec MacGillis covers politics and government for ProPublica.

✉ Alec.MacGillis@propublica.org   🐦 @AlecMacGillis

# Exhibit 8

Case 3:19-cv-08181-JCS Document 82-2 Filed 10/08/20 Page 74 of 125



Miami Herald | IMPACT2020

# Miami Herald

REAL ESTATE NEWS

# How secret offshore money helps fuel Miami's luxury real-estate boom

By Nicholas Nehamas

nnehamas@miamiherald.com

APRIL 03, 2016 02:00 PM, UPDATED SEPTEMBER 06, 2018 04:27 PM



Pilou Asbaek didn't exactly land his role in "Ghost in the Shell" so easily. In the sci fi thriller, in theaters, the 35-year-old Danish "Game of Thrones" actor (pronounced Pe-lou As-beck") plays Batou, second in command to Scarlett Johannson's ba BY EDITED BY MARIO MATEO



**Listen to this article now**
18:20    Powered by **Trinity Audio**

At the end of 2011, a company called Isaias 21 Property paid nearly $3 million — in cash — for an oceanfront Bal Harbour condo.



Paulo Octávio resigned as governor of Brasília after being accused of corruption in 2010. He secretly paid $2.95 million for a condo at the St. Regis in Bal Harbour later that year.

Mossack Fonseca specializes in creating offshore shell companies for the world's richest and most powerful people.

The firm's leaked records offer a glimpse into the tightly guarded world of high-end South Florida real estate and the global economic forces reshaping Miami's skyline.

**SERIES HIGHLIGHTS**

[SECRET OFFSHORE MONEY HELPS FUEL MIAMI REAL ESTATE BOOM](#)

[WHY PRICE PAID FOR EX-JUDGE'S MIAMI CONDO WASN'T PUBLICLY DISCLOSED](#)

[SECRET OFFSHORES TRACE BACK TO BRICKELL CONDO FEATURED ON 'MIAMI VICE'](#)

[MIAMI BEACH FRAUDSTERS HID LOOT IN OFFSHORE COMPANIES](#)

[BEFORE HE WENT ON LAM, FAST-LIVING ITALIAN FUGITIVE USED MIAMI FIRMS TO SET UP OFFSHORES](#)

[MIAMI BEACH'S STONER GUN-RUNNER DRAMA — NOW A HOLLYWOOD MOVIE — SHOWS UP IN PANAMA PAPERS](#)

[MIAMI BEACH CONDO POISED TO FLIP FOR BIG PROFIT IN STRANGE OFFSHORE TRANSACTION](#)

**MORE:**

[LINKS TO THE ENTIRE SERIES](#)

[MIAMI-DADE COMMISSIONERS OBJECT TO EXTRA SCRUTINY OVER MONEY-LAUNDERING](#)

## Local news has never been more important

Subscribe for unlimited digital access to the news that matters to your community.

**#READLOCAL**

But it wasn't clear who really owned the three-bedroom unit at the newly built St. Regis, an ultra-luxury high-rise that pampers residents with 24-hour room service and a private butler.

In public records, Isaias 21 listed its headquarters as a Miami Beach law office and its manager as Mateus 5 International Holding, an offshore company registered in the British Virgin Islands, where company owners don't have to reveal their names.

**TOP ARTICLES**

Florida GOP pulls every trick in the book to keep ex-felons from voting | Opinion

There the trail ran cold.

Until now.

# RE | source Miami newsletter

News, deals and trends for the Miami-area real estate industry.

Enter Email Address

SIGN UP

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.



That's because the Miami Herald, in association with the International Consortium of Investigative Journalists, has obtained a massive trove of confidential files from inside a secretive Panamanian law firm called Mossack Fonseca. The leak has been dubbed the "Panama Papers."

And MF's activities bolster an argument analysts and law-enforcement officials have long made: Money from people linked to wrongdoing abroad is helping to power the gleaming condo towers rising on South Florida's waterfront and pushing home prices far beyond what most locals can afford.

The leak comes as the U.S. government unleashes an unprecedented crackdown on money laundering in Miami's luxury real-estate market.

Buried in the 11.5 million documents? A registry revealing Mateus 5's true owner: Paulo Octávio Alves Pereira, a Brazilian developer and politician now under indictment for corruption in his home country.

A Miami Herald analysis of the never-before-seen records found 19 foreign nationals creating offshore companies and buying Miami real estate. Of them, eight have been linked to bribery, corruption, embezzlement, tax evasion or other misdeeds in their home countries.

That's a drop in the ocean of Miami's luxury market. But Mossack Fonseca is one of many firms that set up offshore companies. And experts say a lack of controls on cash real-estate deals has made Miami a magnet for questionable currency.

**Work virtually — anywhere.**     Try free

**PAULO OCTÁVIO ALVES PEREIRA**

Wealthy Brazilian developer who resigned as governor of Brasília after being accused of taking bribes. Later indicted.

Paid $2.95 million for a condo at the St. Regis in Bal Harbour in 2011.



"The guys who want to clean up dirty money are always going to try to penetrate the system at its weakest spot," said Joe Kilmer, a former Drug Enforcement Administration special agent. "You've got so much real estate being bought and sold in South Florida. It's easy to hide in plain sight."

Take Octávio, a dentist's son who built a fortune developing shopping malls and hotels in Brazil and married the granddaughter of a former Brazilian president before launching his own political career.

In late 2009, Octávio was serving as the vice governor of the capital state of Brasília when federal police filmed his boss, the governor, accepting a thick stack of bills. Prosecutors said it was a bribe. Other tapes caught their associates stuffing pockets, bags and even their socks with cash. Their alleged total take? About $43 million.



Proenza Schouler

$3,490.00

# How deals are done

Panama-based lawfirm Mossack Fonseca partners with a cottage industry in Miami to help foreigners navigate the world's shadow economy and buy South Florida luxury homes. Offshore companies are legal, as long as their owners pay taxes and declare assets. But regulators scorn them as tools for tax evasion and stashing secret funds.

## Example:

**Brazilian investor** ❶ wants to buy a condo in **Miami** ❷ through an offshore company because it offers estate-tax advantages and secrecy.

Investor goes to **Miami law firm** for help.

Miami firm asks **Mossack Fonseca** ❸ to set up offshore company in **British Virgin Islands** ❹, where the company owners don't have to reveal their names.

Miami firm sets up **Florida-based company** ❺ owned by the offshore to buy the Miami condo with cash.

The investor now owns a condo in Miami through an offshore company that owns a Florida company.



KARA DAPENA kdapena@miamiherald.com

The U.S. Treasury Department is so concerned about criminals laundering dirty money through Miami-Dade County real estate that in March it started tracking the kind of transaction most vulnerable to manipulation: shell companies buying homes for at least $1 million using cash.

Those deals are considered suspicious because a) the real buyers can hide behind shell companies and b) banks aren't involved in cash transactions, circumventing any checks for money laundering.

Cash deals accounted for 53 percent of all Miami-Dade home sales in 2015 — double the national average — and 90 percent of new construction sales, according to the Miami Association of Realtors.

"A property owned in the name of a shell company is not transparent," said Jennifer Shasky Calvery, director of the U.S. Financial Crimes Enforcement Network (FinCen), the Treasury agency behind the new policy. "There may be legitimate reasons to be non-transparent, but it's also what criminals want to do."



## Foreign buyers snapping up Miami luxury real estate

Foreign buyers made a quarter of Miami-Dade County's home purchases in 2015. Nationwide, foreigners accounted for just 4 percent.

**Percent of home purchases (2015)**

- Foreign buyers 25%
- Domestic 75%
- Miami-Dade
- Foreign buyers 4%
- Domestic 96%
- U.S.

---

### Miami a hotspot for Latin America

Of the 10 countries with the most purchases in Miami-Dade, seven were Latin American.

**Percent of home purchases in Miami-Dade (2015)**



| Country | Percent |
|---|---|
| Venezuela | 6.5% |
| Brazil | 3.3% |
| Argentina | 3.0% |
| Colombia | 2.0% |
| Italy | 1.0% |
| Mexico | 1.0% |
| Canada | 0.8% |
| Ecuador | 0.8% |
| France | 0.8% |
| Dominican Republic | 0.8% |

Latin American country

---

### Foreign buyers spend more

The median price for Miami-Dade homes purchased by foreign nationals was more than double the countywide median.

**Median purchase price in Miami-Dade (2015)**



- Foreign buyers $590K
- All buyers $270K

Source: Miami Association of Realtors    KARA DAPENA kdapena@miamiherald.com

Law firms like Mossack Fonseca and their Miami partners operate in a shadow economy, largely free from the "know-your-customer" rules imposed on U.S. banks. Others in the real-estate industry, including Realtors, are also exempt.

The corrupt know they can park their cash here with few questions asked.

In Brazil, prosecutors claim Mossack Fonseca created offshore companies that allowed officials of the state oil company to collect and hide bribes. At a news conference in January 2016, prosecutors called the firm "a big money launderer" and announced they had issued arrest warrants for four employees of its Brazilian office for crimes ranging from money laundering to destroying and hiding documents.

In an email, Mossack Fonseca spokesman Carlos Sousa defended its business practices: "Our firm, like many firms, provides worldwide registered agent services for our professional clients (e.g., lawyers, banks, and trusts) who are intermediaries.

As a registered agent we merely help incorporate companies, and before we agree to work with a client in any way, we conduct a thorough due-diligence process, one that in every case meets and quite often exceeds all relevant local rules, regulations and standards to which we and others are bound."

Mossack Fonseca also said that its Brazilian office was a franchise, and that the Panama law firm, which practices only in Panama, "is being erroneously implicated in issues for which it has no responsibility."

You can read MF's full response on [MiamiHerald.com](MiamiHerald.com).

### FROM BRASÍLIA TO BAL HARBOUR

Paulo Octávio was indicted on corruption charges in 2012. He did not agree to a request for comment from the Miami Herald, relayed through Julio Barbosa, the lawyer who handled the dealings with MF, although he did speak with the Brazilian news media in advance of publication and provide tax records showing his dealings were properly reported. Barbosa, who keeps an office on pricey Lincoln Road and asked Mossack Fonseca to set up the offshore, said the purchase of the Bal Harbour condo violated no laws.

---

**MIGUEL JURNO NETO**

Named as a "doleiro," or money launderer, in an investigation over bribery in Brazil's Parliament.

Bought a unit at [Icon Brickell](Icon Brickell) for $482,000 in 2010. Sold it two years later for $590,000. The case was dismissed.



---

"Any transactions in South Florida handled by my firm complied with all applicable laws, including U.S. and Brazilian taxation and disclosure requirements," Barbosa wrote in an email to the Miami Herald.

Owning U.S. property through offshore companies is popular with foreign nationals because it allows them to claim significant breaks on their estate taxes, thanks to the U.S tax code. But offshores are also useful for shifting money around beyond the reach of regulators and tax authorities — not to mention [estranged spouses](estranged spouses) and angry creditors.

Routing money through a web of offshores and other entities can help add a patina of legitimacy to dirty cash, said Ellen Zimiles, a former federal prosecutor in New York. That's crucial for bringing tainted money from abroad into the United States without raising suspicion, Zimiles said.

Many of the people named as owning offshore companies belong to Brazil's [upper echelon](upper echelon), which has pumped money into Miami real estate as the Brazilian economy [has collapsed](has collapsed).

Other people in the files include:

▪ Helder Rodrigues Zebral, the former owner of a popular Brazilian steakhouse convicted twice for embezzling public funds and avoiding public bidding in his home country. Known for driving a Mercedes and dating socialites, Zebral paid $1.9 million for a condo in Sunny Isles Beach in 2011, between his two trials.

▪ Marcelo Carvalho Cordeiro, the former president of Rio de Janeiro's pension fund, who was [fired](fired) after allegedly handing out a multimillion-dollar contract through improper back channels. Cordeiro paid $2.7 million for a home on Key Biscayne last year. He is suing a business partner in Miami for libel.

Case 3:19-cv-08181-JCS Document 32-2 Filed 10/08/20 Page 81 of 125

▪ Luciano Lobao, a construction magnate and the son of Brazil's former energy minister. The elder Lobao is under [investigation](#) for corruption in a massive scandal over alleged bribes for state oil company contracts.

Lobao himself has been investigated over allegations he overcharged the government on 2014 World Cup contracts. He bought a condo at Eden House in Miami Beach for $636,000 in 2013 and sold it for $1.1 million the next year.

There's no proof that dirty money was used in any of the transactions uncovered by the Herald.

---

**HELDER RODRIGUES ZEBRAL**

Convicted twice in Brazil for embezzlement and avoiding public bidding. Ran a popular steakhouse in Brasília.

Paid $1.9 million for a condo at [Jade Ocean](#) in Sunny Isles Beach in 2011.



---

Several of the men, including Lobao and Cordeiro, made no effort to hide the deals. They set up BVI offshores and then bought the properties using Florida companies registered under their own names. Emails between Mossack Fonseca employees and the men's lawyers say the purpose of the offshores was to purchase Florida real estate but don't go into detail.

The Miami Herald called, emailed or sent registered letters to the buyers, as well as their lawyers, asking what role the offshore companies played in the transactions or whether their assets were declared to Brazilian tax authorities, as required by law. Two of them responded.

Marcelo Calvo Galindo is a top executive at a Brazilian network of universities that is facing criminal charges for tax evasion in Brazil. He paid $2.7 million for two units — one of them a 2,900-square-foot penthouse — at the St. Tropez in Sunny Isles Beach. He showed the Miami Herald tax returns stating that he had paid taxes for his offshore companies in Brazil.

Marcos Pereira Lombardi, who runs a newspaper, as well as several other businesses in Brasília, said he set up an offshore for estate-tax benefits. He spent $2.7 million on two condos at Trump Towers I and II in Sunny Isles Beach and said he pays all his taxes in Brazil and the United States.

---

**MARCELO CARVALHO CORDEIRO**

Fired as president of Rio de Janeiro's pension fund in 2010 after alleged irregularities on public bidding.

Bought a unit at [Jade Residences](#) in Brickell for $670,000 in 2009. Sold it last year for $1.25 million. Also owns a $2.7 million home on Key Biscayne.



---

"I bought these properties in Miami because it was a business opportunity, as prices in Florida were very attractive," he wrote in an email. "I love Miami and the United States, so I chose to invest here."

Lombardi, known as "Marcola," has been investigated in Brazil for allegedly getting an insider deal on government land and conspiring to fix gas prices, charges he denies. He bought one Trump Tower unit through a Florida company that listed him as its manager and another under his own name.

But transparency doesn't always mean legality.

The alleged Spanish drug lord Alvaro López Tardón owned fancy condos in Miami through companies registered under his own name or the names of his associates, including a $1 million condo at the Continuum in South Beach.

After his arrest in 2011, López Tardón's lawyers defended his actions as legal and transparent.



Convicted money launderer Alvaro López Tardón bought a $1 million condo at the Continuum in South Beach. A federal judge in Miami sentenced the accused Spanish drug lord to 150 years in prison for money laundering. His case is on appeal. The judge said South Florida is awash in "funny money." CHUCK FADELY Miami Herald file

Prosecutors argued that he was laundering profits from a lucrative cocaine-smuggling business. They said he had been the leader of a violent drug ring called Los Miami and <u>seized his assets,</u> including a fleet of luxury cars and 13 condos, after he was found guilty of money laundering.

Peter Zalewski, a local condo market analyst, said López Tardón's case prompted the feds to take a hard look at Miami real estate.

"Locally, people have been talking about illicit money propping up the condo market since the 1980s," Zalewski said. "The government usually needs a catalyst like this before it can act."

A Miami federal judge sentenced López Tardón to <u>150 years in prison</u>.

"I call it funny money, and we have a plethora of funny money here," U.S. District Judge Joan Lenard said during his sentencing hearing in 2014.

**A CLEANED-UP GAME?**

"Funny money" includes more than briefcases brimming with hundred-dollar bills, a common sight during Miami's cocaine cowboy era in the 1980s. Today, "cash" more commonly signifies certified checks, traveler's checks, cashier's checks and money orders.

For now, FinCen is tracking only transactions that use cash in those forms, as well as hard currency. It will not require reporting on deals that use wire transfers or



Gov. Jose Roberto Arruda of Brasília (left) was forced to resign when federal police filmed him accepting what they said was a bribe. Several other of Arruda and Octavio's associates were filmed taking alleged bribes, including Leonardo Prudente, a former state representative shown here stuffing his jacket (top right) and socks (bottom right) with cash.

When Gov. Jose Roberto Arruda was arrested a few months later, Octávio replaced him. But an informant claimed Octávio also took bribes. The newly minted governor didn't appear in the videos and denied the allegations, but he resigned anyway. His term lasted 12 days.

The next year, Octávio's Miami lawyer asked Mossack Fonseca — which has recently been implicated in a bombshell Brazilian corruption scandal — to set up Mateus 5.

**'FUNNY MONEY'**

In Miami, secretive buyers often purchase expensive homes using opaque legal entities such as offshore companies, trusts and limited liability corporations.

Offshore companies are legal as long as the companies declare their assets and pay taxes. But the secrecy that surrounds those companies makes it easy and tempting to break the law.

Case 3:19-cv-08181-JCS Document 82-2 Filed 10/08/20 Page 84 of 125

The temporary initiative also applies to Manhattan and expires in August. It requires that real-estate title agents identify the true, or "beneficial," owners behind shell companies and disclose their names to the federal government. In Miami-Dade, the rules apply to homes sold for $1 million or more. In Manhattan, where real estate is more expensive and where foreign buyers also flock, the threshold is $3 million.

No other jurisdictions are being targeted.



**MARCOS PEREIRA LOMBARDI**

Brazilian businessman and media mogul investigated for allegedly getting an insider deal on government land, fixing gasoline prices.

Paid $2.7 million for two condos at Trump Tower I and II in Sunny Isles Beach.



The feds will know the real buyers but won't make the information public. Experts say the crackdown could be the first in a series of stronger regulations on cash deals.

Miami has a long history of money laundering. Its financial institutions report more suspicious activity than any other major U.S. city besides New York City and Los Angeles, according to FinCen data. And a recent case of money laundering involving fancy condos and the violent Spanish drug gang Los Miami drew further scrutiny to South Florida.

Jack McCabe, an analyst who studies the booming local housing market, said it's impossible to know how many homes are purchased with dirty money.

"But I think many people believe it could be a sizable portion of the new condominium market in Miami," McCabe said. "Even though developers and real-estate professionals suspect many of these units are bought with illegal funds, they realize their projects may not be successful without that support."

Flight capital from other countries fuels Miami's economy. It revived the construction, real-estate and tourism industries after the Great Recession.

Foreign nationals bought nearly $6.1 billion worth of homes in Miami-Dade, Broward and Palm Beach counties last year, more than a third of all local home spending, according to the Miami Association of Realtors. It's not only foreign money that's suspect. Mauricio Cohen Assor and Leon Cohen-Levy, a Miami Beach father-and-son duo convicted of a $49 million tax fraud in 2011, used Mossack Fonseca offshores to hide assets.

"No one wants to kill the goose that laid the golden egg," McCabe said.

personal checks, which leave more of a paper trail at banks, opening up a potential loophole.

**LUCIANO LOBAO**

Brazilian construction magnate and son of former Energy Minister Edison Lobao, who is under investigation for graft at state oil company Petrobras.



Bought a $636,000 unit at Eden House in Miami Beach in 2013. Sold it the next year for $1.1 million.

By not monitoring those financial instruments, investigators will miss out on most sales of new condos, said Alan Lips, a Miami accountant.

Theresa Van Vliet, a former federal prosecutor in South Florida, said FinCEN could have been uncomfortable stretching its authority to cover wire transfers.

"This is a strategic move," she said. "It's good to start small."

Cash home deals are one of the last unregulated sectors of the U.S. real-estate market; there are already strict reporting requirements for homes bought with mortgages.

Despite the federal scrutiny, most industry professionals say money laundering doesn't play a role in real estate — at least not anymore.

"When I was selling real estate in Davie in the late '80s, we used to get bags of cash," said Jeff Morr, a Realtor at Douglas Elliman. "There were no rules. ... Today, everything is watched. It's clean."

Developer David Martin, who is closing sales for a 319-home development in Doral, said the new FinCen rules haven't caused a single buyer to back out.

"I think this is really blown out of proportion," agreed Carlos Rosso, president of the condo division for local mega-developer Related Group. "Everything is done through the banking system for new construction. Maybe for [single-family] homes and existing condos they are using cash."

Dirty or not, the surge of foreign money means big changes for people who live here.

The real-estate boom that kicked off in 2011 spawned construction jobs and tax dollars. City boosters touted the foreign investment as a sign that Miami had arrived on the world stage. But the boom also sent home prices soaring beyond the reach of many working- and middle-class families. Locals trying to buy homes with mortgages can't compete with foreign buyers flush with cash and willing to pay the list price or more.

Two-thirds of Miamians now rent their homes — more than any other major city in the United States — and that number is up eight percentage points since 2006, according to a recent study from New York University. High housing costs have combined with low incomes to make Miami the least affordable city for renters in the country.

"If we're stifling people's ability to create a financial asset like a home, we're stopping their ability to start new businesses [and] to invest in education for their families," said Ali Bustamante, a researcher at Florida International University.

**FEDS ARE WATCHING**

In 2001, the USA Patriot Act mandated that all parties involved in real-estate closings perform due diligence on their clients. Lobbying from the industry won it a temporary exemption that has been in place for nearly 15 years.

Real-estate agents argue they don't have the expertise to investigate their clients.

The American Bar Association has also opposed stronger disclosure requirements for real-estate lawyers, saying they would violate attorney-client privilege.

---



**MARCELO CALVO GALINDO**

Executive at a Brazilian university that is accused of tax evasion. Personally named in a criminal complaint.

Spent $2.7 million on two condo at St. Tropez in Sunny Isles Beach in 2014.



---

But the new federal initiative centering on Miami-Dade and Manhattan may be the first sign that the exemption is ending.

"This is the ceremonial first pitch," said Miami lawyer Andrew Ittleman said. "We still haven't gotten into the game."

Between the federal crackdown on secret cash home deals and strengthening anti-money-laundering rules around the world, it may grow harder to pump dirty cash through Miami real estate.

Other countries have stricter rules than the United States.

The European Union has started building a centralized database of beneficial owners. The EU's compliance rules extend to real-estate agents, law firms and trust agents, as well as financial institutions.

That disparity frustrates some American bankers, who say they bear too much of the burden in the United States.

"It would be a lot easier for a bank like us to do our job if others [in the real-estate industry] had similar responsibilities," said Scott Nathan, an executive vice president at Miami Lakes-based Bank United.

---

**HEGEL ROBERTO MORHY**

Owner of a construction company linked to a corruption scandal involving Brazilian billionaire Nene Constantino.

Paid $900,000 for two units at Nine at Mary Brickell Village in Brickell last year.



---

A number of events and blog posts have explored loopholes in the new FinCen rules.

One local seminar held in March was headlined "How to Avoid the Treasury Trap." It promised to teach real-estate professionals "how to avoid money-laundering charges and stay on the right side of the law" while working with clients who want to keep their deals secret for legitimate reasons.

"You can not only survive, you can thrive," an advertisement said.

The Miami Association of Realtors hosted the event.

Teresa King Kinney, the association's CEO, said the intention was not to dodge the regulations. "It was to make sure our members understand what the rules are, how

they can affect a deal and what the alternatives are," Kinney explained.

Jennifer Shasky Calvery, FinCEN's director, disagreed. She compared the industry's behavior to a drunk driver turning around before reaching a roadside DUI checkpoint.

"It's always amazing that the drivers think the police aren't watching that," Calvery said. "I feel like we're really learning about the culture of the real-estate economy in Miami."

*An earlier version of this story misstated the year that Paulo Octávio resigned as governor of Brasília. The story has also been updated to note that although Octávio declined through an intermediary to speak to the Herald in advance of publication, he did speak to the Brazilian news media.*

Nicholas Nehamas: 305-376-3745, @NickNehamas

Miami Herald contributor Debora Lima contributed reporting, research and translation to this story. André Shalders, a reporter at Brazilian news website UOL, also contributed.

---

**READ ALL OF THE STORIES IN "THE SECRET SHELL GAME" SERIES**



*MIAMI*



💬 **COMMENTS** ⌄

---

| READ NEXT | | TRENDING STORIES |
|---|---|---|
| | | Haiti's currency is suddenly strong against the dollar. For many, that's disastrous. |
| | | UPDATED OCTOBER 01, 2020 09:52 PM |

# Exhibit 9

 *Miami Herald* | IMPACT2020



## Miami Herald

MIAMI-DADE COUNTY

# After investing big in Miami real estate, these Argentines held in corruption scandal

**BY KYRA GURNEY** AND **NICHOLAS NEHAMAS**

NOVEMBER 03, 2018 07:30 AM, UPDATED NOVEMBER 03, 2018 06:34 PM





Sergio Todisco was arrested by Argentine federal police in Mar del Plata on Oct. 20, 2018. COURTESY *PFA*



**Listen to this article now**

08:53   Powered by **Trinity Audio**

After arresting four people — including the owner of a Miami-area realty firm —
authorities in Argentina appear to have unraveled the mystery of a $65 million

property empire that included luxury condos in South Florida and New York City, as they pursue a major corruption case against ex-president Cristina Fernández de Kirchner.

The four people arrested by federal police in Argentina last month are Elizabeth Ortiz Municoy, an Argentine national who runs an international realty business that until recently operated a branch in Surfside; Sergio Todisco, Municoy's ex-husband and a clothing manufacturer; Carolina Pochetti, the widow of a former top aide to the Kirchner family; and Carlos Cortez, a businessman who travels between Argentina and South Florida.

Prosecutors accuse them of investing illicit money on behalf of the Kirchner aide, Héctor Daniel Muñoz, outside the country using a web of shell companies.

**TOP ARTICLES**



SKIP AD

The arrests were ordered by an Argentine federal judge overseeing a massive corruption case in which Fernández de Kirchner is accused of accepting cash bribes from construction companies in exchange for government contracts. The money was allegedly delivered to her homes in bags by a driver who kept meticulous notes of his deliveries. The driver is cooperating with prosecutors and has handed over notebooks listing his deliveries. (Lawyers for the Kirchner family have said the charges are politically motivated.)

One person listed in the notebooks as accepting bags of cash on behalf of the Kirchners? Muñoz, who for many years worked as the personal secretary of the now-deceased Néstor Kirchner, the late husband of Fernández de Kirchner and also a former president. Muñoz, whom his old boss affectionately called *gordito,* or "fatty," died in 2016.

## Today's top headlines

Sign up for the Afternoon Update and get the day's biggest stories in your inbox.

| Enter Email Address |

SIGN UP

This site is protected by reCAPTCHA and the Google

10/2/2020
Argentines accused of investing dirty cash in South Florida, N.Y. real estate | Miami Herald
Case 3:19-cv-08181-JCS  Document 32-2  Filed 10/08/20  Page 92 of 125

Privacy Policy and Terms of Service apply.

But before that, prosecutors believe he used some of that money to invest tens of millions of dollars in properties in the United States, including expensive homes in Miami and Manhattan and commercial properties such as pharmacies and bank branches around South Florida. The properties — among them a CVS pharmacy building in Little Havana — were purchased by Florida companies registered to Todisco and Municoy, leading to questions about how the couple could have afforded so much valuable real estate.



Elizabeth Municoy, who ran a realty firm in Surfside, is arrested by Argentine federal police last month for her alleged involvement in a money-laundering scheme. Municoy and others are accused of using dirty money to buy tens of millions of dollars in South Florida real estate. Courtesy *PFA*

Muñoz's connection to the properties was uncovered when a leak of secret corporate documents called the Panama Papers revealed that he and his wife owned a British Virgins Island company registered in Todisco's name. Prosecutors are still trying to determine if Muñoz, the former Kirchner aide, had in fact stolen money from the bags of cash and then used it to buy properties for himself or whether he was doing the deals on behalf of the Kirchners.

Federal law enforcement officials in the United States are looking into the allegations that dirty cash was invested here, according to sources familiar with the case. The Argentine press reported that U.S. law enforcement had shared information on Todisco and Municoy's financial activities with authorities there. The U.S. Department of Justice declined to comment on whether it had provided information to Argentine authorities.

Case 3:19-cv-08181-JCS  Document 32-2  Filed 10/08/20  Page 93 of 125

All the U.S. properties have been sold, meaning authorities will have to track down the cash if they wish to seize any assets.

## Local news has never been more important

Subscribe for unlimited digital access to the news that matters to your community.

#READLOCAL

Under Argentine law, suspects can be detained without being indicted. That is the case with the four people arrested. Municoy and Todisco were taken into custody in the city of Mar del Plata, where they live, in late October. Neither of their lawyers responded to requests for comment.

Municoy, who previously told the Miami Herald that she knew nothing about the multimillion-dollar transactions and had "nothing to do" with the properties, is now cooperating with prosecutors and sharing information about how Muñoz acquired the real estate, according to local press reports. She reportedly told prosecutors that her ex-husband was to blame for the scheme.

As a result of her cooperation, Municoy has been released from jail. Todisco, Pochetti and Cortez remain in custody.

Municoy appears to have been cutting her ties in the United States as the investigation heated up. Last year, she sold her $800,000 condo in Hollywood. The office of her Surfside business, Municoy International Properties, has been empty for more than a year. A website for the company, which previously listed luxury homes, now says it is "under construction."

One thing she has kept up: Her monthly $300 payments to the real estate broker whose license she used to buy and sell properties, according to the broker, Thomas Baker of Boynton Beach. (Municoy is not a licensed real estate professional in the United States, but it's legal to use a third-party broker's license.)

"She does still owe me for this month," said Baker. "I'm going to have to cut her loose. I never had an inkling she did anything wrong."

Meanwhile, Todisco is also seeking to cooperate with prosecutors, which could reduce his sentence if he's convicted, but the judge overseeing the case rejected the collaboration agreement. Todisco, Muñoz's alleged front-man, has admitted to acquiring the properties, but said he knew Muñoz "as a businessman" and didn't know the "origin of the funds," according to Argentine newspaper Clarín.

Pochetti, Muñoz's widow, has denied participating in the alleged money-laundering scheme and told the court that she felt "deceived" by her husband, the former Kirchner aide. She claimed that she hadn't asked questions about the astronomical growth of the family's wealth, according to press reports. Her attorney could not be reached.



Carolina Pochetti, the widow of Héctor Daniel Muñoz, a former top aide of deceased Argentine President Néstor Kirchner, is arrested by federal police. Courtesy *PFA*

Cortez, who has also been accused of participating in the alleged scheme, was arrested at the airport in Buenos Aires after returning from a trip to Miami. Prosecutors suspect he had traveled to the United States in an effort to hide assets, Clarin reported.

Cortez also invested in South Florida real estate. In total, companies registered to him paid $2.9 million for condos in Miami and Sunrise.

One of those companies, New Dreams LLC, was set up with help from Olga Santini, the Miami representative of Mossack Fonseca, the now shuttered Panamanian law firm whose files were leaked in the Panama Papers. Cortez also had Mossack Fonseca — the firm that set up an offshore company for Muñoz — register a company named New Dreams in Nevada.

The connections don't end there: Cortez later sold one of his Sunrise condos to Guillermo Eduardo Fernández, an alleged front-man for José López, a former public works secretary under Kirchner and Fernández de Kirchner arrested in 2016 after he was discovered throwing bags of cash and a semiautomatic rifle over the walls of a nunnery outside Buenos Aires. López is cooperating with prosecutors in the corruption case against Fernández de Kirchner, according to press reports.

**WANTED**

Another couple accused of participating in the scheme is still at large.

A federal judge in Argentina has ordered the arrests of Carlos Gellert and Perla Puente Resendez, according to press reports. Resendez served as the director of many of the Florida companies that held the real estate after Todisco and Municoy resigned as directors in 2015.

Resendez is related by marriage to the widow of the former Kirchner aide, according to the Argentine website BorderPeriodismo. Resendez's husband, Gellert, is the widow's cousin.

Property records show Gellert and Resendez own a home in Mission, Texas, about three hours south of Corpus Christi.

Charles Serfaty, a lawyer who served as the registered agent for Resendez's Florida companies — which are now listed as "inactive" in state records — did not return a phone call. Resendez and Gellert did not respond to Facebook messages.

Argentina has asked for their extradition, the Herald has learned. A Justice Department spokeswoman said the department does not comment on extradition requests.

The Florida and New York properties were later sold for nearly $73 million, and part of the money was reintroduced into the banking system and transferred to other U.S. states, as well as to Mexico, Hong Kong and Andorra, according to a report by a special financial crimes unit that was cited in press reports.

Although Fernández de Kirchner was indicted in September on charges that her administration accepted bribes, she currently serves as a senator and therefore has immunity from arrest, although not from prosecution.

Fernández de Kirchner's attorney, Gregorio Dalbón, said in an email that she "has nothing to do with any properties in Miami" and "nothing to do with Néstor Kirchner's secretary."

"No one doubts in Argentina that [Fernández de Kirchner] is the victim of judicial and media persecution in an attempt to defame and banish her," he added in an email. "This is something that will not happen because there is no proof that has destroyed her presumption of innocence."



Héctor Daniel Muñoz, left, was a top aide to now deceased Argentine President Néstor Kirchner, right.

It won't be enough for Argentine authorities to just get to the bottom of this corruption case, said Germán Emanuele, director of transparency and anti-corruption at the Argentine nonprofit Citizen Power Foundation.

"Based on this case and what is being discovered, it's necessary for the government to implement policies of integrity," Emanuele said.

That includes more transparency in government procurement, he added, to prevent large-scale corruption from happening in the future.

In order to recover any funds taken by Muñoz, prosecutors will have to figure out where the cash from the property sales went.

That's something prosecutors will likely expect Municoy to reveal, although she's been tight-lipped on that subject in the past.

In 2016, a Miami Realtor sued Municoy over the sale of the CVS pharmacy building in Little Havana, saying she had wrongly claimed a commission. The Realtor's lawyer subpoenaed Municoy for closing documents that might show what happened to the proceeds of the sale.

The next month, Municoy settled the suit.

*Nicholas Nehamas: 305-376-3745, @NickNehamas*

*Kyra Gurney: 305-376-3205, @KyraGurney*



A CVS pharmacy located at 1177 SW Eighth St. in Little Havana is one of many South Florida buildings that belonged to companies linked to an aide of former Argentine President Néstor Kirchner. Now, Argentina has arrested several people associated with the property deals. PEDRO PORTAL PPORTAL@ELNUEVOHERALD.COM

💬 **COMMENTS** ⌄

# Exhibit 10

*Miami Herald*   IMPACT2020

# *Miami Herald*

AG ▼

BOOK NOW

HOMEPAGE

# Suspicious land deal spurs investigation and intrigue for venerated Miami nonprofit

By David Ovalle, David Smiley and Nicholas Nehamas

dovalle@miamiherald.com

JUNE 19, 2017 06:00 AM,  UPDATED JUNE 19, 2017 03:29 PM



Ola Aluko, who is listed as the president of Miami's St. John Community Development Corp, pictured here in 2008 when he was a city official. He is under investigation by the State Attorney's Office for a suspicious land deal involving St. John. NONE *MIAMI HERALD*



**Listen to this article now**
08:00    Powered by **Trinity Audio**

As a former Miami city official, politically connected construction consultant Ola Aluko boasts years of experience putting together complex development deals and handling millions in government grants.

But in one small land deal that turned a six-figure profit, Aluko's role was curiously obscured.

A few years back, he bought a small tract of vacant land in Overtown for $39,000, creating a shell company to do it. Six months later, the shell company filed paperwork installing a new manager — a 23-year-old Miami woman. The next day, the company flipped the parcel for $150,000.

**TOP ARTICLES**



SKIP AD

The new buyer?

St. John Community Development Corporation, a venerated Miami nonprofit — whose president happens to be Aluko. Today, St. John is pursuing a tax-subsidized affordable housing project on the site.

## Today's top headlines

Sign up for the Afternoon Update and get the day's biggest stories in your inbox.

Enter Email Address

SIGN UP

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

The sale of the parcel at 1643 NW First Ct. underscores the blurred lines between Aluko the businessman and Aluko the head of a prominent nonprofit developer in one of Miami's poorest neighborhoods. It's a role he has used to obtain millions in government money for St. John CDC, which in turn has paid his consulting firm hundreds of thousands of dollars over the past six years.

The revelation of the land deal comes one month after the Miami Herald chronicled St. John and Aluko's role in [Town Park Plaza North](#), a troubled taxpayer-funded condo renovation project in Overtown.

St. John's board chairman insists Aluko made no money off the sale because he gave the profits back — only after board members learned about his purchase of the land.

Still, public-corruption investigators came knocking more than one year ago and their probe remains ongoing, the Miami Herald has learned.

Aluko did not return repeated calls and e-mails from the Miami Herald for this story.

**HIDDEN FIGURES**

## Local news has never been more important

Subscribe for unlimited digital access to the news that matters to your community.

#READLOCAL

Meanwhile, the land remains vacant.

Earlier this year, Aluko requested nearly $6 million in public funding for a 24-unit apartment complex dubbed St. John Village Homes II from Miami's Omni Community Redevelopment Agency. The city-affiliated agency, which invests taxpayer money into combating slum and blight, has not committed any funds, but close to $1 million in federal and county surtax dollars have been separately allocated to it.

The land is part of seven parcels along Northwest First Court that St. John hopes to one day turn into housing.

St. John had for years been trying to buy the parcels that make up most of the block.

County records show that in October 2012 Aluko used his name to create a limited liability company called 1643 NW 1st Ct., which is the address of the purchased lot. Aluko was listed as the registered agent and the shell company's mailing address comes back to a West Kendall Mail Mart, a private mail service company.

Weeks later, the shell company bought the property for $39,000 from Sabrina Jackson, a former Miami police officer, and her husband, who were getting divorced. Neither could be reached for comment.

Forming LLCs to buy land is not unusual, but what happened next was curious.

Six months later, state records show the company's registered agent was changed to "Desiree Durham" – a 23-year-old woman from Miami. One day later, the shell company, listing Durham as the "sole manager," sold the property to St. John for $150,000.

Aluko's knowledge of the deal is documented in one way: He signed the deed as a witness. Whether Durham actually signed it or had anything to do with the transaction remains unclear – her signature doesn't resemble one penned on an unrelated court document filed years earlier. Reached by phone, Durham repeatedly hung up on reporters. She didn't return repeated phone calls or text messages.

St. John Board Chairman Nelson Adams III acknowledged the sale was a "convoluted transaction" but defended its ultimate outcome. Still, he says the board didn't initially realize that Aluko bought the land in late 2012.

He said the CDC didn't have the money at the time to buy the property, so Aluko essentially bought the land for St. John without letting the board know. Six months

later, the nonprofit did have the money, although it shelled out more than triple what Aluko paid for it.

"Ola was acting in the best interest of the CDC trying to procure a property we had been desirous of acquiring for many years," Adams said.

He offered to have the nonprofit show the Herald documentation outlining the board's handling of the deal. St. John, however, never produced the documents.

Adams could not explain why Aluko needed to put Durham's name on the shell company, or even create the corporation to begin with.

"I don't know who she is or what role she played," Adams said.

And it's still not clear why St. John was willing to pay so much more than Aluko did.

Another longtime board member, Will Miller, who became the vice chair the year of the sale, recalled the land purchase but said he knew nothing about the behind-the-scenes financial maneuvering by Aluko.

"This is the first I'm hearing of this," Miller said when informed by a Miami Herald reporter; a St. John board meeting is scheduled for Wednesday. "I guess I'll find out more then," he said.

The Miami-Dade State Attorney's office declined to release records related to its case, citing the "active criminal investigation."

A lawyer for St. John on Monday defended the non-profit, stressing the agency "did not make one penny off this transaction."

"St. John CDC committed no wrongdoing in acquiring 1643 N.W. 1st Court and has fully cooperated with the State Attorney's Office to bring this inquiry to an end," attorney Margot Moss said in a statement.

**BOUNCING BACK**

The 52-year-old Aluko was ousted in 2010 as the head of Miami's capital improvement department amid allegations his employees were inflating the price of projects. He claimed he tried to blow the whistle, while the city countered that he failed to reign in his workers. He was eventually awarded a small settlement by the city.

Aluko rebounded with St. John, the nonprofit that is affiliated with a namesake Baptist church, and has expanded his enterprises.

Between 2011 and 2015, tax documents show St. John has received nearly $12 million in direct government grants, funding an array of well-regarded low-income rental complexes around Overtown.

At the same time, Aluko's private firm, Odua Group, has earned more than $900,000 from St. John for administrative and construction management services, according to tax records. That includes an annual salary of $85,000 last year for serving as the nonprofit's president.

Odua itself has received close to $1 million in payments directly from the city of Miami and the Southeast Overtown Park West Community Redevelopment Agency. Those payments have been for work done with St. John, and other vendors on publicly subsidized projects.

The relationship between St. John and Aluko's private company is tangled.

On state records, websites, letterheads and tax documents, Aluko lists himself as St. John's president – but in an interview with the Herald in May he insisted his private company, Odua, is actually the nonprofit's head.

"I can see how it can be kind of confusing," Dana Moss, St. John's outside accountant, said of the arrangement.

And Odua Group has billed taxpayers for work done by St. John employees. That's something Aluko mentioned in that same May interview, although minutes later, he suggested the work was done after hours.

Adams says the arrangement is a "win-win-win" because it allows St. John to benefit from Aluko's experience, while allowing him to still work with other companies.

But James Kelly, who teaches community development law at Notre Dame Law School and has represented nonprofits, says Aluko's arrangement with St. John is a "peculiar approach that is not common among nonprofit organizations."

Kelly said consultants are often brought in to advise nonprofits, but rarely to run them. And while hiring an experienced, well-connected businessman like Aluko could reap major contracts for the nonprofit, the arrangement also presents clear pitfalls.

"It requires a lot of compliance and oversight," Kelly said. "Even if it is worth their while, the constant need to police the agreement — and make sure there is no use of charitable resources to [improperly] benefit the for-profit — makes it very challenging to make this kind of arrangement work."

The IRS also prohibits non-profits from "self-dealing," and the land sale could potentially jeopardize the organization's tax-exempt status, Kelly said.

"The organization is supposed to use all its resources to fulfill its charitable mission," Kelly said. "The IRS has very strict rules preventing just that kind of thing."

⌕  **COMMENTS** ⌄



READ NEXT

MIAMI-DADE COUNTY

**Brickell has one of the lowest Census response rates in Miami.**

TRENDING STORIES

Miami cop called mom to say he didn't feel well. When she got to his home, he was dead.
UPDATED 4 HOURS 8 MINUTES AGO

Haiti's currency is suddenly strong against the dollar. For many, that's disastrous.
UPDATED OCTOBER 01, 2020 09:52 PM

An ALF tragedy: COVID didn't kill Rita at age 95, despair and loneliness did
UPDATED OCTOBER 01, 2020 05:50 PM

Florida adds more than 100 COVID-19 deaths again and 2,628 cases
UPDATED 9 HOURS 51 MINUTES AGO

# Exhibit 11

**Keep projects moving — even from home.**

Try free



# In luxe Miami condo tower, Venezuelan oil tycoon with state ties chases capitalist dream

By Nicholas Nehamas and Jim Wyss

nnehamas@miamiherald.com

APRIL 22, 2016 05:52 PM, UPDATED APRIL 26, 2016 03:35 PM



JOSÉ A. IGLESIAS *JIGLESIAS@ELNUEVOHERALD.COM*



**Listen to this article now**
12:03   Powered by **Trinity Audio**

Gerardo Pantin Shortt and his family have won hundreds of millions in contracts from Venezuela's state oil company since the 1980s. The relationship continued to flourish after Hugo Chávez — staunch ally of Fidel Castro, arch-foe of American capitalism — came to power in 1999.

Now Pantin is quietly using his fortune to fund a uniquely capitalist enterprise: developing a $100 million condo tower in Miami, the beating heart of anti-chavista feeling.

Tropical Storm Gamma forms over Caribbean Sea, more rain for South Florida

A lawsuit filed in Miami-Dade County by a former partner alleges Pantin hid his involvement in the project through shell companies and front men.

The reason, according to the suit, was that Pantin feared "the Venezuelan government will not look favorably on his investing in Miami, which is considered illegal flight capital, and if they were to learn of such investments, may seize his company located in Venezuela and block the payments."

## Today's top headlines

Sign up for the Afternoon Update and get the day's biggest stories in your inbox.

Enter Email Address

SIGN UP

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Pantin also spent millions on ultra-luxe homes, including a waterfront mansion in Miami Beach and condos in Aventura and Sunny Isles Beach.

He launched his South Florida development career in 2014, when a company he controlled behind the scenes took over a stalled condo project near Miami's leafy Morningside neighborhood. A bad economy and neighbors upset at living under the shadow of a 14-story complex had scuttled a previous developer's vision during the recession.

The project, rebranded Boulevard 57 by Pantin's team and shrunk to eight stories, is back on track. It has begun selling pre-construction units and opened a sales center at 5700 Biscayne Blvd.

Units aren't for the masses: They start at $600,000 and top out at $2.65 million.

all of my business ventures under one umbrella for purposes of protecting me from liability," he wrote.

## Local news has never been more important

Subscribe for unlimited digital access to the news that matters to your community.

#READLOCAL

Pantin also said safety concerns led him to list his associates in public records instead of himself. His sister, brother-in-law and mother had been kidnapped in Venezuela before he moved to the United States, he said.

His family has no involvement in politics, Pantin added. "Our relationship with the government is strictly commercial," he wrote. Between 2008 and 2015, the family firm had signed contracts worth $991 million with Venezuela's state-owned oil company PDVSA, he said.

And he pointed out that other companies such as Halliburton, Chevron and Shell have also worked with Venezuela's government.

But the oil magnate's involvement in the Miami project — and the stealthy nature of his investment — give a glimpse of the unseen forces shaping South Florida's real-estate boom.

Cash from wealthy foreign nationals, including people linked to corruption, is pouring into local real estate, according to a Miami Herald analysis of secret offshore documents known as the Panama Papers. Locals can't compete for homes as prices rise while wages stagnate.

"Miami is an international gateway city," said Andrew Hall, a Miami litigator who specializes in international asset recovery. "There's a lot of cash floating around real estate here. ... The question is transparency. Can you figure out who is behind the money?"

Pantin does not appear in the Panama Papers. He and his family have never been accused of corruption.

### FAMILY AFFAIR

In the Venezuelan news media, Pantin is often portrayed as a creature of the Bolivarian Revolution — owing his wealth to government contacts. But his family had been in the oil industry long before Chávez.

Cementaciones Petroleras Venezolanas, or CPVEN, was started in 1981 by Pantin's father, Eduardo Pantin Pérez, and specialized in high-pressure pumping services and the cementing of wells.

It was very much a family affair. In 2000, when the company was profiled in an academic journal, Pantin's three sons were executives: Eduardo Pantin Shortt was

After seeing its heyday around 1997, the company fell on hard times. By 2000 the family was considering bankruptcy, according to the profile.

But the Pantins learned to work with the Chávez administration, becoming a regular contractor for state-run PDVSA oil company. Their firm continued to work with the government after Chávez's death in 2013. It also does business in Colombia, Ecuador, Peru, the United States and Kuwait, according to a company brochure.

Juan Fernández, a former PDVSA executive who was ousted during politically motivated layoffs in 2002, said Pantin's company has a reputation for being very well connected.

And while Fernández underscored that there's nothing wrong with Venezuelans investing abroad, he said U.S. authorities need stricter controls to make sure the sources of those funds are legitimate.

"It's not illegal to have a company in Panama or invest in Miami, but you have to make sure it's legal money," he said.

Federal prosecutors in the United States have targeted corruption at PDVSA.

In 2011, the U.S. District Court of Connecticut found Venezuelan-American Francisco Illarramendi guilty of building a Ponzi scheme using hundreds of millions in funds from PDVSA's pension accounts. In that case, there were also allegations that tens of millions of dollars went to PDVSA officials in the form of bribes and kickbacks to tap the funds.

Earlier this year, in Houston, a Venezuelan living in Florida and four other people pleaded guilty to paying millions in bribes for PDVSA contracts.

One of the bribes was a $15,000 stay at the Fontainebleau in Miami Beach.

Fernández said the allegations suggest PDVSA isn't being run like a serious oil company anymore. "It's more like a mafia operation," he said.

**UNDER THE RADAR**

There are good reasons Pantin might want to fly under the radar in Miami. Chávez's successor, President Nicolás Maduro, often speaks of South Florida as a breeding ground for coup and assassination plots against him. And those who do business in the community are often painted in state-run media as anti-revolutionary traitors.

A source close to the family says Venezuela's state oil company, which is suffering from plunging global oil prices, has stopped paying the Pantins for past work. It now owes them about $200 million, the source said and Pantin confirmed it.



**Gerardo Pantin Shortt** a Venezuelan oil tycoon with state ties, is quietly funding **Boulevard 57**, an eight-story condo tower slated for the Morningside neighborhood.

MARCO RUIZ mruiz@miamiherald.com

Jaime Guttman, a lawyer for Pantin, said in an email that "personal security" led his client to stay quiet in Venezuela about his involvement in Boulevard 57.

"In Miami, however, he has been public about the project in a low-key manner," Guttman wrote. "He was introduced during the launch gala a couple of months ago. He has met personally with people in the industry, financial institutions, etc. in the Miami area. His involvement is certainly not a secret here."

Boulevard 57 is managed locally by a company called Unitas Development Group. The firm's manager is listed in Florida public records as Javier Sanguino, Pantin's right-hand man, according to the Miami-Dade lawsuit.

Carlos Cuevas — a former partner in the venture who met Pantin when they attended college together in Venezuela — filed the suit last year.

In the suit, Cuevas claims Pantin owes him at least $10 million for work on Boulevard 57. He also said Pantin told him of earning revenues worth $600 million from state oil company contracts between 2004 and 2010.

Cuevas himself is dealing with several lawsuits and a foreclosure. Miami investors currently suing him say he swindled them out of a $300,000 stake in a company called Recyclable Planet. He allegedly used company money to pay for personal expenses such as golf equipment, restaurant meals and a $27,000 Cartier watch.

The allegations are similar to what Pantin says of Cuevas today.

In a legal response to Cuevas' complaint, an attorney representing the oil magnate wrote that Cuevas "through a series of misrepresentations induced Mr. Pantin [who represented a group of investors] to invest" in the Miami condo project.

The lawyer said Cuevas misappropriated corporate funds for his own use and that Cuevas had been removed from the project after allowing it to fall 21 months behind schedule.

Investigative journalist Casto Ocando tweeted that Pantin was backing Boulevard 57 after the Herald published a story on the project earlier this year that didn't mention his involvement. Freelance journalist Alek Boyd has also reported on Pantin's ties to both the Venezuelan government and Miami.

In an interview, Unitas' chief operating officer, Hector Torres, described Pantin's role.

wasn't sure why Pantin's name was left off corporate documents.

Of Cuevas' lawsuit, however, he is certain: "It's extortion. It's a smear job. Cuevas is a con artist."

Carlos Trujillo, Cuevas' attorney, dismissed those claims.

Cuevas, he said, "is a longtime upstanding member of the community whose reputation speaks for itself. Like many business people, Carlos struggled during the economic recession. It doesn't surprise us that Pantin is desperate and is trying to tarnish Carlos' name."

Cuevas initially did not return a message, but after this story was published online wrote in an email: "In the next few months all the truth will come out during the legal process. And we will be able to know who the real con artists are."

**LUXURY HOMES**

Pantin has put his money to work in South Florida.

Property records show that in 2012 a company managed by his associate Sanguino spent $12.9 million on a 9,800-square-foot mansion on Sunset Island I in Miami Beach.

Pantin's name doesn't appear anywhere on the documents. But he told the Miami Herald he is the owner.

Pantin also owns other South Florida properties, including a pair of condos at the Bellini tower on Williams Island in Aventura.

The Aventura condos — bought for $2.75 million in 2013 — are owned by Offshore Services Management, an anonymous shell company registered in the British Virgin Islands. Corporate rules in the Caribbean offshore haven allow owners to stay secret. (The company does not appear in the Panama Papers database.)

In 2014, Miami-based Sabadell United Bank issued Pantin a $9.25 million mortgage for the Sunset Island and Aventura properties. Unitas used those funds as part of a $15 million deal for the 2.1-acre Boulevard 57 site.

Property records also show that last year a Delaware shell company controlled by another Pantin associate, Irisliz Castellano, spent nearly $4.3 million on two condos at the ultra-luxury Mansions at Acqualina in Sunny Isles Beach.

Pantin signed his name to a mortgage document for the homes.

In addition, Pantin paid $1.4 million for a condo at the Millennium Tower in Brickell two years ago, a deed shows. The same day he bought the two-bedroom unit, he transferred it to a Florida company that has been inactive since 2011, according to corporate records.

Secrecy in real estate can be a problem, said Thomas Lehman, a Miami attorney who does work for clients trying to identify the buyers of South Florida condo units.

Lehman said many buyers list addresses that seem to have no actual relation to them. Others list shell companies that don't exist in public records or have been

he said.

In today's slowing market, it might be tough for Boulevard 57 to get off the ground. Sputtering economies in Latin America have dried up the buyer pool that has driven Miami's market since 2011.

Recent reports show luxury home sales across Miami-Dade faltering.

And while residents of Morningside generally support the plans for Boulevard 57, which is scheduled to open in 2018, Pantin's business dealings might change that.

"It does put a sour note on the development," said José Trujillo, who left Venezuela as a child and has lived in Morningside since 2007. "I stay away from gas stations that I know sell gas from Venezuela because of what it stands for."

el Nuevo Herald staff writer Antonio Delgado contributed to this report.

Nicholas Nehamas: 305-376-3745, @NickNehamas



Venezuelan oil tycoon Gerardo Pantin Shortt paid $12.9 million for this mansion on Sunset Island I in Miami Beach. Pantin, whose firm works with Venezuela's socialist government, is quietly backing a $100 million condo project in Miami. JOSÉ A. IGLESIAS JIGLESIAS@ELNUEVOHERALD.COM

💬 COMMENTS ⌄

READ NEXT

TRENDING STORIES

Miami cop called mom to say he didn't feel well. When she got to his home, he was dead.

UPDATED 4 HOURS 48 MINUTES AGO

# Exhibit 12

Case 3:19-cv-08181-JCS Document 32-2 Filed 10/08/20 Page 112 of 125

**The New York Times** | https://nyti.ms/2byqRB6

# Rent-to-Own Homes: A Win-Win for Landlords, a Risk for Struggling Tenants

By Alexandra Stevenson and Matthew Goldstein

Aug. 21, 2016

COLUMBIA, S.C. — Alex Szkaradek is a landlord who seems to have the best of both worlds.

Mr. Szkaradek, 36, collects rent, but he never has to pay for repairs on any of the more than 5,500 homes — many of them rundown — that his firm manages across the country.

The firm, Vision Property Management, blurs the line between what it means to be a renter and a homeowner. These companies do not offer regular leases or mortgages — they offer "rent to own" contracts on homes that require tenants to make all repairs, no matter how big or small.

Mr. Szkaradek says Vision, a leader in the fast-growing market, is bringing the dream of homeownership to Americans who lack good credit or are too poor to qualify for mortgages.

In many communities, housing prices have recovered from the financial crisis. At the bottom end, however, banks have all but stopped making loans for homes worth less than $100,000, leaving millions of people with few options.

But these rent-to-own agreements reside in a gray area of the law. An examination by The New York Times of contracts and court filings, as well as interviews with housing lawyers and more than a dozen of Vision's customers across the country, found that these deals are risky, lack consumer protections and may not be enforceable in some states.

Most tenants walk away with nothing, having sunk money for rent and repairs into homes they had once hoped to own. Others faced surprise evictions, having signed a contract that did not disclose what repairs were needed, yet set a deadline for making sure the home was up to local housing code. As different tenants move in and out of the same property over the course of years, many homes fall further into disrepair.

A recent report from the National Consumer Law Center found similar issues with certain rent-to-own programs, calling them deceptive in nature.

When Donna Thomas signed a lease for a Cincinnati home with Vision, she said she was not told that it had unresolved building code violations and a standing order from the city to remain vacant.

Samuel Rankin thought he was starting fresh when he and his two daughters moved out of a 1970s trailer home into a three-bedroom Vision rental home in Alexander, Ark. But he soon discovered that the house, located just outside Little Rock, had no heat, no water and major problems with its sewage system that led to nearly $10,000 in repairs.

Ms. Thomas's and Mr. Rankin's cases are not isolated, The Times found. It is difficult to measure the size of the rent-to-own housing market. Nobody tracks activity, and few rent-to-own agreements end in actual purchases, so they tend not to be recorded.

Across the country, however, dozens of smaller firms offer to lease cheap homes with options to buy, such as Vision does. Entrepreneurs conduct how-to seminars at conferences for small landlords hoping to strike it rich. And housing lawyers in cities including Detroit, Philadelphia and Columbus, Ohio, say they are seeing an uptick in disputes involving rent-to-own transactions.



Samuel Rankin and his daughters moved into a three-bedroom Vision Property Management rental home in Alexander, Ark. He soon discovered that the house had no heat, no water and major problems with its sewage system that led to nearly $10,000 in repairs.  Jacob Slaton for The New York Times

Several big Wall Street companies like the Blackstone Group and Home Partners of America offer programs through which people can buy the homes they are renting. But those homes are often relatively new or recently renovated, and worth well over $100,000. The deals at the lower end of the market are the ones that worry housing advocates.

"We're seeing an influx in these contracts," said Katarina Karac, a city lawyer for Columbus, who is involved in one case the city has against Vision. "It looks like a landlord-tenant relationship, except instead of having the landlord take care of the property, they are putting that obligation on the tenant," she added.

## Blurred Lines

Every home rented by Vision comes "as is" and has strict contractual terms that require a tenant to pay for any repairs, no matter how big. Renters are given a few months to deal with any outstanding building code violations and to make the homes habitable.

In interviews, as well as in court documents, customers said they were confused by the contracts' terms and requirements, and were not sure whether they were owners or renters.

They signed their leases and put down an initial payment to reserve the right to buy the house. Unlike most typical home purchases, rent-to-own contracts have no requirement to obtain an independent home inspection. The customers contend they were not informed of outstanding issues with Vision homes, many of which the company had bought for $10,000 or less.

Tenants who are evicted during the tenure of these seven-year contracts walk away empty-handed, receiving no credit for money spent on repairs or renovations.

Rent-to-own leases are similar in many ways to contracts for deeds: long-term, high-interest installment contracts that call for the resident to make monthly payments to the seller. Unlike a contract for deed — which typically lasts 30 years, at the end of a Vision contract, tenants still need to find financing to complete the deal. The buyer does not receive legal title to the home until the last payment is made.

Federal and state regulators began looking into seller-financed deals after a front-page article in The Times in February highlighted the resurgence of these transactions. Seven United States senators recently wrote to the Consumer Financial Protection Bureau to express concern over the lack of protections for low-income home buyers.

Still, contract for deeds are at least subject to basic consumer-lending regulations like the Federal Truth in Lending Act, which requires firms to detail how much interest they are charging and how many payments prospective buyers must make before they own the house.

In most states, landlords are required to keep the homes and apartments that they rent in habitable condition. Some legal experts said contracts like the ones used by Vision could violate that requirement.

Cincinnati, for example, has an ordinance that requires rent-to-own landlords to adhere to building, housing and safety codes, as well as to "make all repairs and do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition."

Judith Fox, a professor of law at the University of Notre Dame, said that in most states landlord obligations cannot be waived. "If it's a lease and they are claiming that none of the landlord-tenant obligations apply, then I would argue they have to adhere to federal truth in lending rules."

She added, "You can't have it both ways."

## Implied Equity

Vision, based here, buys homes spread across 24 states through nearly two dozen limited liability companies, all with different names like MI Seven, OH Seven and Kaja Holdings.

The firm advertises its properties on its website, through Craigslist and in handwritten signs posted on the lawns of properties promoting low monthly rents. Negotiations are done via phone or email, and prospective tenants are given a code to a lockbox on the door to inspect properties.

In-depth inspections can be difficult with the power turned off in a home before it is bought, however. Last September, Ms. Thomas signed a lease for a home on McHenry Avenue in Cincinnati that required her to bring the property into a habitable condition within three months. Vision's contract offered to sell her the home for $27,000.

It was only after signing the contract that Ms. Thomas, 38, learned of at least three unaddressed property-code violations and about $5,000 in unpaid fines. She then sought a lawyer to get out of her contract and recover her $600 initial payment.

"It was like pulling teeth to get them to give me $600 of my money back," Ms. Thomas said.

Within days, Vision found another tenant, a couple who moved into the same house. None of the building code violations had been addressed.

Edward Cunningham, a Cincinnati building department official, said the city had issued more than 20 notices to Vision on the property. "Communications have been very poor in this case," he said.

There are $13,250 in unpaid citations on the McHenry home and the city has referred the matter to a collection agency. Vision bought the house from Fannie Mae for $9,300 in 2014.

Mr. Szkaradek, of Vision, said the firm had a small team that worked with municipal officials to address outstanding code violations. In subsequent emails, he said that Vision offered "a full and unconditional refund" to tenants within the first 30 days of a contract and that the firm had consulted with regulatory counsel in drafting its contract.

"Our goal is to put people into houses and turn renters into homeowners," Mr. Szkaradek said during an interview at Vision's offices in a two-story building on the outskirts of Columbia, S.C. He declined to comment on specific cases.

Mr. Szkaradek refers to Vision's seven-year contract as a "hybrid lease" that enables renters to build up "implied equity" with each monthly rent payment. Vision works with clients to help them through the process of managing payments, he said.

Donna Thomas, seen here babysitting, said she was not told that her home, which was leased from Vision Property, had a standing order from the city to remain vacant. Andrew Spear for The New York Times

Vision, which does not provide financing for tenants to buy homes, pointed to Mr. Rankin as one client it has worked with to help make a home livable.

In October, Mr. Rankin moved into his home after signing a contract that valued the three-bedroom house at $38,000. There was no carpeting and no linoleum on the floors, and the walls were covered with what Mr. Rankin described as a tar-like substance. These issues seemed easily fixable, though, Mr. Rankin said, because he runs his own flooring company.

But not even a craftsman like Mr. Rankin was prepared for the biggest problem with the house: a condemned septic tank that the local water department said needed to be upgraded.

The cost to install a new sewerage system was more than $8,000, Mr. Rankin said. Vision helped him find a contractor to make the repairs, but it rolled the cost into a new contract that revalued the purchase price of the home to $60,000 and increased his monthly costs by $65, to $470 a month.

"Financially, they kind of stuck it to me," Mr. Rankin said. But, he added, "when you don't have any options and someone is willing to work with you, it's really a blessing."

Vision paid $10,760 to the Department of Housing and Urban Development for the house last July.

## Cheap Homes

"If you're doubling your money off of people who are scraping by and you're taking advantage of their vulnerability to enrich yourself, that is being predatory," said Beryl Satter, the author of the 2009 book "Family Properties," which chronicled the exploitation of black homeowners in Chicago.

Nearly half of Vision's homes were bought from Fannie Mae, the government-backed mortgage firm, according to RealtyTrac.

A number of tenants and former tenants interviewed said they had hoped to buy homes from Vision either by ultimately getting a mortgage or saving cash to buy a home outright. But other tenants expressed concern they would end up losing the home.

That is what happened to Heidi Anderson, 45, whose two children and partner moved into a Vision house in Vassar, Mich., last fall. They spent the winter months without heat because the furnace had been submerged in water and no longer worked. The only thing they had to keep warm during a cold Michigan winter, she said, was an electric heater and a wood-burning stove in the kitchen.

Ms. Anderson said she called Vision several times about the furnace, but nobody got back to her, so she stopped paying rent. In February, Vision filed a nonpayment proceeding, seeking the family's eviction and $3,100 in overdue rent. She sent a check to Vision, she added, but the company returned it, saying it was late.

Case 3:19-cv-08181-JCS Document 32-2 Filed 10/08/20 Page 116 of 125

Days before Memorial Day weekend, the family moved out, before the formal eviction. They have since moved into another nearby home through a contract-for-deed deal. It was the best option available because, Ms. Anderson said, she still could not qualify for a mortgage.

"There is a little bit of work, but mostly it's cosmetic," she said. "The furnace works."

# Exhibit 13

# Examining Wedgewood: A Look at the Home-Flipping Giant in Battle With Homeless Mothers

**nbcbayarea.com**/investigations/examining-wedgewood-a-look-at-the-home-flipping-giant-in-battle-with-homeless-mothers/2208119

## The West Oakland home seized by the mothers from Moms4Housing is one of more than 120 Bay Area properties currently owned by Wedgewood Inc.



*Google Maps and Sean Myers/NBC Bay Area*
Wedgewood owned at least 125 properties across eight Bay Area counties through its network of LLCs as of December 2019, according to an NBC Bay Area review of assessor and recorder records.

Southern California home-flipping giant Wedgewood Inc. was thrust into the spotlight last month when homeless mothers from Moms4Housing began squatting in a vacant West Oakland home owned by the company and refused to leave. It's an unusual situation for Wedgewood, which until recently, had received little public attention or scrutiny in Northern California.

Attorneys representing Moms4Housing argued in Alameda County Superior Court on Monday that housing is a human right and the mothers should be allowed to stay because of the ongoing homelessness crisis in Oakland. Judge Patrick McKinney is expected to release a ruling in the coming days.

1/5

While all eyes are focused on the battle for control of the three-bedroom home on Magnolia Street, scant attention has been paid to Wedgewood's other activity in the region, which has faced legal challenges from tenants and opposition from housing advocates.

An NBC Bay Area analysis of property records and legal filings revealed Wedgewood's Bay Area real-estate portfolio is far more extensive than the Magnolia Street home they purchased out of foreclosure in August. The home represents less than one percent of Wedgewood's Bay Area holdings, and a much smaller fraction of what the company owns nationally.

Determining the extent of Wedgewood's property ownership in the Bay Area and elsewhere is difficult because the company conducts business through a sprawling network of LLCs, such as Catamount Properties 2018, LLC, which owns the home currently occupied by the homeless mothers.

But Catamount Properties 2018 is just one of 98 active LLCs NBC Bay Area traced back to Wedgewood using secretary of state business filings and a database of property records from Santa Clara County and San Mateo County. While the LLCs have different names, they share one common characteristic connecting them to Wedgewood: The mailing address of the company's Redondo Beach headquarters.

Wedgewood currently owns at least 125 properties across eight Bay Area counties through its network of LLCs, according to a review of assessor and recorder records. That tally doesn't include any properties the company might own in Solano County, which said it could not provide ownership records over the phone. It's also possible there are additional LLCs tied to the company not identified in NBC Bay Area's search.

Of those 98 active LLCs, 31 Wedgewood entities appear to have owned property in Bay Area counties since 2015, according to assessor and recorder records. The other entities appear to perform separate functions for the vertically integrated company.

But the current count of Wedgewood's properties doesn't accurately portray the scope of the company's Bay Area operation. Its business model, centered around buying, fixing, and quickly flipping homes, means Wedgewood rarely holds onto homes for long. Although the Magnolia Street home was vacant when the homeless mothers took it over in November, Wedgewood had just purchased the home in August and said it planned to fix and sell the home soon.

Deed records from counties across California reveal thousands of property transactions over the past five years. Although these records confirm activity in a given area, there may be multiple transactions for a single purchase or sale.

The Wedgewood LLCs identified by NBC Bay Area show up more than 220 separate times

since 2015 in Solano County deed records, 726 times in Kern County deed records, and 926 times in San Bernardino County deed records.

And that's just California. In Dallas County, Texas, for example, there were more than 544 deed records tied to Wedgewood LLCs since 2016, and more than twice that in Broward County, Florida. Catamount Properties 2018, LLC is currently registered in 18 different states, according to state business records.

"That kind of speculative activity drives up the cost of housing," said Amy Inglis, a program director at Tenants Together, a San Francisco-based non-profit tenant advocacy group.

Although corporate acquisition of foreclosed properties has slowed significantly since the peak of the foreclosure crisis, Inglis said the practice continues, and it can lead to the displacement of tenants renting homes that went into foreclosure.

"Corporations were buying up homes in foreclosure and many of those homes were already rented," Inglis said. "By the end of the crisis, we saw from our count at least a million tenants in California were displaced by that activity of new owners coming in and giving tenants an eviction notice instead of allowing them to stay, and then flipping the properties."

In response to NBC Bay Area's request for comment, a representative for Wedgewood said:

> The Company acquires a large number of distressed properties on a regular basis, the vast majority of which are occupied by the prior owners, whom **their** lender foreclosed upon. In some instances, the properties are non-owner occupied and, in those instances, to the extent the occupant is legally entitled to remain in the property, Wedgewood honors that right and allows them to stay for the duration of their lease or other entitlement. Wedgewood always follows all legal requirements in connection with its efforts to obtain possession of the properties it purchases.
>
> *Sam Singer, spokesman for Wedgewood*

A search of court filings in four counties where Wedgewood has owned property revealed more than 300 lawsuits since 2015 that involve the company, mostly unlawful detainers in which the company was attempting to evict a tenant or former owners living in a home it recently purchased.

In San Bernardino County alone, Wedgewood has been a party in 275 lawsuits since 2015, the majority of which were unlawful detainers.

"They basically get properties that people are living in and then their job is to evict them," said Leah Simon-Weisberg, Legal Director for Alliance of Californians for Community Empowerment (ACCE). Simon-Weisberg is handling the eviction defense for the homeless

mothers occupying the Magnolia Street home.

The moms did not inhabit the home nor own the property when Wedgewood bought it in August. Thus the dispute differs from other lawsuits involving Wedgewood where legal action was taken against the prior owner or existing tenant of a property at the time it was purchased by the company.

"It's almost like they're an eviction machine as much as anything else. That's what they're selling. They get the properties, kick people out, and sell them empty," Simon-Weisberg said.

In San Francisco, a city with strong tenant protection laws, Wedgewood was accused on three separate occasions since 2016 of wrongfully evicting tenants renting foreclosed properties the company had recently purchased.

In a 2016 lawsuit, plaintiff Maria Hernandez sued Wedgwood for wrongfully evicting her from a home she'd rented for years. The lawsuit alleged an agent for Wedgewood used illegal tactics to get her out of the home once she refused a small buyout.

"Defendant Wedgewood has directed its employees and its agents to aggressively clear out foreclosed homes, while concomitantly directing its employees and agents to refrain from repairing the substandard conditions within these properties until all occupants have been vacated and/or been forced to vacate," the complaint stated. "Where such pressure tactics are unsuccessful, Defendant Wedgewood's eviction department assigns these tenant-occupied properties to local eviction attorneys who uniformly commence "no cause" post-foreclosure eviction proceedings that illegally circumvent the just cause eviction protections."

At the time, Wedgewood denied each allegation in a written response to the court.

Two of the wrongful eviction lawsuits in San Francisco reviewed by NBC Bay Area were settled for undisclosed amounts. One remains active.

In response to NBC Bay Area's inquiry about the cases, a representative for the company said, "The two cases that were settled have confidentiality provisions that limit Wedgewood's ability to respond beyond saying 'the matter was resolved.'"

Although the West Oakland house was vacant when the Moms4Housing mothers  seized the property, they did so without permission from Wedgewood. Now the company is in a legal fight to evict them.

Wedgewood has served an eviction notice to the Moms4Housing mothers and a favorable ruling for Wedgewood in Alameda County court could lead to removal of the moms.

Meanwhile, Oakland City Councilmembers Rebecca Kaplan and Nikki Fortunato Bas have demanded that Wedgewood negotiate to sell or give the property to the women.

CCPA Notice

## Weather Forecast

San Jose, CA

91°

Smoke

0% Precip

Tonight
62°

Tomorrow
91°

Copyright © 2020 NBCUniversal Media, LLC. All rights reserved

Close Menu



# Exhibit 14

# Civil rights groups accuse real estate firm of preying on poor homeowners

cbsnews.com/news/fair-housing-lawsuits-vision-property-michigan

Leading civil rights groups are accusing a Michigan real estate firm that bought and resold dilapidated houses in the state of misleading mostly low-income homebuyers about the properties' condition.

In a class-action lawsuit filed this week, lawyers for the NAACP and American Civil Liberties Union allege that Vision Property Management violated fair housing, consumer protection and civil rights laws, claiming that the firm targeted people "who had been unable to obtain the dream of homeownership." The houses Vision purchased are in predominantly Black neighborhoods in Detroit, Flint and Inkster.

More specifically, the suit alleges that Vision misled potential homebuyers into believing they could purchase a home through a seven-year contract when in reality the company was ensnaring them in 20- to 30-year payment plans. As a result, the plaintiffs' lawyers argue, some homebuyers were shocked to discover that the payments they had been making for years were only for interest and hadn't made a dent in the principal balance.

"Some homebuyers recalled being told that, after 84 payments, the house would be theirs and that they would have the deed to the property free and clear after seven years," the ACLU said in court documents. "Others recalled that Vision's sales pitch made them believe their full monthly payment was going toward the purchase price and that they would have finished paying for the home by the seven-year mark."



Efforts to contact a spokesperson at Vision were unsuccessful. FTE Networks, a New York-based real estate investment company, bought Vision last December. FTE Networks did not respond to a request for comment.

## Poorly maintained homes

The suit said many homes Vision sold had "torn-out electrical wiring, missing or non-functioning appliances, missing or damaged plumbing, missing toilets" and other problems — defects that allegedly were kept hidden from homebuyers.

### Trending News

- $2.2 trillion HEROES Act would provide second stimulus check
- House passes COVID relief bill, but it's unlikely to pass Senate

- <u>Nearly 20,000 Amazon workers tested positive for COVID-19</u>
- <u>Amazon, eBay block sales of items with "stand back" and "stand by"</u>

"Some homes have floors that are collapsing or roofs that leak badly," the ACLU said. "Many have raw sewage backing up in the home because of plumbing lines in need of a significant overhaul."

Vision's business practices drew national attention four years ago when a Baltimore family suffered lead poisoning while living in a house owned by the firm. The following year, the late U.S. House Rep. Elijah Cummings pushed for an investigation and <u>asked</u> Vision how many other homes it owned in Baltimore. A subsequent probe found that Vision had bought thousands of foreclosed homes from Fannie Mae.

Fannie Mae later announced it would <u>stop</u> selling homes to Vision.

Vision also came under fire last year when New York state officials <u>sued</u> the company, alleging similar predatory business practices. Attorney General Letitia James <u>said</u> Vision "trapped New Yorkers in mold-infested, dilapidated homes and wrongfully placed the onus on consumers to pay the price."

The company later settled for $600,000 and gave deeds to the families living in the Vision-owned homes. Vision also has settled fair housing lawsuits against accusers in <u>Ohio</u> and <u>Wisconsin</u> as well.