D. Victoria Baranetsky (Cal. Bar No. 311892)
THE CENTER FOR INVESTIGATIVE
REPORTING
1400 65th St., Suite 200
Emeryville, CA 94608
vbaranetsky@revealnews.org
Telephone: (510) 982-2890

Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and AARON GLANTZ<br><br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE TREASURY,<br><br>    Defendant. | Civil Action No. 3:19-cv-08181-JCS |

**DECLARATION OF LEILANI FARHA**

I, Leilani Farha, declare as follows:

1. I am an international human rights lawyer and world-renowned expert in the area of the human right to housing. Currently, I am the Global Director of The Shift – an international organization focused on the right to housing. Previously, I served as the United Nations Special Rapporteur on the right to housing for six years (2014-2020). Special Rapporteur mandates are part of the special procedures of the United Nations Human Rights Council. There are 55 Special

Rapporteurs and independent experts covering a wide range of thematic issues and country-specific situations.

2.       As UN Rapporteur, I travelled to countries and cities in every region of the world including India, Egypt, Chile, Portugal, Serbia, South Korea, New Zealand, Spain, Ireland, Indonesia, Philippines, and the United States. In these places I assessed governments' compliance with international human rights obligations in the area of housing. I met regularly with government officials at all levels, with private bar lawyers, judges, human rights institutions, and other civil society actors.

3.       As Special Rapporteur I wrote 13 thematic reports on a variety of topics including on the financialization of housing; homelessness; the international human rights obligations of sub-national governments; and the connection between the right to housing and the right to life. These reports were presented to member States of the UN General Assembly and the UN Human Rights Council. In my capacity as Rapporteur I also engaged governments in dialogue on matters related to the right to housing through formal communications protocols.

4.       Much of my research and publications in the last four years has centered on the role and impact of private equity firms and institutional investors in residential real estate. Beyond writing a groundbreaking thematic report on this topic, I have had a number of opinion pieces published on this topic including in The Guardian, Thomson Reuters, and the Globe and Mail. I am also the central character in PUSH, a documentary film recently released in more than 50 countries including the US, on this topic and I co-host a weekly Podcast, PUSHBACK Talks, listened to in more than 85 countries, also on this topic. My expertise in the area of the financialization of residential real estate is widely recognized and called upon.

5. Between 2002 and 2013 I was the Executive Director of a human rights organization, the Centre for Equality Rights in Accommodation. Between 2012 and 2020 I was the Executive Director of a national organization, Canada Without Poverty.

6. Public disclosure of information involving beneficial owners is a common practice within the legal systems of many countries worldwide. Although providing greater transparency over beneficial ownership is a relatively novel phenomenon, the registration of beneficial owners and disclosure of their corporate data is quickly becoming the new international legal standard.

7. Over fifty countries, including members of the European Union (EU) and G-20 countries, have adopted new legislation or amended existing legislation to ensure that beneficial ownership information is legally required to be disclosed to the public. The Financial Action Taskforce (FATF) provides several guidelines and best practices with respect to beneficial ownership and transparency. Since 2012, over 198 jurisdictions have committed to implementing the FATF's standards on beneficial ownership into their own legal systems.[1]

8. States that regulate the issue of beneficial ownership do so through company laws, company registration rules, regulations implementing EU directives or anti-money laundering legislation.[2]

9. Many countries require a company to report information on beneficial owners to state or local authorities; this is generally administered by a designated national institution such as a business registrar, national tax authority, securities regulator, securities exchange or local court.

10. In recent years, the EU in particular has been increasingly committed to ensuring Member States collect and monitor information about beneficial ownership to prevent money laundering, terrorist financing and other criminal activity.

---

[1] http://www.fatf-gafi.org/media/fatf/documents/reports/G20-Beneficial-Ownership-Sept-2016.pdf
[2] https://www.loc.gov/law/help/beneficial-ownership/disclosure-beneficial-ownership.pdf

11. In May 2018, the EU adopted the Fifth Anti-Money Laundering Directive, which required Member States to create national registers of beneficial ownership information for corporate and other legal entities that are incorporated within their jurisdictions.[3] Several Member States such as Italy, Germany and Spain allow any person or organization that demonstrates a legitimate interest in the information to have immediate access to it.

12. Argentina, the United Kingdom and Sweden are examples of jurisdictions that provide significant transparency with respect to the disclosure of beneficial owner information. In Argentina, the Unidad de Informacion Financiera-Minsterio de Justicia y Derechos Humanos de la Nación (Financial Information Unit – Ministry of Justice and Human Rights) is the institution authorized to collect beneficial owner information at a national level. Under Argentinian law, a beneficial owner is considered to be any individual holding at least 20% of the capital or voting rights in a legal entity, or that by other means exercises final direct or indirect control over any legal entity.[4] The information is required to be updated yearly and is open to the public upon written request, except with respect to stock companies.

13. In the United Kingdom, the Companies House is the institution that manages the country's Central Public Register. This Register is publicly accessible and contains information about persons with "significant control" of a company or that have the right to exercise direct or indirect influence over a company, trust or firm.[5]

14. In Sweden, the Bolagsverket (Swedish Companies Registration Office) provides free public access to its Public Register. It is required that any information maintained by a

---

[3] https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32018L0843&from=EN
[4] https://www.loc.gov/law/help/beneficial-ownership/disclosure-beneficial-ownership.pdf
[5] https://www.loc.gov/law/help/beneficial-ownership/disclosure-beneficial-ownership.pdf

beneficial owner must be available for inspection by any agency or private entity that needs access at any time.[6]

15. The province of British Columbia in Canada has also adopted similar beneficial owner legislation. In 2019, it passed a law titled the *Land Owner Transparency Act* (LOTA) to address the issue of hidden ownership in real estate. The LOTA requires disclosure of individuals, such as corporations, partners or trustees, that hold a direct or indirect beneficial interest in land within the province.[7] Beginning in November 2020, when an individual wishes to register an interest in land in the British Columbia land title register, a transparency declaration must be filed to the LOTA Administrator by each land transferee. The transparency declaration states whether the transferee is a reporting body, and if it is, whether thee reporting body is a relevant corporation, trustee or partner.[8] The statute also mandates that a publicly searchable registry is to be created in order to provide access to primary identification information with respect to interest holders and reporting bodies.

16. The public disclosure of beneficial ownership is in the public interest. Identifying the individuals behind transactions is widely regarded to be a key deterrent to money laundering and terrorism financing. The Panama Papers, Paradise Papers and the recent Cyprus Papers reveal the ease with which corporations can be used to evade taxes or hide money derived from criminal activity. When beneficial ownership data is accessible to the public, civil society organizations, and investigative journalists, for example, law enforcement and other relevant parties are better able to identify criminal activity. Journalists in countries such as Mexico and South Africa have been able to use publicly available beneficial owner information to identify and report corporations

---

[6] https://www.loc.gov/law/help/beneficial-ownership/disclosure-beneficial-ownership.pdf
[7] https://landtransparency.ca/
[8] https://landtransparency.ca/

who are suspected of engaging in illegal activity. Similarly, in Slovakia, the media and national watchdog organizations were able to use public company ownership information to flag a corporation that was winning several lucrative government contracts, later resulting in the Public Procurement Office issuing a fine.[9]

17.     Increasing transparency of beneficial owner information also serves to prevent tax evasion and improve tax agencies' ability to enforce tax laws. Shell corporations deprive national treasuries of billions of dollars in tax revenues, hinder asset recovery and add significant costs to law enforcement. Both the European Commission and the UK government conducted cost-benefit analyses and found that beneficial ownership registries could save significant amounts of public tax dollars; the UK study determined that at least £30 million would be saved every year in police time alone, which would outweigh any additional costs that would be incurred from creating a public beneficial ownership registry.[10] With respect to African countries, both the UN and the African Union estimate that countries across the continent could gain approximately $50 billion USD annually by preventing illegal financial outflows that are facilitated by anonymous shell companies.[11]

18.     There is minimal evidence to support the assertion that disclosure of beneficial owner information impedes law enforcement initiatives. In fact, anonymous companies are more often an obstacle for law enforcement. If beneficial ownership data is made readily available to the public, it will expedite the process through which law enforcement authorities gather information about these individuals and it is less likely individuals engaged in illicit activity will

---

[9] https://www.opengovpartnership.org/wp-content/uploads/2019/05/Global-Report_Beneficial-Ownership.pdf
[10] https://static1.squarespace.com/static/5df7c3de2e4d3d3fce16c185/t/5dfb8a955179d73d7b758a98/1576766126189/no-reason-to-hide.pdf
[11] https://www.opengovpartnership.org/wp-content/uploads/2019/05/Global-Report_Beneficial-Ownership.pdf

be tipped off about police investigations.[12] Additionally, having beneficial owner information be publicly accessible acts as an effective deterrence mechanism because it makes it more difficult for individuals to hide any illicit activity, as well as the fact that transparency allows for greater accountability and disincentivizes illegal behavior.

19.     In the area of residential real estate, into which criminal money is often invested, it is particularly important for tenants to be able to identify who owns the property in which they reside. Because access to adequate housing is a significant determinant of health and well-being, tenants must be able to hold property owners accountable for deficiencies. Also, Tenants who run into difficulties within their tenancy such as harassment by another tenant or a crisis resulting in rental arrears may wish to speak directly to the beneficial owner of the unit for more personalized assistance.

20.     I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief.

Executed October 5, 2020 in Washington, D.C..

_/s/_ _Leilani Farha_
Leilani Farha

---

[12] https://static1.squarespace.com/static/5df7c3de2e4d3d3fce16c185/t/5dfb8a955179d73d7b758a98/1576766126189/no-reason-to-hide.pdf